**BILLY J. WILLIAMS, OSB #901366**
United States Attorney
District of Oregon
**STUART A. WEXLER**
Trial Attorney, Tax Division
Stuart.A.Wexler@usdoj.gov
**LEE F. LANGSTON**
Trial Attorney, Tax Division
Lee.F.Langston@usdoj.gov
1000 SW Third Ave, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **3:15-cr-00438-JO** |
| **Plaintiff,** | **GOVERNMENT'S SENTENCING MEMORANDUM** |
| **v.** | |
| **WINSTON SHROUT,** | |
| **Defendant.** | |

The United States of America, by and through Billy J. Williams, United States Attorney

for the District of Oregon, and Stuart A. Wexler and Lee F. Langston, Trial Attorneys, Tax

Division, respectfully submits this memorandum to assist the Court in sentencing the defendant.

### I.    Government's Recommendation

The United States recommends a sentence in this case of at least twenty years

imprisonment (240 months), which represents a sentence *below* the advisory Guidelines range

and appropriately accounts for each of the statutory factors set forth in Title 18, United States

Code, Section 3553(a), including consistency with similar sentences for similar conduct. *See* Section VI.D.i., *infra*.

The government further recommends a period of five (5) years of supervised release, with special release conditions that immediately bar the defendant from (1) participating, in any manner, in any seminar, class, video or audio podcast, educational forum, or lecture regarding federal taxation or the use or creation of financial instruments; (2) publishing or selling any text or document advising or counseling others regarding federal taxation or the use or creation of financial instruments; and (3) assisting, advising, or counseling others in the preparation of federal or state tax returns of any type or the use or creation of financial instruments of any type. Finally, the defendant should be ordered to pay restitution of $191,226.10 to the Internal Revenue Service.

This is a case of pure fraud.  Defendant Winston Shrout masterminded and orchestrated a scheme to defraud the United States and financial institutions that spanned many years and multiple jurisdictions.  He blatantly created fictitious financial instruments and used them in a nefarious and egregious scheme to defraud financial institutions and the federal government out of trillions of dollars.

Defendant Shrout also made hundreds of thousands of dollars peddling this scheme through seminars, videos and materials, yet never filed a single tax return nor paid a single penny in tax on any of his income for over at least ten years.  He traveled the country and the world promoting his "technology" as a way to eliminate debt and pay taxes, mortgages, credit cards, and more.  The defendant, therefore, not only defrauded the United States and financial institutions, he preyed on many people facing tough financial times looking for a way to eliminate their debt without paying it and sold them a bill of goods that they were all-too-willing

to take at face value.  Additionally, some of his clients - who knew full well the defendant was peddling a fraudulent scheme and hoped it would help *them* fool the system - went to prison as a result of the defendant's teachings.  The defendant admitted these acts through his own trial testimony and the jury found his excuses unbelievable and lacking.  The defendant did not act in good faith that his actions were somehow legal but, rather, out of greed and disdain for both the law and institutions he sought to victimize.  The crimes for which the defendant was convicted are serious criminal offenses, the defendant has not shown an ounce of remorse for his criminal conduct, and he has consistently demonstrated a flat-out refusal to admit that he is bound by federal law.

## II.   **Procedural Posture**

On March 15, 2016, a federal grand jury in Portland returned a superseding indictment charging the defendant with 13 counts of making, presenting, and mailing fictitious financial instruments, in violation of 18 U.S.C § 514, and six counts of willfully failing to file income tax returns, in violation of 26 U.S.C. § 7203.

Trial began on April 18, 2017.  The jury convicted the defendant on all counts four days later.  The Court originally set sentencing for August 1, 2017, but reset to May 17, 2018.

On April 16, 2018, the defendant filed a Motion for Hearing to Determine Mental Competency.  The Court conducted a hearing on September 27, 2018, and held that the defendant was competent to understand the nature and consequences of the proceedings against him and to assist defense counsel properly at sentencing.  As a result, the Court set sentencing in this case for October 22, 2018.

/ / /

/ / /

III.  **Offense Conduct**

The final Presentence Report provides an accurate summary of the offense conduct as proven at trial. For the sake of efficiency, the government would refer the Court to the PSR, the trial transcripts, and trial evidence for a detailed review of the facts of the case.  The Government, however, would highlight the following for the Court:

A. *Defendant's Lengthy and Insidious Scheme*

Defendant Shrout's offense conduct spanned at least ten years, per the superseding indictment, and approximately twenty years per the defendant's admissions. *See* Tr. at 421, ln. 24-25 ("So I stopped paying income tax, and I stopped filing for income tax returns. That's been well over 20 years ago."); 446, ln. 2-3 (". . . I have done that for over 20 years."). This is a lengthy period of specific offense conduct targeted at defrauding financial institutions and the federal government.  The defendant also spent a significant amount of time beginning in at least February 2008 promoting and marketing the use of fictitious financial instruments and other means to defraud various entities.  While not specifically charged with *promoting* the use of fictitious financial instruments in this manner, the evidence presented at trial goes to prove both the extent of the defendant's scheme and his intent and knowledge concerning the fraudulent nature of that scheme.  The defendant used seminars, one-on-one coaching sessions, and for-sale products and seminar recordings, to teach others how to create documents that purported to be financial instruments and how to submit such documents to attempt to pay off existing debts. The defendant utilized a legitimate-sounding business name – "Winston Shrout Solutions in Commerce" ("WSSIC") – to market and brand his products and services, and maintained a website for those purposes (the defendant, in fact, maintained and operated that website up to

and including the day of his competency hearing, nearly fifteen months after he was convicted in this case).

The defendant did not limit his promotion of these fraudulent financial instruments to one seminar. Evidence presented at trial proved the defendant taught his scheme at numerous seminars, around the world, between February 2008 and June 2012. In addition, the defendant provided one-on-one coaching to clients during roughly that same timeframe. The defendant charged significant fees for attending a WSSIC seminar and for his private coaching services. He packaged recordings of his seminars together with various materials, such as document templates and instructions, and sold those through his website and the mail.

The defendant's seminar instruction was far from unequivocal and demonstrates its insidious nature. As presented at trial, the defendant frequently peppered his talks with various warnings and slips-of-the-tongue that revealed the fraudulent nature of his scheme. *See* Trial Exhibits 15-7 through 15-13. It's clear from his own words that the defendant was making this up as he went along, continuously trying to arrive at the right combination that would unlock the vaults of the U.S. Treasury and banks around the world. By teaching the scheme at seminars, the defendant was simply attempting to get "more people around him" utilizing his approach, so that he himself could "find a little better success." *See* Trial Exhibit 15-10 ("So if you're the only guy or gal in your community that is pressing these issues, you're going to have a little bit of a problem. If you get more people around you starting to press these issues, then I think you're going to find a little bit better success.")

The combined effect of these statements is that the defendant maintained a persistent and deep-rooted disregard for the law and a strong tendency toward hucksterism. Over the course of many years, his scheme was aimed at developing an army of clients equipped with the tools and

the words to defraud commercial entities, financial institutions, and the United States government.  His cautionary statements during seminars were not focused on the illegality of what he was teaching but, rather, how his clients could ensure they were not caught.  They reveal the defendant's true intent: fraud.

**B.  *American Metro Bank***

During the course of trial, the jury heard the testimony of Mr. Bill McGrath, former Vice President, Cashier, and Bank Security Act officer of American Metro Bank ("AMB") in Chicago, Illinois.  Mr. McGrath testified that he reviewed approximately 1,000 International Bills of Exchange ("IBOEs") sent to the bank by the defendant on behalf of MGH, an entity that AMB executives then-believed was a serious potential investor in the bank and in which the defendant held an executive position. *See* Trial Exhibit 11-16, pg. 2-4.

While each IBOE purported to be worth $1 trillion and Mr. McGrath concluded the documents were fictitious, the defendant was clear in his testimony that he sent them to AMB hoping they would be honored and that he would receive some financial benefit in the exchange. Further, Mr. McGrath testified that the IBOEs did not arrive in a vacuum; the bank received other corporate and identification documents that purported to legitimize the exchange.  Mr. McGrath's diligence uncovered the fraud, but the defendant's scheme was no less criminal because it failed.

**C.  *The Non–Negotiable Bill of Exchange***

In June 2015, the defendant mailed a different type of fictitious financial instrument to the United States Treasury.  This fictitious instrument purported to be worth $1.9 billion, was titled "Non-Negotiable Bill of Exchange" ("NBOE") and bore a striking resemblance to the NBOE that the defendant helped S/A Morini make in late-2009. *See* Tr. at 98 – 100.  The NBOE

contained a "Stub," which appeared to be detachable.  The jury heard evidence from one of the defendant's seminars that the defendant created this "stub" to give the document more credibility.

The defendant admitted he mailed the fictitious instrument to the Treasury with several other documents and a note, which stated, "Please adjust this account Thx WS."  While different in form from the defendant's IBOE scheme, there is no difference in substance: the defendant created a fictitious financial instrument that he sent to an unsuspecting authority intending to receive significant financial benefit in the exchange.  As the video clips from the defendant's seminars demonstrated, this conduct was representative of what he had been teaching to his clients for years.

### D. *Willful Failure to File*

The government also proved at trial that from 2009 through 2014 the defendant received over $500,000 in gross income, yet never filed a single tax return.  In fact, the defendant admitted as much during his direct testimony. *See* Tr. at 421, ln. 24-25. ("So I stopped paying income tax, and I stopped filing for income tax returns. That's been well over 20 years ago.").[1]

While the defendant was coy as to what he termed income and from where such income derived, the government proved at trial that the defendant received income during the 2009 through 2014 tax years through pension payments, for speaking at various seminars, and as royalty payments associated with the sale of DVDs and other products related to his seminars. The approximate income amounts, their sources, and to which tax year they apply, were detailed for the jury and are re-presented in the following chart:

/ / /

---

[1]    While the defendant was not specifically charged for the full extent of this illegal activity, it is clearly relevant to his other conduct at issue in this case.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                                    **Page 7**

| Source of Income | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| Pension Income | $15,018 | $15,018 | $15,018 | $15,018 | $15,018 | $15,018 |
| Speaking Fees | $6,614 | $36,600 | $56,297 | $58,120 | $56,216 | $27,500 |
| Royalty Payments | $50,785 | $5,000 | $13,000 | $7,500 | $0 | $28,839 |
| PayPal Income | N/A | N/A | N/A | N/A | N/A | $123,263 |
| Square Income | N/A | N/A | N/A | N/A | N/A | $2,652 |
| **Total Gross Income** | **$72,417** | **$56,618** | **$84,315** | **$80,638** | **$71,234** | **$197,272** |

Significantly, the government proved at trial that the defendant received his speaking fees and royalty payments for seminars and products through which he advised and instructed individuals regarding the creation of fictitious financial instruments and other various financial theories and methods that purported to assist individuals with paying off their debts. The government further proved that some of the defendant's income related to "personal coaching," through which the defendant would provide specific one-on-one assistance to individuals for a fee.

## IV.    Sentencing Procedure Generally

The advisory sentencing guidelines serve as the initial benchmark in every sentencing proceeding, *Gall v. United States*, 552 U.S. 38, 39 (2007), and "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *United States v. Rita*, 551 U.S. 338, 350 (2007).

In *United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) (en banc), the Ninth Circuit summarized the procedures a sentencing court must follow. The court must first correctly determine the applicable guideline range. *Id.* at 991. The court must also allow the parties to "argue for a sentence they believe is appropriate," and must "consider the § 3553(a) factors to decide if they support the sentence suggested by the parties." *Id.* The court may not presume the guidelines are reasonable, and should not give them any more or any less weight than any other

factor. *Id*. The court "must make an individualized determination based on the facts," and must explain its choice of sentence "sufficiently to permit meaningful appellate review." *Id.* at 991-92.

The statutory sentencing factors include the nature, circumstances, and seriousness of the offense, the defendant's history and characteristics, the need to provide just punishment and adequate deterrence, the need to promote respect for the law, and the need to protect the public from further crimes committed by the defendant. *See* 18 U.S.C. §§ 3553(a)(1)-(2). They also include "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

## V.    Advisory Sentencing Guidelines Calculation

As noted *supra*, the first step in determining the defendant's sentence is to correctly determine the applicable guideline range. *Carty*, 520 F.3d at 991.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. *Gall*, 552 U.S. at 49.

### A.  *Base Offense Level*

The PSR correctly groups counts 1-19 for guideline calculation purposes. U.S.S.G. § 3D1.2(d). The PSR also properly calculates the base offense level of seven (7) in this case pursuant to U.S.S.G. § 2B1.1.

Violations of 18 U.S.C. § 514 are classified as Class B felonies under 18 U.S.C. § 3559. Therefore, a sentence of probation may not be imposed. 18 U.S.C. § 3561(a)(1); U.S.S.G. § 5B1.1(b).

### B.  *Adjustments to the Base Offense Level*

Having determined the base offense level, the Court should proceed to determine whether that offense level should be adjusted, up or down, based on additional factors and specific

offense characteristics. In this case, the defendant's sentence should be enhanced for two separate specific offense characteristics: relevant conduct and sophisticated means. Additionally, the defendant's sentence should not be reduced for acceptance of responsibility.

### Loss Attributable to Counts of Conviction and Relevant Conduct

The base offense level, as recommended in the PSR, should be increased by 30 levels based on an intended loss in excess of $550,000,000. The defendant produced and issued more than 300 fictitious financial instruments purporting to be worth in excess of $100 trillion dollars. Per the Guidelines, the offense level is determined based on the aggregate amount of fictitious financial instruments produced, presented or mailed by the defendant as reflected in the counts of conviction,[2] including "all acts and omissions committed. . . or willfully caused" by him, § 1B1.3(a)(1)(A), as well as "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense[s] of conviction." U.S.S.G. § 1B1.3(2); *see also* U.S.S.G. § 3D1.2(d). The Court may consider "[c]onduct that is not formally charged or is not an element of the offense of conviction," including "uncharged and unadjudicated conduct." U.S.S.G. § 1B1.3 cmt. Background; *United States v. Williamson*, 439 F.3d 1125, 1138-39 (9th Cir. 2006).

Offenses are part of the "same course of conduct" if they "are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses," taking into account factors such as "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses." U.S.S.G. § 1B1.3 cmt. n.9. The Ninth Circuit has long held that "the essential components of the

---

[2]    The aggregated actual loss associated with the defendant's willful failure to file tax returns from 2009-2014, as discussed *infra*, should also be part of this calculation. Based on the large sums reflected in the fictitious financial instruments, however, the failure to file loss is somewhat subsumed by the fictitious instrument loss when calculating offense level.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                                    **Page 10**

section 1B1.3(a)(2) analysis are similarity, regularity, and temporal proximity." *United States v. Hahn*, 960 F.2d 903, 910 (9th Cir. 1992).

As a starting point, even if the defendant's conduct is simply limited to those fictitious instruments charged in the Superseding Indictment, the purported value of those instruments is in the trillions of dollars. *See* Doc. 17. The Court should also include, however, the hundreds of additional fictitious instruments found on the defendant's computer and entered into evidence (*See* Trial Exhibit 11-19), as well as the additional, uncharged, 998 fictitious IBOE's the defendant sent to AMB. *See* Tr. 213 and 447. It is clear from the evidence presented at trial and the defendant's own admissions that he produced, presented or mailed all of these instruments. The documents are virtually identical, save for dollar amounts and to whom they were issued to for credit. *See* Tr. 239-264. All of the instruments are dated within the same timeframe. Finally, all of the fictitious instruments found on the defendant's computer or that he mailed to AMB utilize the same scheme the defendant taught for years at his seminars. In fact, nearly the entirety of the defendant's testimony focused on explaining why they were all similar and structured a particular way.

The evidence presented at trial, therefore, clearly demonstrated that these additional fictitious financial instruments documents were part of a regular and ongoing pattern of conduct, are similar in kind, and share a narrow temporal proximity to the counts of conviction as to warrant their inclusion as relevant conduct in the Guidelines loss calculation.

### Intended and Actual Loss

The government proved at trial that the defendant *intended* to defraud financial institutions and the United States of trillions of dollars. Loss for the purposes of the Guidelines calculation is the greater of actual loss or intended loss. U.S.S.G. § 2B1.1, cmt. n. 3(A)(ii). The

Application Note defines "intended loss" as "the pecuniary harm that the defendant purposely sought to inflict" and specifically includes "intended pecuniary harm that would have been impossible or unlikely to occur." *See also United States v. Blitz*, 151 F.3d 1002, 1010 (9th Cir. 1998) ("We have not . . . hesitated to hold defendants responsible for the full reach of their intent, even when that intent was thwarted. The fact that, due to conditions beyond their control, the seed that defendant had so hopefully sowed could never grow into a harvest crop has not affected our determination of the intended loss itself.") (internal citations omitted); *see also United States v. McGrue*, 567 Fed.Appx. 503 (9th Cir. 2014) (holding that District Court's loss calculation was properly based on the value of the fictitious instruments defendant intended to use). Therefore, even if the defendant's scheme was never likely to work, he should nevertheless be sentenced based on the entirety of the intended loss. *See, e.g., United States v. Anderson*, 353 F.3d 490, 505 (6th Cir. 2003).

For example, the fact that AMB did not have enough money to actually honor the fictitious instruments the defendant issued to the bank is irrelevant for sentencing purposes. The government proved at trial that the defendant's *intent* was to have these instruments honored by the bank. Similarly, the fact that it may have been unlikely that the United States would pay the defendant $1.9 billion based on his fictitious NBOE, the government proved at trial that the defendant presented this instrument to the government with *the intent* that it be paid. The proof at trial also extended to instruments contained on the defendant's computer, although not specifically charged. FedEx slips, letters to banks, client folders, and similar evidence all demonstrated the defendant's *intent*: to have these fictitious financial instruments honored and paid.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                    **Page 12**

Further, the defendant admitted his intent during his direct testimony. The defendant engaged in a long and somewhat rambling explanation of how he was purportedly acting on behalf of an individual named Ray C. Dam and an organization known as the Office of International Treasury Control ("OITC"). The defendant stated that he was appointed by OITC, in part, to create the funds through banks. *See* Tr. 424-39; Tr. 445 ("[W]e had reason to believe that some of the international banks, and so forth, could actually take such instruments, put them into a program, and to produce the funds that we needed . . ."). While the jury necessarily did not credit the defendant's story as an excuse of his conduct, it is clear from even the most generous interpretation of the defendant's testimony that he, at a minimum, intended for his fictitious instruments to have value and to be paid as if they had value. Therefore, it is clear from the defendant's own testimony that he *intended* the loss associated with his conduct; that the defendant failed in his attempt does not change the character of his intent. As a result, the PSR properly recommends that, per U.S.S.G. § 2B1.1(b)(1)(P), the defendant's base offense level should be increased by 30 levels. There is no objection from either party as to this increase.[3]

Additionally, as proved at trial, the defendant willfully failed to file income tax returns for 2009 through 2014. IRS Revenue Agent Kristin Emminger testified at trial that the defendant's failure to file income tax returns and pay the associated tax resulted in an actual tax loss of $157,895. *See* Trial Exhibit 8-2. The tax loss calculation for violations of 26 U.S.C. § 7203, willful failure to file a return or pay tax, includes penalties and interest. U.S.S.G. § 2T1.1, cmt. n. 1. Interest on the defendant's tax loss has continued to accrue since the tax loss

---

[3]    The government does not know the defendant's position regarding relevant conduct. Nevertheless, as noted, even if the Court excluded relevant conduct from the Guidelines calculation, the charged offense conduct alone would result in a 30-level enhancement to the offense level calculation.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                **Page 13**

calculations presented at trial. As of October 22, 2018, the current date for sentencing in this case, the actual loss associated with the defendant's willful failure to file and pay over tax has increased to $191,226.10. The Court should also order the defendant to pay this amount in restitution to the Internal Revenue Service.[4]

**Sophisticated Means**

The PSR correctly recommends that the defendant's offense level should be further enhanced two levels for "otherwise involv[ing] sophisticated means and . . . intentionally engag[ing] in or caus[ing] the conduct constituting sophisticated means." PSR ¶ 36; U.S.S.G. § 2B1.1(10)(C). The Guidelines define "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." USSG § 2B1.1 cmt. n. 9(B).[5] The Ninth Circuit has affirmed the application of the sophisticated means enhancement in a variety of fraud schemes. *See*, *e.g. United States v. Augare*, 800 F.3d 1173 (9th Cir. 2015) (collecting cases). Importantly, "repetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme." *Id. citing United States v. Finck*, 407 F.3d 908, 915 (8th Cir. 2005).

In this case, the defendant used a combination of mundane and complex activity, linked together, to execute an overall complex and sophisticated fraud scheme. The defendant created hundreds of fictitious financial instruments on his computer, taking special care in creating elaborate borders and using sophisticated language intended to trick unsuspecting bankers and government officials. The defendant also created scores of false affidavits representing to banks

---

[4]        See Attachment A to this memorandum for the updated IRS calculations that account for the accrued interest and penalty amounts.

[5]        The defendant objected to the inclusion of this enhancement in the draft PSR. The defendant's analysis, however, stopped at the Guidelines. The defendant failed to account for the significant Ninth Circuit case law that has further developed the definition of "sophisticated means" under the Guidelines. Based on both the Guidelines and the case law discussed *infra*, therefore, it is clear the "sophisticated means" enhancement applies to this case.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                                    **Page 14**

around the world that he was authorized to issue such instruments.  The defendant hid behind a

falsified Letter of Appointment and Commission that purported to grant him the authority to

issue the documents.  In fact, the document was wholly fabricated and referenced a fraudulent

entity, the OITC. In addition, rather than present his documents to banks in person, the defendant

targeted institutions that were hundreds, sometimes thousands, of miles away from him and that

had no prior business relationship with the defendant.  Finally, the defendant stated during his

seminars that he included "detachable stubs" and grossly inflated numbers on some of the

instruments so that they would appear more legitimate.

While some of these acts may appear mundane and necessary to any fraud, such as

inflating numbers on documents, the defendant's overall pattern of behavior, when taken as a

whole, exhibits high levels of sophistication.  *See*, *e.g.*, *United States v. Horob*, 735 F.3d 866,

872 (9th Cir. 2013) (per curiam) (in a bank fraud and identity theft case the Court upheld

application of the "sophisticated means" enhancement where the defendant's use of numerous

fabricated documents contributed to the scheme's complexity and a "complicated and fabricated

paper trail made discovery of his fraud difficult.")

Based on the foregoing, an additional two-level enhancement is appropriate.

**Acceptance of Responsibility is Not Appropriate**

The PSR correctly recommends that the defendant is not entitled to any reduction for

acceptance of responsibility. The adjustment for acceptance of responsibility "is not intended to

apply to a defendant who puts the government to its burden of proof at trial by denying the

essential factual elements of guilt, is convicted, and only then admits guilt or expresses remorse."

U.S.S.G. § 3E1.1, cmt. n. 2.  The defendant was found guilty at trial after putting the government

to its burden of proof.

**GOVERNMENT'S SENTENCING MEMORANDUM**                                **Page 15**

Additionally, the PSR correctly notes that even as of the completion of the presentence investigation, the defendant had still not admitted guilt or expressed any remorse for his conduct. *See* PSR at ¶ 42. Since his conviction the defendant has gone on weekly video podcasts espousing various theories similar to those that he taught at his seminars and that underlie his conviction. *See* https://thegoldfishreport.wordpress.com. In at least one of these, in approximately February, 2018, the defendant stated "[S]o the way that they decided to attack me was with the, uh, you know, federal court system, but that's not gonna work out too good for 'em." *See* https://youtu.be/8yqtpGb3EqQ?t=33s.

Such statements and activity belie any sense of acceptance of responsibility on behalf of the defendant and, therefore, any appeal for a 2-level reduction in the offense level for acceptance should be rejected.

## C. *Defendant's Advisory Guidelines Range*

Both the PSR and the government calculate the advisory Guidelines as follows:

| | | |
|---|---|---|
| 1. | Base Offense Level [§ 2B1.1(a)(1)] | 7 |
| 2. | Loss Greater than $550,000,000 [§ 2B1.1(b)(1)(P)] | +30 |
| 3. | Sophisticated Means [§ 2B1.1(b)(10)(C)] | +2 |
| | **Total Offense Level** | **39** |

Based upon a total offense level of 39 and a presumed Criminal History Category I, the defendant's advisory Guidelines range is 262 to 327 months incarceration. The PSR recommends that the defendant be sentenced to a term of 180 months incarceration followed by a five-year term of supervised release and ordered to pay restitution to the Internal Revenue Service. For the reasons stated herein, the government recommends that the defendant be

sentenced to a term of 240 months incarceration followed by a five-year term of supervised

release and ordered to pay restitution of $191,226.10 to the Internal Revenue Service.

**VI.**    **Section 3553(a) Factors**

Following a calculation of the applicable Guidelines range, the Court must consider

application of the factors set forth in 18 U.S.C. § 3553(a). *See Carty*, 520 F.3d at 991.  The Court

should consider each of the § 3553(a) factors, explain the chosen sentence, and explain any

deviation from the Guidelines range. *Id.* at 991-92.  Those factors include:

> (1)    the nature and circumstances of the offense and the history
> and characteristics of the defendant;
> (2)    the need for the sentence imposed
>> (A)    to reflect the seriousness of the offense, to promote
>> respect for the law, and to provide just punishment;
>> (B)    the need to afford adequate deterrence to criminal
>> conduct;
>> (C)    to protect the public from further crimes of the
>> defendant; and
>> (D)    to provide the defendant with educational or
>> vocational training, medical care, or other
>> correctional treatment in the most effective manner;

18 U.S.C. § 3553(a).  Additionally, the Court must consider the kinds of sentences available, the

range set forth by the Guidelines, any pertinent policy statements by the Sentencing

Commission, the need to avoid unwarranted sentencing disparities, and the need to provide

restitution to any victims of the offense. *Id.*  A thorough consideration of all the sentencing

factors set for in 18 U.S.C. § 3553(a) suggests that a sentence of 240 months is appropriate.

**A.    *Nature and Circumstances of the Defendant's Offense***

The defendant in this case engaged in a serious offense.  Section 514 was enacted in

1996, in part, as a response to the Oklahoma City bombings.  141 Cong. Rec. S9533-34.

Referring to the use of fictitious financial instruments to defraud banks and other institutions,

which resulted in hundreds of millions of dollars in losses, then-Senator Alphonse D'Amato

stated, "these frauds have been perpetrated by antigovernment groups . . . which use fictitious financial instruments to fund their violent activities." *Id.*  The goal of the legislation was to close a gap in existing law and "cut the purse strings of these organizations." *Id.*  From the outset, it was clear the law contemplated the use of "very large denomination" instruments that sought to "undermine the soundness of the U.S. financial system." *Id.*  Congress further expressed the severity of these acts by making Section 514 a Class B felony.

The offenses for which the defendant was convicted at trial fall squarely into what Congress intended to outlaw.  While no evidence of violence was presented at trial,[6] there was an abundance of evidence that proved the defendant produced and passed fictitious financial instruments in very large denominations that, by the defendant's own admissions, sought to affect international commerce. Tr. 443-45.  If the defendant had succeeded in his fraud, banks around the world and the federal government would have lost billions, if not trillions of dollars. His lack of success in no way diminishes the severity of his crimes.  The Guidelines make this distinction clear and treat intended loss no differently than actual loss under these circumstances.

Further, the defendant did not just create and pass these instruments but, rather, engaged in a years-long scheme of promoting their creation and use by hundreds of other individuals.  He openly flaunted federal tax law throughout, failing to file tax returns he admittedly knew were

---

[6]     Although not presented at trial, the defendant's computer contained documents related to members of the sovereign citizen and extremist movements that have been associated with violence.  For example, there were numerous documents found in a folder labeled "Jerry Kane."  Jerry Kane and his son, Joe, killed two West Memphis, Arkansas, police officers in 2010 after they were pulled over in a routine traffic stop.
       The defendant also had a document on his computer titled "The Anti-Government Movement Guidebook." The Guidebook itself appears to be a legitimate publication of the State Justice Institute intended to assist law enforcement in combating the sovereign citizen movement.  The Guidebook discusses Gordon Kahl, who died in 1983 in a police shootout in Smithville, Arkansas, after he had already killed at least one Deputy US Marshall in North Dakota who had come to arrest Kahl on a parole violation stemming from his conviction for tax crimes. It also discusses Terry Nichols of the Oklahoma City bombing.  The version of this Guidebook that the defendant had on his computer, however, begins with a preamble that focuses on how to use the Guidebook as a way to defeat the strategies and tactics of law enforcement.  It ultimately dismisses the Guidebook as the work of "ignorance" and instructs its readers to, instead, rely on the "silver bullet:" the sovereign himself.

due and failed to pay income tax he admittedly knew he owed.[7] Tr. 445-46.  As described both

*supra* and through the course of the government's presentation of evidence, this was an insidious

scheme that sought to establish its own legitimacy by propagating the scheme through

unsuspecting clients.  As the defendant once said in a seminar, "if you get more people around

you starting to press these issues, then I think you're going to find a little better success." *See*

Trial Exhibit 15-10.

The defendant *did* have success in convincing others to follow his schemes.  For

example, though not charged, the defendant perpetrated a successful OID scheme.[8]  Individuals

who followed this scheme, at the defendant's urging, included the defendant's stepdaughter,

April Rampton, who testified during her criminal trial that she trusted and relied on the defendant

when she filed false tax returns with the IRS. *See* Attachment B at 844, ln 18 through 847, ln 7.[9]

The defendant's former-student-turned-assistant, Paul Zaccardi, pleaded guilty to passing

fictitious financial instruments similar in kind to those the defendant used in this case. *See* Tr. at

460-61; *United States v. Paul Ben Zaccardi*, 2:13-cr-00463-TC, Doc. 35 at Counts Seven-Nine

---

[7]      The defendant admitted during his testimony that he was fully aware of what the law stated his tax reporting and paying obligations were, he just disagreed that those laws applied to his "non-resident alien" status. The jury did not find the defendant's excuses credible.

[8]      Many of the cases cited herein do not involve the filing of fictitious financial instruments.  Instead, they involve a different scheme that the defendant promulgated through his seminars and online materials prior to 2015 involving the filing of false tax returns using bogus IRS Forms 1099-OID. *See* Doc. 48, Attachment D.  This scheme was listed as one of the IRS's "Dirty Dozen" tax scams from at least 2009 through 2014. *See* https://www.irs.gov/newsroom/beware-of-irs-2009-dirty-dozen-tax-scams; https://www.irs.gov/newsroom/irs-releases-the-dirty-dozen-tax-scams-for-2014-identity-theft-phone-scams-lead-list.  The defendant's involvement in promulgating this scheme was a primary focus of the search warrant executed on the defendant in 2012. *See* Doc. 48, Attachment D. The defendant discussed this scheme at his seminars and had guest speakers appear at his seminars who instructed attendees on its implementation.  For example, Teresa Marty, referenced *infra* at Section VI.D.ii. pleaded guilty to preparing false OID tax returns for others; Marty was a guest speaker on the topic of OID tax returns at the defendant's Orlando seminar in 2008 that is excerpted in Trial Exhibit 15-7.  While the defendant was not charged in this case with acts directly related to the filing of false OID tax returns, his conduct vis-à-vis such returns falls under the purview of relevant conduct to this case.

[9]      Indeed, The Honorable Judge Dee Benson, who presided over the Rampton trial, asked at sentencing "Whatever happened to Winston Shrout? . . . His name keeps coming up in these cases, and you have another one before me, and Winston Shrout is always coming up. He is like the godfather of this whole thing and he ought to be prosecuted if everyone else is." *United States v. Rampton*, 2:11-cr-00812, Doc. 137 at 18, ln. 12-25 (D UT 2013).

(D. UT 2015); *Id*. at Doc. 110. Anton Paul Drago was convicted and sentenced to 25 years in

prison for, in part, using fictitious instruments the defendant created for him to defraud banks.

*See* Trial Exhibit 11-2; *United States v. Anton Paul Drago*, 2:13-cr-00334-JCM-CWH, Doc. 1 at

Count Eight (D. NV 2016); *Id*. at Doc. 177. Richard Armstrong and Curtis Morris relied on

DVDs of the defendant's seminars to perpetrate a fraud for which they were sentenced to nearly

10 years in prison. *See United States v. Morris, et al*, 1:10-cr-00317-REB, Doc. 140 (D. CO

2012); *Id.* at Docs. 588, 623. Douglas Dent and Norman Secor were convicted of fraud they

learned after attending the defendant's seminar in Panama. *See United States v. Norman James

Secor*, 2:13-cr-00216-LSC-PWG, Doc. 18 (N.D. AL 2013); *United States v. Douglas Ervin Dent*,

2:13-cr-00151-LSC-JEO, Doc. 15 (N.D. AL 2013). There are many other examples of

individuals that attended a seminar, watched a DVD, or received one-on-one coaching from the

defendant who were later convicted for acts they were taught to commit by the defendant.[10] *See*

Attachment C. These are prime examples of how the defendant sought to flood the system and

cloud the process with his various schemes in order to legitimize and increase the potential

success of his own acts. Further, the damage the defendant has caused to the lives of these

individuals, and to banks and the federal government by extension, should not be ignored by the

Court. The creation and use of fictitious instruments is a serious offense, but the defendant's

promotion of this scheme over many years makes his acts more heinous.

This is a serious economic crime, which courts have consistently found are significant,

harmful and appropriate for lengthy prison sentences. Economic crimes can have a "severe

emotional and financial effect" on the lives of hundreds of victims and thus "require a

corresponding long sentence so as to promote respect for the law and provide just punishment."

---

[10]     The government does not intend to call witnesses at sentencing. IRS Special Agent Casey Hill, however, is prepared to testify at the Court's request concerning all of the cases referenced within this paragraph.

*United States v. Asieru*, 435 Fed.Appx. 605, 606 (9th Cir. 2011) (unpublished). Indeed, as Judge

Michael Simon recently recognized, white-collar criminals are likely to "weigh the benefits of

creating and maintaining a fraudulent enterprise" against the costs including "the degree of

punishment they will face." *United States v. Heine*, 3:15-cr-238-SI, 2018 U.S. Dist. LEXIS

99922, 2018 WL 2986212, at *8 (D. Ore. 2018).

Moreover, economic crimes, unlike most crimes of violence, are capable of impacting

dozens or even hundreds of individuals.  In *United States v. Treadwell*, the defendant was

convicted of operating a Ponzi scheme that defrauded 1700 people. 593 F.3d 990, 1012 (9th Cir.

2010).  In part because of the widespread nature of the crime, the Ninth Circuit upheld a sentence

of 300 months and noted the importance of deterrence of white-collar crime and the

minimization of discrepancies between white and blue-collar offenses.  *Id.* (*citing United States

v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006)).

In *United States v. Harder*, 3:12-cr-485-SI, Judge Simon sentenced the defendant to

fifteen years imprisonment for deceiving investors around the country with a mail fraud scheme.

144 F.Supp.3d 1233 (D. Ore. 2015).  In *Harder*, like here, the sentence was justified by the

severe impact the defendant's conduct had on individual victims "wholly apart from the dollar

value of the loss . . ." *Id.* at 1239.

Similar sentences have been upheld as reasonable by the Ninth Circuit.  In *United States

v. Rangel*, the Ninth Circuit upheld a 264 month sentence for a defendant engaged in a mail fraud

scheme that defrauded investors and homeowners. 697 F.3d 795, 800 (9th Cir. 2012).  In *United

States v. Booth*, the sentencing court noted the fact that the defendant had preyed on gullible

victims and caused serious financial and emotional harm before issuing a sentence of 162

months. 200 Fed.Appx. 678, 679 (9th Cir. 2006) (unpublished).

The defendant's conduct over the last ten-plus years has not only created significant emotional and economic harm for his intended targets and the federal government, it has created real penalogical harm for members of his family, close associates, and complete strangers who happened to sit in on one of his seminars or who purchased a set of his DVDs. As a result, there is perhaps an even greater interest to consider, as Judge Simon noted in *Harder*, the impact of the defendant's conduct "wholly apart from the dollar value of the loss" and sentence the defendant accordingly.

### B. *History and Characteristics of the Defendant*

Nothing in the defendant's past mitigates his criminal culpability. To the contrary, based on his testimony at trial and information provided to the Probation Office, the defendant is educated, experienced, had a stable home life growing up, held a steady job for a number of years, and reports no history of drug or alcohol abuse. *See* PSR ¶¶ 52-67. In short, the defendant had the ability to succeed without resorting to crime. Rather than use his skills and experience to promote and maintain an honorable livelihood, however, the defendant succumbed to greed and refused to accept that he was bound by federal laws.

Nor should the defendant's age or health be an excuse for a lenient sentence in this case. While the Sentencing Guidelines allow that departures based upon a defendant's age, medical health, and mental status "may be relevant" in imposing a sentence, such departures only apply when those characteristics "are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. §§ 5H1.2, 1.3, 1.4. Although this Court held the defendant was mentally competent to proceed to sentencing, at least two examiners, Drs. Martin and Millkey, opined that the defendant suffers from a mental disease or defect, namely Delusional Disorder. *See* Docs. 133, 152 [Filed Under Seal]. During those examinations the defendant also

disclosed a number of physical health issues he has dealt with and continues to manage, such as a hip replacement, hernias, and injured discs in his back. *See Id.*; PSR at ¶ 61.  None of these mental or physical health issues are unique to the defendant, nor are the outside the capabilities of the Bureau of Prisons to mitigate and manage. *See* Attachment D.  In addition, the defendant admitted to Dr. Millkey that he was going through the mental competency evaluation for the purpose of undoing his conviction without having to appeal. *See* Doc. 152 at 2 of 21 [Filed Under Seal]. As a result, the Court should not consider these health issues as mitigating factors in the defendant's sentence.

The defendant may separately argue that a lengthy prison term for a man his age – 70 years – would amount to a life sentence. But Courts have routinely rejected such arguments in cases, like this one, involving sustained criminal conduct that results in significant harm. In *United States* v. *Seijan*, 547 F.3d 993, 998 (9th Cir. 2008), for instance, the district court sentenced an 87-year old defendant to 240 months' imprisonment. Affirming the district court, the Ninth Circuit noted:

> Seljan argues that the district court did not adequately consider his advanced age. This argument is meritless. The district court acknowledged that Seljan's age and health reduced the likelihood of recidivism, and it addressed Seljan's concern that the 20-year sentence at age 87 was tantamount to life imprisonment. The district court even considered the sentence that a defendant without a prior conviction would receive. Indeed, the sentence imposed by the district court was 22 months below the low end of the Guidelines range. Seljan argues only that the reduction should have been even greater. On this record, however, the district court's sentence was reasonable.

547 F.3d 993. *See also United States* v. *Lewis*, 594 F.3d 1270, 1276-77 (10th Cir. 2010) (affirming 330-year sentence for fraud offenses and upholding district court's rejection of a 72-year old defendant's request for a variance based upon age and health); *United States* v. *Dowd*, 451 F.3d 1244, 1256-57 (11th Cir. 2006) (rejecting the defendant's argument that his 305-month sentence was unreasonable because he was 65 years' old); *United States* v. *Kerns*, 2009 WL 1956258 at *1-*2 (11th Cir. July 9, 2009) (unpublished) (rejecting the defendant's argument that his 240 month sentence for fraud offenses, which was already a departure, was a *de facto* life sentence and noting

**GOVERNMENT'S SENTENCING MEMORANDUM**                                                    **Page 23**

that "the district court weighed Kerns's advanced age against the seriousness of his offense and the need to protect the public from fraud").

The defendant persisted in his crimes for many years, and flaunted the potential repercussions for his conduct throughout – all while in his 50's and into his 60's.[11]  Having chosen to continue his criminal conduct in that advanced age, the defendant should not now be able to claim age as a significant mitigating factor.

While there are no characteristics of the defendant that excuse his conduct or mitigate his sentence, there are characteristics of the defendant that exacerbate the impact of his conduct. The defendant is a veteran of the United States Marine Corps.  As a Marine, the defendant would have taken the oath of enlistment, which states that he will support and defend the Constitution of the United States.  The defendant even sought to engender trust from the jury by stating that he was honorably discharged from the Marines. *See* Tr. at 412.  Yet, outside the presence of the jury, the defendant told the Court that he is not even a citizen of the United States. *See* Tr. at 464-66.[12]  The defendant's conduct here flies in the face of his oath and was certainly far from honorable.  His attempts to hide behind his service in front of the jury but then disavow his own citizenship outside their presence demonstrates his duplicitous nature and willingness to warp facts to shape his own ends.

The defendant is also married. *See* PSR ¶ 56.  This in and of itself weighs neither for nor against the defendant, except that the defendant testified he is not married. *See* Tr. at 409.  In fact, the defendant challenged the government's use of his "married" status when calculating his tax due and owing, stating that his marriage "was terminated in 1994." *See* Tr. at 374.  After trial, however, the defendant relied on his marriage to seek a continuance of sentencing. *See* Doc.

---

[11]    The defendant turned 70 on April 27, 2018.
[12]    The defendant maintains this charade, objecting to the PSR's classification of his citizenship and, instead, asserting he is a "non-resident alien." *See* Defendant's Objections to Draft PSR, submitted January 16, 2018, at 1.

117 at 4 ("Fourth, to allow Mr. Shrout to travel to Utah so that he may be present when his wife undergoes hip replacement surgery . . ."). It is clear that the defendant will tell whichever story he then feels will benefit him the most. Denying he was married at trial potentially reduced his tax debt. Telling the Probation Office and the Court he is married helps him get continuances and engender sympathy at sentencing. Such a loose handling of the truth at trial reinforces why the defendant should be sentenced per the government's recommendation.

The government is not the only party that views the defendant's true nature as predatory and duplicitous. The Southern Poverty Law Center ("SPLC"), a nonprofit legal advocacy organization that, among other things, classifies and tracks extremists and hate groups, identified the defendant as part of the leadership of the "sovereign citizens" movement in 2010, which was right in the middle of the defendant's conduct in this case. *See* Attachment E, pg. 12. SPLC considers the defendant a significant enough threat that they continued to track him through his conviction in this case. *See* https://www.splcenter.org/hatewatch/2017/05/09/sovereign-files; https://www.splcenter.org/hatewatch/2018/10/01/sovereign-files-october-1-2018. In addition to the SPLC, the Anti-Defamation League ("ADL"), another organization that, in part, educates the public about extremism, identified the defendant as a "sovereign citizen" guru in 2012, at the height of his conduct at issue in this case. *See* Attachment F. They continued warning the public about the defendant through the time of his conviction. *See* https://www.adl.org/blog/winston-shrout-the-rise-and-fall-of-a-sovereign-citizen-guru; https://www.adl.org/blog/sovereign-citizen-funny-money-not-so-humorous-for-victims. As these articles and reports from the SPLC and ADL demonstrate, the defendant is and has been a well-known threat to individuals, banks, and other financial institutions. His activities over the course of the last several years have been the focus of concern of both individuals and respected organizations whose focus it is to protect the

public from such predatory and dangerous behavior.  Such is the history and characteristics of the defendant that this Court should consider when determining an appropriate sentence.

C. ***Promote Respect for the Law, Afford Adequate Deterrence and Protect the Public***

Sentencing the defendant to a lengthy term of imprisonment will serve to (a) specifically deter the defendant from engaging in this conduct in the future; (b) generally deter other similarly-minded individuals or those sympathetic to the defendant's ideology from engaging in this conduct; and (c) protect the public who have and may in the future unwittingly enter the defendant's sphere of influence or his wake of financial and legal devastation.

i. ***Specific Deterrence***

The defendant has engaged in his criminal conduct, by his own admission, for at least 20 years.  The superseding indictment specifically alleges conduct going back ten years.  The defendant's conviction does not stem from a one-off dalliance but, rather, prolonged and systemic criminal behavior.  Throughout, the defendant has demonstrated a complete lack of remorse and an utter unwillingness to alter his conduct to abide by the law.

The defendant was put on direct notice that his conduct was potentially criminal no later than June 2012, when federal agents executed multiple search warrants against him and his business associates.  The defendant was put on *in*direct notice that his activities were considered criminal when his stepdaughter, April Rampton, was indicted in September 2011. *See United States v. Rampton,* 2:11-cr-00812, Doc. 1 (D. UT 2011).   The defendant was similarly put on notice when his associate Stanley Wardle was indicted in February 2012, and again when his former-student-turned-associate, Paul Zaccardi, was indicted in January, 2014.  *See United States v. Wardle*, 2:12-cr-00073, Doc. 1 (D. UT 2012); *United States v. Zaccardi*, 2:13-cr-00463, Doc. 35 (D. UT 2014).  All three were found or pleaded guilty to conduct taught by or similar in

substance to the defendant's conduct in this case. Despite his family, friends and associates coming under indictment for activities which he was both promoting and engaging in, the defendant never once stopped. The defendant did not cancel any seminars, the defendant did not stop selling materials on his website, and the defendant did not stop producing and passing fictitious financial instruments.

While the defendant was on both direct and indirect notice that the government considered his activities criminal before he was ever indicted, the defendant was certainly on notice when he was in fact indicted in December, 2015. Rather than be deterred by a criminal indictment, however, the defendant – acting through his agent, Patricia Bekken – "served" both the government and the Court with fictitious documents purportedly assessing penalties against them in the millions of dollars. This was similar to his response to the 2012 search warrant, after which which he served various federal officials with a false commercial lien that purported to indebt them to the defendant for millions of dollars. Soon after the defendant's first court appearance following his indictment, he embarked on the "ConspiraSEA Cruise" and hosted a seminar spewing the same ideology at the heart of his criminal activity. *See* https://violentmetaphors.com/2016/01/27/reverse-the-constitutional-polarity-of-the-baryonic-trustee-matrix-legal-gibberish-on-the-conspirasea-cruise-day-2/.

During the pendency of his case, the defendant also appeared weekly on an Internet video podcast called The GoldFish Report, through which he again spewed his ideology and rhetoric. *See* https://www.youtube.com/channel/UC6KorV7Zypphb3v204ixI9Q. These appearances resulted in real harm, as the comments to the defendant's videos show. For example, in the comments to the defendant's video on August 24, 2018, an individual appears to believe the defendant's assertion that the IRS is illegitimate and asks whether he or she needs to keep filing

taxes. *See* Attachment G at 1-2 (highlighted portion). Similarly, a commenter to the defendant's video on September 22, 2018, asks to know the status of the defendant's court case so the defendant could assist him or her with handling a third-party debt collection issue (the video is focused on how individuals can avoid paying third-party debt collectors). *See Id*. at 8-10 (highlighted portion).

The defendant even appeared on The GoldFish Report the day after the Court held a competency hearing on September 27, 2018, at which the Court ordered the defendant to cease advertising for a seminar scheduled for October 19-21, 2018, and to not hold that seminar. *See* https://youtu.be/vRJpvWlvbIg.  During this version of The GoldFish Report, the defendant made "an announcement" that one of his "privileges" had been "suspended," specifically that "Solutions in Commerce has been suspended under threat by agents of the present government." *See* https://youtu.be/vRJpvWlvbIg?t=1h6m39s.[13]  The defendant went on to say that his material would be back once "this new government comes into effect and then it will come back up as Solutions in Commerce." *Id.*

The defendant also appeared on an Internet audio podcast called "Tad's Talkshoe – Youhavetheright.com" in March, 2016, during the pendency of his case, where he openly acknowledged he was under indictment but attempted to dismiss its severity by reverting to his ideology and admitting he had served liens on officials and committed other acts intended to help him avoid trial. *See* Attachment H at 1-5.[14] Even *after* the defendant was convicted and had been

---

[13]    Despite the defendant's representations in this video, the government did not request, nor did the Court order, that the defendant cease all wssic.com activity.  It is perhaps revealing that the defendant did not see a way in which Solutions in Commerce could continue at all under the Court's admonishments.

[14]    Audio of this podcast is available at https://www.talkshoe.com/episode/4590740

awaiting sentence for over a year, he advertised a seminar through which he again intended to promote his now-proven-false ideology. *See* Attachment I.[15]

Never once has the defendant taken any opportunity to admit his conduct was criminal or apologize for the harm he caused.  Rather, the defendant has repeatedly thrown up excuses or attempted to deceive his listeners into believing he was innocent through the malicious application of conspiracy theories and fake news.  A perfect example of this is The GoldFish Report from September 27, discussed above, that was recorded *the day after the defendant's competency hearing*.  The defendant did not take the opportunity during that recording to accept guilt, to admit his conduct was harmful, apologize for misleading his followers, or even just simply state that the Court had ordered that he desist with certain activities.  Instead, the defendant lied, blamed it on a conspiracy theory and stated, emphatically, that it would all be back in the future.

The defendant has demonstrated, clearly and repeatedly, that he simply will not be deterred from his criminal activity by words alone, regardless of whether those words convey probable cause to issue a search warrant, a grand jury's indictment, a jury's verdict, or the very law itself.  Nor should the Court be persuaded by the defendant's timely response to its September 27 Order to terminate the advertising for an upcoming seminar and to not conduct the seminar.  This order came years after the Court's initial orders to not conduct this type of activity.  Rather than comply, the defendant disregarded the Court until he was caught and his attempts at delaying sentencing had finally run out.[16]  The defendant's actions do not

---

[15]    At the conclusion of the competency hearing on September 27, the Court ordered the defendant to cease advertising this seminar and to not conduct the seminar.  To the best of the government's knowledge, the defendant ceased advertising the seminar through his website on September 28 and calls to the Grotto (the intended site of the seminar) revealed that the event had been cancelled.

[16]    The government learned of the pending seminar through an unsolicited third-party email from an apparently concerned citizen. *See* Attachment  J (redacted).

demonstrate actual remorse or change in character; instead, the defendant's words on The GoldFish Report the day after the Court's most recent order reveal the defendant is simply biding his time, hoping things blow over, so that he can resume his activity. This type of cat and mouse game with the government and the Court supports the Government's recommended sentence in this case; the defendant's actions support the conclusion that only a firm and lengthy prison sentence will deter his future criminal conduct.

### ii.    *General Deterrence*

While specifically deterring the defendant is an important goal of sentencing, a firm sentence may serve the greater effect of generally deterring others from this conduct. General deterrence is critical in criminal tax cases because of the voluntary compliance nature of the tax system and the relative infrequency with which criminal tax prosecutions are filed. Accordingly, the Sentencing Commission issued a policy statement on tax cases for general deterrence:

> Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. Ch. 2, pt. T., introductory cmt.

The Ninth Circuit has affirmed the Sentencing Commission's policy. In *United States v. Orlando*, the court upheld a district court's imposition of an upward variance in a tax evasion case on the grounds that the Guidelines range "failed to capture tax crimes' particular sensitivity to deterrence." 553 F.3d 1235, 1239 (9th Cir. 2009). In other cases, the Ninth Circuit has similarly confirmed that courts should consider the Sentencing Commission's policy statements and the particular need for deterrence in tax cases, noting that "Congress, in enacting the law, and the Sentencing Commission, in prescribing prison for tax offenses, set out a policy." *United*

*States v. Bragg*, 582 F.3d 965, 969 (9th Cir. 2009) (vacating probationary sentence in a tax fraud case and remanding to the district court where it had expressed "doubt that deterrence works in tax cases"). *See also United States v. Morace*, 594 F.3d 340, 349 (4th Cir. 2010) ("[T]he policy statements also reflect the Commission's view that general deterrence . . . should be a primary consideration when sentencing tax cases, and that there must be a real risk of actual incarceration for the Guidelines to have a significant deterrent effect in tax evasion cases.").

 While a portion of the defendant's conduct in this case was aimed at financial institutions and was not directly related to tax, the fictitious financial instrument he supplied to the United States Treasury and his willful failure to file income taxes or pay tax directly implicates the deterrence policies discussed above.  The defendant's other conduct is similar enough in kind, and motivated by the same false ideology, so as to also implicate those policies.

The defendant has engaged in the promotion of his scheme and ideology for at least ten years.  During that time, hundreds of people have learned from the defendant how to try to defraud commercial entities, financial institutions and the federal government.  In some ways, the fact that the defendant remained at liberty may have served to sway them that they could also get away with this type of conduct.  Aside from those who attended one of his seminars, hundreds – if not thousands – more have watched a DVD of the defendant spewing his ideology, or watched a YouTube video or read a book or reviewed a template that the defendant produced showing just the right way to attempt to scam the system. *See, e.g.*

https://www.youtube.com/watch?v=v5l_oqqkADw (showing 168,030 views as of October 17, 2018).  Beyond those thousands, many more have observed his conduct from afar, through organizations like SPLC and ADL.  Wherever the defendant's conduct has popped up on the

Internet, comment boards quickly fill up with his supporters' words of encouragement, a tidal wave beating back those few rational folks willing to tell them it is all pure nonsense and illegal.

A lenient sentence in this case will only serve to embolden the defendant's ardent followers and erode confidence in those trying to protect the public from the defendant's behavior.  Tax protesters and sovereign citizens maintain close ties to each other, founded on their shared desire to remove themselves from the legal system and to avoid their financial responsibilities to the United States, in the form of taxes, and for other debts.  Internet message boards have shown that many are closely monitoring events in this case.  These groups will find victory in a lenient sentence and word will quickly spread among that community that even if what you are doing is illegal, and even if you get caught and ultimately convicted, there is not much of a price to pay. A firm and lengthy sentence, however, will help send a strong message to the thousands who have heard the defendant speak or read a document he has produced that this conduct is criminal and those who engage in it will be punished severely.  As a result, the government urges the Court to sentence the defendant according to its recommendation.

### iii.    *Protection of the Public*

Finally, when considering a sentence for the defendant, the Court should consider the urgent need to protect the public from con artists and swindlers like the defendant.  As reflected in the myriad cases referenced above and in Attachment C, many have followed the defendant and paid a significant personal and financial price.  Many others randomly come across the defendant's website, or an article he wrote or a video he appeared in and are drawn into his web. Severely limiting the defendant's access to the public by sentencing him to a lengthy term of imprisonment helps protect these individuals from his influence and prevent them from falling into his trap.

**D.** *The Need to Avoid Unwarranted Sentencing Disparities*

The Guidelines range suggests a sentence of between 262 to 327 months incarceration. The best way to ensure that the defendant's sentence is not disparate from those convicted of similar crimes is to sentence him similarly. Defendant Shrout's conduct presents a hybrid of an individual seeking to defraud banks and the United States out of large sums of money and a promoter and fraudster who charged others to learn his schemes, failed to file income tax returns, and failed to pay income tax. The facts of the following cases are reasonably similar or related to the facts here such that a sentence of 240 months for defendant Shrout would not result in unwarranted disparity.

**i.    United States v. James Timothy Turner, 1:12-cr-00169-MHT-WC (M.D.AL 2013)**

Like the defendant, Turner was included in SPLC's 2011 profile of leaders of the sovereign citizen movement. *See* Attachment E at pg. 12. In 2013, Turner was tried and convicted in the Middle District of Alabama for conduct remarkably similar to the defendant's conduct in this case. *See United States v. Turner*, 1:12-cr-00169, Doc. 1 (M.D. AL 2013); *Id.* at Doc. 173. As in the instant case, Turner was convicted of passing fictitious obligations which purported to be worth in excess of $2 trillion. Turner was also convicted of aiding and abetting others to pass fictitious obligations, as well as obstructive conduct toward the IRS, failure to pay taxes, and false statements. Turner's sentence of 216 months was derived through a combination of the intended fraud loss and Turner's overall pattern of conduct, a pattern of conduct eerily similar to Shrout's conduct in this case. *See United States v. Turner*, 2013 U.S. Dist. LEXIS 109426 (M.D. AL Aug. 5, 2013).

Like Defendant Shrout, Turner hosted and spoke at seminars during which he spread his "redemption scheme" ideology and taught others how to use fictitious instruments to pay tax and

other debts. Just like the defendant in this case, Turner charged seminar participants a fee yet never filed or paid income tax on his income. The *Turner* Court highlighted how Turner "lured a substantial number of people into his scheme, causing them both to lose the money he charged for his seminars and, in many cases, to accrue criminal charges themselves" and used those facts as a basis for its 216-month sentence. *Id.* In sum, Turner's *modus operandi* was virtually identical to the defendant's in this case, as was his motive. Even the Turner Guidelines calculation was similar in kind. *Id.*

Whereas Turner was sentenced to 216 months imprisonment, however, the government in this case recommends 240 months for defendant Shrout to reflect the difference in length of time and scope of the defendant's scheme versus Turner's. Turner's offense conduct was limited to 2008 through 2010, with the primary focus being 2008. The defendant's conduct in this case, however, spans at least ten years and extends to approximately twenty if you consider the defendant's in-court admissions. Additionally, Turner's fraudulent conduct primarily targeted the IRS. The defendant's conduct, however, was global and targeted financial institutions around the world *in addition* to the IRS and United States Treasury. The difference in time and scope justifies this Court sentencing the defendant to an additional two years beyond Turner's sentence.

ii.    **United States v. Teresa Marie Marty, 2:13-cr-00217-KJM (E.D.CA 2017)**

Teresa Marty was a presenter at the defendant's 2008 seminar in Orlando. She spoke about how to apply the redemption scheme to file false tax returns using bogus IRS Forms 1099-OID. *See* Doc. 48, Attachment D. This was a topic the defendant addressed in a number of his seminars but later removed from his presentations and online products. Marty pleaded guilty in the Eastern District of California to conspiring to submit false claims that utilized these false

OIDs and to defrauding the United States and she was sentenced in 2017 to ten years in prison. *See United States v. Marty*, 2:13-cr-00217, Doc. 201 (E.D. CA 2017).

The government presents this case both as a related case – Marty was sentenced for conduct that, at one time, was part of the defendant's seminars and that she actually did present at one of the defendant's seminars – and as a case that can be differentiated from the defendant's. Marty was merely a guest speaker at one of the defendant's seminars and filed false tax returns. The defendant's conduct eclipsed Marty's in nearly every way – his fraud was greater and he actively promoted his fraud to hundreds across at least ten years – yet Marty was still sentenced to ten years in prison. If Marty received ten years in prison and was merely a *part* of the defendant's lengthy and broad scheme, certainly the defendant should receive a greater sentence in this case.

### iii.     United States v. Eddie Ray Kahn, et al, 1:08-cr-00271-RCL (D.C. 2010)

Eddie Kahn was convicted and sentenced in 2010 in the District of Columbia for promoting and implementing tax fraud schemes, for which he was sentenced to 20 years in prison. *See United States v. Kahn*, 1:08-cr-00271, Doc. 409 (D.D.C. 2010). One of the fraud schemes that Kahn promoted was Redemption Theory, the same "theory" underlying much of the defendant's promotional activity over the last ten years. *See e.g.* Tr. 84-86. In fact, materials related to the defendant were found in Kahn's possession and were used in Kahn's marketing and sales material. *See Kahn*, 1:08-cr-00271, Doc. 409. The case against Kahn included allegations of fictitious financial instruments and the overall amount of fraud committed and intended by Kahn and his co-conspirators is similar to that of the defendant in this case. *See Id.*, Doc. 370 at 2-27. The Kahn case provides a good example of how similar conduct may be charged under multiple statutes but, in the end, the conduct speaks for itself. The conduct at

issue and the harm intended in Kahn – while charged under different statutes – was essentially the same as the conduct and harm at issue in this case.

### iv.    United States v. Dennis R. Alexio, 1:13-cr-01018-JMS-BMK (D.HI 2017)

Alexio was the defendant's client[17] and was convicted in 2017 for implementing the defendant's OID and fictitious instrument schemes in the District of Hawaii, for which he was sentenced to 15 years in prison. *See United States v. Alexio*, 1:13-cr-01018, Doc. 312 (D. HI 2017).  This case provides an important window into the havoc and harm that resulted from the defendant's fraudulent schemes.  As noted throughout this sentencing memorandum, the defendant's promotional activity across the last several years has spawned disciples that have committed their own fraud against the federal government and other institutions.  But for the defendant's own conduct, many of these other acts may never have been committed.  The defendant should bear some of the responsibility for the harm he has indirectly caused by teaching and promoting tactics and techniques to defraud banks, governments, and other entities.

Like the *Marty* case above, the Alexio case should represent a sentencing floor for the defendant in this case.  Alexio was the defendant's client and student.  Alexio did not take at least the last ten years to teach others across the country and around the world how to commit this harm.  Alexio did not charge hundreds of clients and students over $500,000 to access information and materials related to his schemes.  And, ultimately, Alexio did not seek to commit the same level of harm as the defendant in this case.  These are all things the defendant did in this case.  The defendant was the master in his relationship with Dennis Alexio and the more ambitious criminal.  He should receive a sentence reflective both of this dynamic and of his greater degree of conduct.

---

[17]     The defendant maintained a folder and documents on his computer related to Dennis Alexio. *See* Trial Exhibit 11-19 at 2, ln. 2.

## VII.    <u>Conclusion</u>

For the reasons stated above, the defendant should be sentenced to a term of 240 months incarceration followed by a five-year term of supervised release, to include specific release conditions, and ordered to pay restitution of $191,226.10 to the Internal Revenue Service as a condition of supervised release.  The defendant has shown at every turn that he is a con man and a cheat.  He has exhibited repeated disregard for the law and for this Court.  The defendant has used his false promises and fraudulent schemes to injure his clients, the government, and other third parties.  The defendant has spawned disciples who have committed their own acts of fraud against the government and third parties.  For at least the last ten years, Winston Shrout has been a veritable queen bee in a hive of fraud and deceit, sending out worker drones armed with false documents and bogus arguments to harass, harangue, and defraud.  The Court should now send a message to the defendant, and all those of like mind and intent, that this conduct is egregious, it is illegal, and it is met with harsh penalties.

Dated: **October 17, 2018**

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney

*/s/ Stuart A. Wexler*
STUART A. WEXLER
LEE F. LANGSTON
Trial Attorneys, Tax Division

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 17, 2018, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system, which will send notification of such filing to

the attorney(s) of record for the defendant.


_/s/ Stuart A. Wexler_
STUART A. WEXLER
Trial Attorney, Tax Division