1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3                  PORTLAND DIVISION

4
UNITED STATES OF AMERICA,        )
5                                )
                    Plaintiff,   )   Case No. 3:15-cr-00438-JO
6                                )
              v.                 )
7                                )   October 22, 2018
WINSTON SHROUT,                  )
8                                )
                    Defendant.   )   Portland, Oregon
9    _____)


10

11

12

13                      SENTENCING

14              TRANSCRIPT OF PROCEEDINGS

15       BEFORE THE HONORABLE ROBERT E. JONES

16      UNITED STATES DISTRICT COURT SENIOR JUDGE

17

18

19

20

21

22

23

24

25

```
 1                           APPEARANCES

 2   FOR THE PLAINTIFF:
                              STUART A. WEXLER
 3                            Department of Justice
                              Tax Division
 4                            601 D Street NW
                              Washington, DC 20004
 5
     FOR THE PLAINTIFF:
 6                            LEE F. LANGSTON
                              Department of Justice
 7                            Tax Division
                              601 D Street NW
 8                            Washington, DC 20004

 9   FOR THE DEFENDANT:
                              RUBEN L. INIGUEZ
10                            Federal Public Defender's Office
                              101 SW Main Street
11                            Suite 1700
                              Portland, OR 97204
12

13

14

15

16

17

18   COURT REPORTER:      Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
                          United States District Courthouse
19                        1000 SW Third Avenue, Room 301
                          Portland, OR 97204
20                        (503)326-8191

21

22                             *   *   *

23

24

25
```

TRANSCRIPT OF PROCEEDINGS

(October 22, 2018)

(In open court:)

THE COURT:  Good morning, everybody.

MR. WEXLER:  Good morning, Your Honor.

MR. LANGSTON:  Good morning, Your Honor.

THE COURT:  Have a seat, please.

We'll hear from the government.

MR. WEXLER:  Yes, Your Honor.  Good morning.  We're here in the matter of the United States v. Winston Shrout, 3:15-cr-438, for the purpose of sentencing.

If I may, Your Honor, the Court has the government's detailed brief.  It's certainly not my intention today to read that brief into the record, but I do want to highlight for the Court some areas that I believe would be helpful for the Court to focus on when considering a sentence in this case.

I want to start just by reiterating what the government's recommendation is in this case, and that is 20 years of imprisonment followed by five years of supervised release, with special conditions as outlined in the government's sentencing memorandum, and an order of restitution to the Internal Revenue Service for $191,226.10.

Now, not surprisingly, the defense disagrees with the government's recommendation.  I think the first point of disagreement appears to be around the calculation of loss and

how the Court should handle that.  The defendant's position is
that loss in this case is only approximately $150,000, which is
related to the defendant's failure to file and pay taxes and
that there's essentially no other harm.  But that position is
incorrect for two reasons.  First, the intended loss in this
case is significantly higher, and both the sentencing
guidelines and Ninth Circuit case law are clear that the Court
should consider intended loss when applying the guidelines.
And this includes even where the defendant's fraud was
impossible or unlikely to occur or where the defendant's
fraudulent intent was thwarted.

And there was significant evidence at trial, including the
defendant's own admissions, that he intended for his fraud to
work.  And even if the defendant's -- even the defendant's
sentencing memo implies that the loss was intended to occur.

I mean, why else would the defendant focus on his supposed
beneficent motivations for doing the conduct?  Why do the
conduct at all if you're not intending for it to work, if
you're not intending for the loss to occur?

So the Court can and should include the intent of the
defendant's fraud even if he never succeeded or couldn't have
succeeded.

And the second reason is that the actual harm in this case
is really closer to $30 million if the Court considers relevant
conduct.

Now, the guidelines and the Ninth Circuit both state that the Court can consider conduct that isn't charged or is not an element of the conviction if it was part of the same course of conduct or common scheme or plan as the offenses of conviction, and the Ninth Circuit specifically says to focus on similarity, regularity, and temporal proximity.

The defendant's seminars, which were a large part of the government's case, weren't limited to promoting and teaching the use of fictitious financial instruments. The defendant also promoted other fraudulent schemes, including a scheme known as the false form 1099-OID scheme, which the -- essentially involved the filing of false tax returns using a fraudulent IRS form, and the government's brief goes into a little bit more detail as to what the OID scheme is essentially about.

And the defendant's promotional activity resulted in a number of related convictions, including family, friends, and customers. The government provided a list of approximately two dozen cases -- that was attachment C to the government's sentencing memorandum -- where individuals used portions of the defendant's schemes learned through attending a seminar, viewing or reading a product, such as a video or a book, or receiving one-on-one coaching. And those cases defrauded the federal government out of at least $30 million, and that's the amount of ordered restitution. That's real harm.

1        And that conduct only includes cases where there was a

2   federal tax nexus.  It doesn't include any cases that may have

3   occurred at the state level.  It doesn't include any cases that

4   may have not had a tax nexus, such as mortgage fraud or bank

5   fraud.

6             THE COURT:  What does it include?

7             MR. WEXLER:  It includes cases -- a number of cases

8   related to the OID scheme and a number of cases related to the

9   fictitious -- filing of fictitious instruments.

10            THE COURT:  You now say 30 million loss?

11            MR. WEXLER:  Yes, sir.

12            THE COURT:  Loss to whom?

13            MR. WEXLER:  Loss to the federal government,

14   Your Honor.  I think, in some of those cases, it may have been

15   third-party loss to banks, but essentially it's loss to the

16   federal government for -- either related to false tax returns

17   or --

18            THE COURT:  Are you talking about the taxation of

19   30 million, or are you talking about the gross amount?

20            MR. WEXLER:  I'm talking about the gross amount,

21   Your Honor.  So this would have been, for example, someone

22   would have filed a false tax return using the OID scheme, and

23   they would have received a fraudulent refund as a result.  Some

24   of these refunds were quite large, and so that's the loss.  The

25   government is out that loss, and that was the basis of the

1    restitution.

2              MR. INIGUEZ:  Your Honor, if I may, I wanted to wait

3    until my turn; however, I was going to object not only to the

4    government's exhibit, but to this evidence.

5              THE COURT:  I know you do, and you wait your turn.

6              MR. INIGUEZ:  Okay.  Thank you, Judge.

7              THE COURT:  Now, while we're on the -- I appreciate

8    that there's no -- all you can do is give it your best

9    estimate.

10        Do you know how many people over the years actually

11   attended these seminars?

12             MR. WEXLER:  Your Honor, it would be in the hundreds.

13   I don't know the exact number, but I have reviewed records from

14   BEADS, which was the organization that ran a number of the

15   seminars, and I know that they received customer payments from,

16   at times, at least a hundred people for a given seminar.

17             THE COURT:  That's just for one seminar.

18             MR. WEXLER:  That's just one seminar, Your Honor.

19   This is conduct that went on for at least ten years.  The

20   seminars went on for at least ten years.

21             THE COURT:  I'm trying to get at a total number of

22   attendees, if you figured that out, of your best estimate.

23             MR. WEXLER:  Your Honor, I -- I don't -- I would --

24   it would just be an estimate, and it would be in the hundreds.

25   I can't put together a better -- because, one, the government

1   is not aware of every seminar that the defendant gave.

2          THE COURT:  Do you know approximately how many

3   seminars he conducted?

4          MR. WEXLER:  Your Honor, if I can have a moment,

5   Special Agent Casey Hill, who's here today, who would have a

6   better sense of that number, if I can just ask him?

7          THE COURT:  Of course.

8          MR. WEXLER:  Thank you.

9          THE COURT:  You know, he's welcome to pull over a

10  chair and sit at counsel table.

11         MR. WEXLER:  Thank you, Your Honor.

12         THE COURT:  Counsel, you can slide over just a little

13  bit.  Thank you.

14         MR. WEXLER:  Agent Hill's best estimate is, in terms

15  of organized seminars, 15 to 20 organized seminars that we know

16  of.  I personally know of at least half a dozen private

17  coaching seminars where individuals hired the defendant to come

18  out to them and give them a personal private seminar.  So we're

19  up to at least two dozen seminars that we know of.

20         THE COURT:  Over the ten-year period?

21         MR. WEXLER:  Over the ten-year period, beginning

22  in -- I will say the defendant's seminar activity has trailed

23  off in the last few years.  So it's really between 2006 -- I

24  mean, the defendant has been under indictment.  So I would say

25  between 2006 and 2015.  So really an eight- to ten-year period.

1          And that, of course --

2               THE COURT:  What was the charge?  How much were the

3     participants charged?

4               MR. WEXLER:  That would range, Your Honor, but the --

5     Your Honor saw the defendant's advertisement for a new seminar

6     during the competency hearing, and I believe the fee was $575

7     for that.  I would imagine the defendant charged different

8     rates over different periods.

9          Do you know?

10         From -- Agent Hill's recollection, it's from $350 on up.

11         This, of course, Your Honor, is just related to the

12    seminars.  The defendant also sold copies of his seminars

13    through DVD sales on his website, and the government's PayPal

14    records, which were part of the government's evidence at trial,

15    showed that the defendant made 1 -- over 1,000 individual

16    transactions -- individual sales of his material from April of

17    2014 to April of 2015.  That's just a one-year period.  Over

18    1,000 transactions of selling his material.

19              THE COURT:  So to backtrack over the whole period of

20    time, you think it was how many people, again, over a ten-year

21    period went to seminars?

22              MR. WEXLER:  Your Honor, I would say, conservatively,

23    2,000 seminars, 50 people per seminar.  So about a thousand

24    people.

25              THE COURT:  Now, how do you reach your 30 million?

1          MR. WEXLER:  Your Honor, that's just the cases that

2    we provided you in attachment C, are cases Agent Hill --

3    Agent Hill can take the stand if Your Honor would prefer to

4    hear from him under oath, but Agent Hill sent out a national

5    inquiry to IRS investigative agents, asking if they had or were

6    aware of cases that had a connection to the defendant.  And the

7    cases that we have listed in our attachment C are cases that

8    came back where those defendants either attended a seminar put

9    on by the defendant, they received a private seminar put on by

10   the defendant, they relied on videos or one-on-one coaching.

11   In all of those cases, there's a connection between the scheme

12   the defendant used and what the defendant was teaching, and

13   those defendants were in possession and were known to have

14   relied on that material.

15          THE COURT:  I don't know how you jump from 100 plus

16   the sales at -- at the seminars to 30 million.  How do you get

17   there?

18          MR. WEXLER:  Well, Your Honor, that's the -- the

19   restitution amounts that are in those cases, that's the

20   30 million.  So the government's argument is that the defendant

21   should be responsible, in part, for that loss because it was

22   his schemes that were relied on in those cases.  So the

23   30 million is loss from those cases.  So for --

24          THE COURT:  How is it loss?

25          MR. WEXLER:  From successful fraud, Your Honor.

1   These were restitution amounts that were ordered because

2   individuals succeeded in defrauding the government out of those

3   amounts.  So they were ordered to pay restitution in the amount

4   of the fraud loss.

5          THE COURT:  You mean, now -- let's just take your

6   maximum number of attendees again.  State the number of

7   attendees over a ten-year period.  It's how many?

8          MR. WEXLER:  I would very conservatively say at least

9   a thousand, Your Honor.

10          THE COURT:  A thousand.  All right.

11      Out of a thousand, they paid so much to go to it.

12          MR. WEXLER:  Yes, Your Honor.

13          THE COURT:  That adds up to how much?

14          MR. WEXLER:  Hundreds of thousands.  The

15   government's -- I don't have the exact income amounts that the

16   government presented at trial to the defendant, but it would

17   have been hundreds of thousands over that period of time.

18          THE COURT:  And then how do you get up to 30 million?

19          MR. WEXLER:  So let me just take a step back,

20   Your Honor, because I think we're probably passing each other

21   here.

22          THE COURT:  Well, I keep asking you the same

23   question.  I'm trying to get a -- an amount that makes sense.

24          MR. WEXLER:  Sure, Your Honor.

25          THE COURT:  If we're talking about him charging, I --

1   I thought it would be many more seminars than what you propose,

2   from what I heard, so I'm -- we'll limit it to no more than

3   what you said.

4        Then so much income came from those, and you gave me a

5   figure in the hundreds of thousands.  But I don't know how that

6   lines up.  And then you jump to 30 million, and I don't know

7   how you get there from here.

8              MR. WEXLER:  Yes, Your Honor.  So the $30 million

9   number is related to conduct that the government is arguing is

10  relevant conduct, and it's not -- and it's not loss associated

11  with the defendant charging at a seminar.  It's loss associated

12  with a customer of the defendant's defrauding the government.

13             THE COURT:  Okay.  Now, how many customers defrauded

14  the government?

15             MR. WEXLER:  Well, Your Honor, I don't have a certain

16  number of that, but what I do have is what we presented in

17  attachment C, which is at least two dozen cases that went to

18  indictment, trial, and conviction.

19       I don't -- I don't know who, beyond that, went and tried

20  to defraud the government.  It could be -- if each individual

21  at the seminar did exactly what they were taught, then it could

22  be everybody.  But I don't have a number for that.

23       What I do know is that the cases that we included in our

24  attachment C, I can confirm that all of those two dozen cases

25  had a connection to what the defendant taught and those people

1    learned it.

2                THE COURT:  Those two dozen cases amount to how much?

3                MR. WEXLER:  The restitution amounts that were

4    ordered in those cases total approximately $30 million.

5                THE COURT:  Okay.  That's where I wanted to get.

6        So we're talking about the restitution amounts of the

7    people that were, quote, students of the defendant, applied his

8    tax evasion scheme, amounted to $30 million.

9                MR. WEXLER:  Yes, Your Honor.

10                THE COURT:  To your best estimate?

11                MR. WEXLER:  Yes, Your Honor.

12                THE COURT:  Thank you.  Go ahead with your

13    presentation.

14                MR. WEXLER:  Thank you, Your Honor.

15        Loss, as the Court is well aware, is a significant part,

16    but it's also just one part of the Court's consideration when

17    determining an appropriate sentence.  And the Court must also

18    consider factors under Section 3553(a).

19        The government feels that one of the most helpful factors

20    for this case is the need to avoid unwarranted sentencing

21    disparities.  This leads me to the discussion of the similar

22    cases that the government presented in its brief and the one

23    case that the defense presented in its brief.

24        The first case that the government's presented was

25    *United States v. Teresa Marty*.

1        Now, in that case, Marty pleaded guilty to, in part,

2   defrauding the United States through the use of the false OID

3   scheme.  This may actually help the Court understand sort of

4   the nexus.

5        And Ms. Marty received ten years in prison.

6        And the case -- Marty's case is related to this case

7   because Teresa Marty actually presented at the defendant's

8   seminar.  She was a guest speaker at the defendant's Orlando

9   seminar, which was part of the government's case at trial,

10  where she talked about how to do the OID scheme.

11       And the government would suggest that the ten-year

12  sentence represents really a floor for the sentence in this

13  case because Ms. Marty was just a guest speaker at the

14  defendant's seminars.  The defendant's conduct goes beyond that

15  for a number of years and a number of schemes and a number of

16  individuals.

17       And so Ms. Marty got ten years, but she was just a small

18  part of the defendant's overall fraudulent activity.

19            THE COURT:  Any criminal history?

20            MR. WEXLER:  In this case, Your Honor, or Ms. Marty?

21       None that I'm aware of in Teresa Marty's case, Your Honor.

22            THE COURT:  Thank you.

23            MR. WEXLER:  The next case that the government

24  provided was *United States v. Dennis Alexio*.  In that case

25  Alexio was convicted of filing false returns that used the OID

1    scheme and the use of fictitious financial instruments, just

2    like the defendant here was convicted of.

3        And there was actually a client folder for Dennis Alexio

4    on the defendant's computer that was found during the search of

5    the defendant's computer, and it contained a false OID tax

6    return.   And Dennis Alexio received 15 years, but he was just a

7    client of the defendant.   Just one of hundreds.

8        But, finally, the government presented the case of

9    *United States v. James Timothy Turner*, and that's the case the

10   government feels most clearly reflects the defendant's conduct

11   in this case.

12       Turner received a sentence of 18 years for producing and

13   using fictitious financial instruments that totaled over

14   $2 trillion.   Now, the Court there also considered Turner's

15   other conduct, such as hosting seminars, where he spread his

16   fraud schemes; teaching others how to use fictitious

17   instruments, to pay tax and other debts, and failing to report

18   the income he received from customers from his seminars.

19       The Turner court was also persuaded by the fact that

20   Turner caused many of his customers to lose money as a result

21   of the schemes or to accrue criminal charges themselves, and

22   that's exactly like the defendant.

23            THE COURT:   Now, we're talking about your allegation

24   of 300 fictitious financial instruments worth in excess of

25   $100 trillion?

1          MR. WEXLER:  Yes, Your Honor.  Those instruments were

2    found on the defendant's computer.  Mr. Kerr testified at trial

3    as to those instruments.  The government would argue that under

4    the guidelines they can be considered as relevant conduct.

5          THE COURT:  So you're -- thank you.

6          MR. WEXLER:  But the connection between the *Turner*

7    case and this case is -- is -- goes beyond just the fictitious

8    instruments, as I just mentioned.

9          In fact, the government provided to the Court in its brief

10   the intelligence report from the Southern Poverty Law Center

11   from 2010 that labeled both Timothy Turner and the defendant

12   here as leaders of the same sovereign citizen movement for

13   promoting the same schemes and doing essentially the same

14   conduct.

15         The only difference really is that the defendant did it

16   for longer than Timothy Turner did.

17         Now, on the other hand, the defendant -- the defendant

18   only gave one case, and that's the case of *United States v.*

19   *Richard Ulloa*.  But the defense mischaracterized the facts in

20   that case.  While the Court did a guidelines calculation based

21   on actual loss, that came to 21 to 27 months, as the defense

22   stated, the Court actually found that range too low, when

23   considering Ulloa's overall conduct, and sentenced him to

24   60 months.

25         The extent of Yoloa's conduct in that case is far, far

1    less than the extent of the defendant's conduct in this case.

2         Now, an important goal embodied in the sentencing

3    guidelines is the concept of uniformity of punishment.  Similar

4    conduct in the federal system should be punished similarly.  It

5    simply cannot be a fair and just system if the defendant's

6    conduct in this case, which is virtually identical to

7    Timothy Turner's conduct in the Middle District of Alabama, is

8    sentenced much differently than Timothy Turner's conduct was.

9         So I would like to transition to just talk briefly about

10   the actual offense conduct and the nature of the offense under

11   3553(a).

12        Your Honor, Section 514, which covers fictitious

13   obligations, is a serious crime.  As the government noted in

14   its brief, the Court can look to the Congressional Record for

15   the why of 514 being enacted.  But the Court should also make

16   note that Congress made it a Class B felony, a very serious

17   felony that's not eligible for a probationary sentence.

18        In other words, Congress did not intend for people who

19   commit this crime to receive probationary sentences; yet that

20   is exactly what the defendant is asking for.  The defendant is

21   asking for one day, but the credit received -- the defendant

22   receives credit for being processed by the marshals, so he's

23   essentially only served one day.  So it's essentially only a

24   fully probationary sentence.

25        Congress went so far as to not only criminalize --

1          THE COURT:  Well, technically, the defense gets

2     around that by saying one day and then followed by supervised

3     release.  It ends up having the same personnel handling it, the

4     same conditions.  So it's just a matter of nomenclature than

5     anything else.

6          MR. WEXLER:  Yes, Your Honor.

7      And Congress went so far as to not only criminalize intent

8     in 514, but also simply possessing fictitious instruments with

9     an intent to defraud is a crime.

10     The breadth of the statute itself speaks to just how

11    serious Congress considered this conduct.

12     Now we're talking about a 20-year pattern of conduct.  By

13    the defendant's own admission, the defendant got on the stand

14    and said he's been doing this for at least 20 years.

15     Now, as I mentioned earlier, the Court should consider

16    this relevant conduct that the defendant is promoting, multiple

17    schemes, including this OID scheme, which is widespread and

18    harmful.  He's not simply someone who didn't file his taxes and

19    try to defraud the government and banks with fictitious

20    instruments.  He's a nationwide, even worldwide promoter of

21    antigovernment fraud schemes.  The government put on evidence,

22    as evidence at trial, the defendant's seminar from London, and

23    the defendant has also given seminars in Canada and Australia.

24          THE COURT:  Now, in respect to that --

25          MR. WEXLER:  Yes, Your Honor.

1          THE COURT:  -- has there been any calculation as to

2     the amount of world travel that he's engaged in -- he says they

3     admired him in Australia, and he went to London on these

4     excursions -- as to how that was paid for or what it was -- the

5     costs at all?

6          MR. WEXLER:  If I can have a moment, Your Honor?

7          THE COURT:  Really, I just need a feeling as to how

8     much travel there was.  Were these isolated?

9       Go ahead.

10         MR. WEXLER:  Yes, Your Honor.  There's at least a

11    half dozen to a dozen seminars that the defendant gave abroad.

12    Most of them are in Canada because it's close.  The defendant

13    did give one in Panama, in London, and -- in London, England;

14    in Australia.

15      Right after he was indicted, the defendant went on a

16    cruise to Mexico called the Conspira-Sea Cruise, where he spoke

17    on that.  The government provided a citation in its brief to a

18    review of what he actually stated on that cruise.

19         THE COURT:  Thank you.

20      You answered my question.

21         MR. WEXLER:  Thank you.  And, of course, Your Honor,

22    as I mentioned, the promotion activity that the defendant

23    engaged in led to criminal conduct by family members, by

24    friends, and by at least the two dozen cases that the

25    government cited in its brief.  But as we discussed, the number

1    is really a lot more.

2        And none of that reflects well on the defendant's

3    character.

4        The defendant, in his brief, seems to view himself as some

5    sort of Robin Hood.  But the jury rejected that.  They heard

6    the defendant on the stand, and they still convicted him.  The

7    defendant knew his family, friends, and customers were going to

8    jail using the things that he was teaching, and he kept going.

9    And the defendant seemed to ignore, in his brief, the fact that

10   one of the fictitious instruments that he was convicted of was

11   sent to the United States Treasury, and it was for payment to

12   him.

13       The defendant's sentencing memo talks about how none of

14   this was payment to him.  He was just doing this for other

15   people.  But it completely ignores the fictitious instrument.

16   The nonnegotiable bill of exchange the defendant sent to the

17   Treasury for his own benefit.  He's not Robin Hood.  He's just

18   robbing people.

19           THE COURT:  How much for this?

20           MR. WEXLER:  That was 1.9 billion, this instrument,

21   Your Honor.

22           THE COURT:  Thank you.

23           MR. WEXLER:  There are no mitigating health issues in

24   this case.  Dr. Pelton's letter, which the government provided

25   to the Court from the Bureau of Prisons, says the defendant's

1    physical ailments are nothing new.  In fact, there's an entire

2    system within BOP for handling inmates with physical conditions

3    like the defendant.

4        The case law that the government provided in its brief

5    says that the defendant's age, his advanced age, is not -- does

6    not necessitate a lenient sentence, and the defendant's mental

7    health, frankly, is mischaracterized in the defendant's brief.

8        First, the Court presided over the competency hearing.

9    It's not settled that there's any delusion at all.  The Court

10   can completely discard Dr. Martin's report.  She did not

11   testify at the hearing.  And most importantly, her report does

12   not include any consideration of subculture, which both

13   Drs. Millkey and Lopez said was critical to their analysis.  So

14   the Court can discard that.

15       So really the Court is left with Dr. Millkey versus

16   Dr. Lopez.  And they come up to differing conclusions.  The

17   defendant just relies on Dr. Millkey and completely ignores

18   Dr. Lopez.

19       Second, even if the defendant is delusional, Dr. Millkey

20   was clear that the delusion is not related to the conduct in

21   this case.  Dr. Millkey said the defendant believed in aliens.

22   Dr. Millkey never said that the defendant couldn't act

23   purposely or intentionally to defraud somebody, which is what

24   they -- the defendant's sentencing memo actually says that

25   Dr. Millkey -- Dr. Millkey never made that conclusion.

1       Really, the entire mental health issue is just an intent
2    to nullify the verdict.   The first attempt was to have the
3    competency hearing itself and to avoid sentencing entirely.
4    And now the second attempt is to claim some sort of diminished
5    capacity.   But the jury concluded that there was no diminished
6    capacity at the time of the defendant's actions.   There's --
7    there was no discussion from Dr. Millkey or Dr. Lopez regarding
8    whether the defendant was actually suffering from any
9    diminished capacity when he was committing these acts.
10       The defendant can't split the baby.   He can't argue that
11   he's led a law-abiding life and poses no threat to society but
12   at the same time has mental issues to prevent him from
13   controlling behavior that he knows is wrong.
14       The fact is that the defendant's mental health, as it
15   relates to his criminal conduct, is fine.   It's always been
16   fine.
17       He's always known exactly what he was doing.
18       Your Honor, I just would like to finish with a discussion
19   about deterrence.
20       Now, deterrence is an area that often gets short shrift
21   but is part -- I believe a particular important factor for the
22   Court to consider in this case.   First, there is the issue of
23   specific deterrence.
24       The defendant says the issue of one day in prison is
25   sufficient.   But we're talking about a 20-year pattern of

conduct.  The defendant, throughout that period, was repeatedly put on notice of the criminality of its conduct, and it had no effect.

When the defendant was indicted, he simply responded with a commercial lien and threats against the Court and law enforcement.  He still does weekly and regular podcasts that appear on YouTube and in other venues where he's flouted his case as being part of his larger plan, and the pod -- he gave a podcast the day after his competency hearing in which he said that even though he took down his website, it would all be back when there's a change in government.  Whatever that means.  But what it does mean is that the government is not deterred -- the defendant is not deterred.

It's laughable now that, frankly, the defendant would argue that just one day in jail would deter conduct that's gone undeterred for 20 years.  Despite knowing his friends and family were going to prison, his customers were going to jail, he was under investigation for his conduct.  He was under indictment for his conduct.  He was convicted for his conduct. None of that has deterred him.

But, Your Honor, perhaps of even greater importance here is the concept of general deterrence.  Frequently, in tax cases, the government highlights the importance of tax enforcement and deterring noncompliance with the tax code, and those are important issues.

1    But more importantly here is that the defendant is a

2  prominent figure in the sovereign citizen and tax defrauding

3  community.  As I stated earlier, he had over 1,000 customers in

4  a one-year period, from April of 2014 to April of 2015.  The

5  government provided a link to a YouTube video of defendant

6  speaking that has over 160,000 views.  This case has been

7  followed by the local press here in Portland.  It's been

8  followed by national organizations, like the Southern Poverty

9  Law Center and The Anti-Defamation League.

10    All of this is to say that people are paying attention.

11  People of like mind with the defendant, who see him as a

12  leader, as an authority figure, in a matter of hours, news of

13  this Court's sentence here today will spread throughout that

14  community, and those folks, which is hundreds of people, if not

15  thousands, will either be emboldened by defendant walking away

16  with merely a slap on the wrist and think that their conduct is

17  worth that risk, or they'll be deterred.  They will see that

18  the risk is too great, and they won't want to spend a good

19  portion of their lives in prison for that conduct.

20    They'll turn away.  They'll choose a different path.

21    And the Court has the power here today to alter the path

22  of hundreds of like-minded individuals.  And the government

23  asks that the Court seize that opportunity, consider the

24  government's brief and all that I've discussed here today, and

25  sentence the defendant to 20 years in prison.

1           THE COURT:  Thank you, sir.

2           MR. WEXLER:  Thank you, Your Honor.

3           THE COURT:  Counsel?

4           MR. INIGUEZ:  Good morning, Your Honor.

5      Your Honor, I have appeared before this Court many times

6 in the last 20, 25 years.  This is probably the single case

7 where I have seen such a difference in perspective between the

8 parties.  The government here is arguing that this Court should

9 exercise its sound discretion and sentence this 70-year-old

10 gentleman, whose commission of these offenses resulted in no

11 violence, no actual loss, and I'm asking you to consider all

12 the personal history and characteristics.

13      20 years imprisonment; one day in prison, five years of

14 supervision.  That is a big gap.  I don't envy the Court's

15 decision.  I think what Mr. Wexler just told the Court -- I

16 know the Court is not concerned with public -- the public.

17 It's concerned with justice, fairness, reasonableness, and I

18 wanted to start out by reading what Congress directed the

19 Sentencing Commission 34 years ago when it initiated the

20 sentencing guidelines that we operate under in this courtroom,

21 and I'll quote from Title 28 U.S. Code § 994(j), the Sentencing

22 Reform Act of 1984.  And what Congress instructed was that the

23 general appropriateness of imposing a sentence other than

24 imprisonment in cases in which the defendant is a first

25 offender who has not been convicted of a crime of violence or

1    an otherwise serious offense -- this was not a crime of

2    violence.  This is a first-time offender.  This is an older

3    gentleman who does have a lifetime of accomplishment, who

4    stands before you.

5         I'm not trying to stay that this is not serious.  He's

6    been found convicted, guilty of these offenses.  But, again,

7    I'll go to the issue that you first addressed with the

8    government, which is the issue of loss here, Judge.  And that

9    is why I am objecting to the guideline calculations here

10   because it is undisputed.  These over -- I think it was 300

11   documents that they're claiming is relevant conduct, worth over

12   100 -- supposedly $100 trillion is the purported face value.

13   The fact is not one of those fictitious instruments was

14   negotiated, honored, transacted, accepted by any person or any

15   entity, including the federal government.

16        You heard the government talk about that one document sent

17   to IRS.  That, of course, just like what the bank did, was look

18   at it.  It's ludicrous on its face.  And this, Your Honor, I

19   think, ties directly into the notion that whether the

20   government likes it or not, there are two professional expert

21   opinions, both who found Mr. Shrout to suffer from delusional

22   disorder.  I know they want to ignore that and say, "Oh, it's

23   not proven.  It's not accepted."  It is.  We had testimony

24   about that.

25        And that is key in this case, Judge, because if Mr. Shrout

1  was a perfectly functioning individual without a mental

2  disorder, then that would say this person perfectly intended

3  for other people to suffer loss.

4      In fact, no actual loss.  I'll get into this issue of

5  $30 million because I do have a very, I think, strong objection

6  there, Judge.  Everything that you're hearing from the

7  government, your questions are well directed, and I think

8  they're getting at the point here.

9      The government, until its submission of this sentencing

10 document and this listing of other cases, listening -- reading

11 their brief and listening to the presentation this morning, it

12 strikes me how much of the government's case is talking about,

13 not Mr. Shrout, but other people, restitution of $30 million of

14 other individuals in other cases who they claim -- and that's

15 all they do, is claim -- attended a seminar.  Read -- read

16 something, listened to a DVD, and somehow, because someone --

17 part of what they read -- you know, my bookshelf is full of

18 books.  Simply because I read a poem by Robert Frost, is he

19 culpable for something that I later do because they can show I

20 bought his book?

21      What they want to say is these people committed acts on

22 their own.  We don't know anything about those individuals,

23 anything about their characteristics, anything about those

24 facts, and, yet, the government comes in here today and tries

25 to say, "He should be held responsible for everything these

1  other people that we say are somehow associated with him --

2  they attended a seminar, they read a book, and therefore he

3  should be held responsible for something they have already been

4  held responsible for."

5       No one, not Mr. Shrout, no one has that much power to

6  control and direct.  Did he not control and direct these

7  individuals.  That argument, that use of that amount -- why

8  does the government do this, Judge?  Why is it trying to use

9  restitution in other cases as actual loss here?  Because it has

10  no actual loss.

11       These instruments, again, undisputed.  I would challenge

12  my colleague to tell the Court about any single instrument that

13  was honored by anyone.  The answer is he cannot because it did

14  not occur.  There is no actual loss.  The only loss in this

15  case is the tax loss for the failure to file that the

16  government suffered, that Mr. Shrout agrees he must pay and he

17  will pay.

18            THE COURT:  The 191,000?

19            MR. INIGUEZ:  I believe the number proven at trial,

20  Judge, was a little over 157.  The government is arguing that

21  the Court should allow penalties and interest.  It did provide

22  information last week that the defense has not had an

23  opportunity to review.

24       As I suggest, the statute allows us to set over

25  restitution only for a period where we can get to the bottom of

exactly how much.  But the bottom line is this:  It's less than
$250,000.  We both agree.  Their position is 191; mine is 157.
We'll figure out whether the loss and the penalties apply.  The
reason that less than 250 is important is because when you look
at the tax table -- go to 2T1.1, and 1.4 is the table -- that
is a base offense level of 16.  That is where we should begin
this discussion.  Not at this level seven plus.  Because the
loss was over $100 trillion of intended loss, we're going to go
up 30 levels to more than 20 years, that's where the government
comes up with this number, Judge.  And that's just not -- this
case really shows us how the guidelines, try as they might to
be reasonable and fair, it's not one size fits all.

     We have no actual loss.  My argument, and, again, it
ties -- this case cannot be decided without looking at
Mr. Shrout's mental health.  And the guidelines define intended
loss as purposefully inflicting pecuniary harm or intending to
inflict pecuniary harm.  Even if it's unlikely, as the
government says, or impossible to occur, right, but it has to
be intentional, purposeful, and that's why this conduct here
does not satisfy the definition of intended loss.

     The loss we're dealing with really is less than $250,000
under the tax table, and that's where we should start.

     Now, going back to these other cases that the government
is talking about, Judge, you know, my objection is this:  The
need -- they're really focused on the need to avoid unwarranted

sentence disparity.  He discusses it.  20 percent of the
government's brief addresses that issue, addresses other cases,
not Mr. Shrout's case.  That's where they would like the Court
to spend its time and attention.  Not on this unique individual
before the Court and that the Court must judge.

They discuss the *Marty* case right now orally.  A guest
speaker.  You heard Mr. Wexler admit she, not him, advocated
this OID scheme.  Not Mr. Shrout; her.  She's responsible for
her own conduct, but somehow the government wants to say she
was a speaker; so, therefore, because she did that, you should
attribute that to him and hold him equally or more accountable.

Here is really my -- they talked about *Alexio* and *Turner*,
too, Judge, but here is the bottom line:  The government, in
much of its brief, acknowledges Ninth Circuit law that applies
but not when it comes to this issue that they spend so much
time discussing.  Here is the Ninth Circuit law that guides the
Court on the issue of unwarranted disparity.  We both cited
this case, and it's *United States v. Treadwell*.  It's a 2010
Ninth Circuit case.  The citation being 593 F.3d 990.  Here is
what the Court -- the Ninth Circuit in that case says I would
like to quote.  A district court need not, and, as a practical
matter, cannot compare a proposed sentence for defendant to the
sentence of every criminal defendant who has ever been
sentenced before.  Too many factors dictate the exercise of
sound sentencing discretion in a particular case to make the

inquiry that the government urges helpful or even feasible.

That's at page 1012 of *Treadwell*.  It is a bit of a long quote, but I'm going to read it, Judge.  Because here is what -- here is what the defendant in *Treadwell* was trying to do, was use the same argument the government was saying.  Look at all these other people around the country at other times and in other cases who got lighter sentences.  So you should compare me not with the defendants in this case; right?  That's what you do with sentence disparities.  Look at defendants in their particular case, not at people from all around the country.  And the Court shot that argument down.

It doesn't matter, for the purposes of 3553(a), said the Court, that the government could point to a specific criminal defendant who may have received a greater sentence for a different fraud.  A district court considers the 3553(a) factors to tailor a sentence to the specific characteristics of the offense and the defendant, and they quote from the Supreme Court.  It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual.  And every case as a unique study in the human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensue.  That's a quote from the Supreme Court.

The mere fact that here the government can point to a defendant convicted at a different time of a different fraud

1   and sentenced to a term of imprisonment, greater -- here

2   greater than the defendant's -- does not create unwarranted

3   sentence disparity.

4        For one thing, we aren't presented with the records in

5   those cases on which the government relies.  That is really my

6   argument, Judge, that they're asking you to consider something

7   that you should not.  It's illegal.  They can't ask the Court

8   to consider these other cases when deciding the sentence here.

9   The focus here -- the focus here, as always, is on this unique

10  defendant, these unique circumstances, this particular offense.

11       Judge, I -- I cannot presume, with the Court's

12  experience -- I know this Court has sentenced thousands of

13  defendants.  You, better than my colleague, better than myself,

14  can look at this case.  I know we have had this case for years.

15  Mr. Shrout has appeared before you several times.  Not only at

16  trial, but at the competency hearing.  And I trust that the

17  Court can look at this case and say, you know, 20 years

18  imprisonment.  Prison?  Years in prison?  Really?  For a

19  defendant who is nonviolent, who's had the kind of background

20  and history -- you can see from his family -- sons, daughters,

21  grandchildren --

22            THE COURT:  On that score, I received a letter from

23  his common-law wife.

24            MR. INIGUEZ:  Charlotte?

25            THE COURT:  What?

1            MR. INIGUEZ:  Charlotte Killips?

2            THE COURT:  Yes.  She says that Winston raised 18

3     children, consisting of 12 sons and 6 daughters.  Is that -- is

4     that the correct number?  Would you ask him?

5            THE DEFENDANT:  Yes.

6            MR. INIGUEZ:  Yes, Judge.

7            THE COURT:  All right.  And apparently all the

8     children have done very well?

9            MR. INIGUEZ:  They have.

10           THE COURT:  Have been crime-free?

11           MR. INIGUEZ:  Yes.  Yes.

12           MR. WEXLER:  Your Honor, they actually haven't.

13           MR. INIGUEZ:  One is a stepdaughter.

14           THE COURT:  Well, that was a stepdaughter.  That was

15    a separate thing completely.  I kept it out before the jury.  I

16    keep it out of my thinking for this sentence.

17           MR. INIGUEZ:  Judge, you know, the first factor under

18    3553(a), if I may, is personal history and characteristics, and

19    that's really what I'm asking you to consider here, among other

20    things.  Not only his age.  You know, it strikes me as so

21    incredible sometimes when the government can come in and just

22    pooh-pooh someone's age and health and treat it like it just

23    should not be considered.  It should and it must, and Congress

24    has dictated that it should and must.

25         This gentleman has several health issues.  I have heard,

1   as I'm sure the Court has, so many times, the government come

2   in and try out the fact that the Bureau of Prisons can take

3   care of this.  "It's okay.  Send him to prison.  He'll be fine

4   with the Bureau of Prisons."  There are studies upon studies,

5   most recently from this year, where the Bureau of Prisons is

6   woefully inadequate.  They cannot -- they say they can, but

7   they cannot address these sorts of physical health conditions.

8         The government could sit here before you and say that they

9   can, but it's just a claim.  The studies bear it out.  They're

10   not able to.  And that's a factor that the Court can consider.

11   Those health conditions, as we all know, during the past almost

12   three years that he's been on pretrial supervision, with the

13   Court's authority, he's traveled outside the country because

14   it's less extensive get hip replacements, to have his back

15   worked on.  He suffers from chronic pain.  I -- I think during

16   the time that we've seen him in this process, he's -- his

17   health has substantially deteriorated.  The cataracts, the

18   heart condition, the --

19         THE COURT:  Hernia?

20         MR. INIGUEZ:  The hernias, the condition of his legs

21   that he's about to have treated, Judge.  Those are all things

22   that we need to consider.

23         The other thing we just discussed -- and these are, I

24   think, extraordinarily strong family ties and support.

25   Marriages of many years.  Ms. Killips, who you just discussed

1   in the letter, that is his common-law wife of almost 40 years.

2           THE COURT:  Is she here today?

3           MR. INIGUEZ:  She is not -- oh, where is Charlotte?

4   She's right there, next to Ms. Bekken.

5           THE COURT:  Yeah, she said in her letter to me that

6   she had been here constantly.

7           MR. INIGUEZ:  Your Honor, military service.  You

8   know, it's not insignificant.  And, again, the government wants

9   to turn it on its head and somehow say, wow, let's treat it --

10  because he stands convicted of offenses that he does, that we

11  should just disregard his military service and treat it as if

12  he's dishonorable.  He's not.  He served three years --

13  four years in the Vietnam War.

14          THE COURT:  Well, he wasn't in the Vietnam War.  He

15  was stationed in Okinawa, and he received -- he was a tech

16  sergeant in the Marine Corps, and he served his time honorably.

17  He's a sharpshooter.

18          MR. INIGUEZ:  That's right.

19          THE COURT:  So he did a good job.

20          MR. INIGUEZ:  Judge, also his education.  Clearly,

21  and, you know, this is the thing about delusional disorder --

22  and we heard it from the witness stand -- it is not unusual for

23  this to offset in later life.

24       And, I think, Judge -- again, I know you've seen so many

25  defendants, so many witnesses, and what I'm hoping is that it's

1  come clear to us every time Mr. Shrout stands before you that,

2  you know, it's difficult for me to stand in front of a client

3  and say, "I'm sorry, but you suffer from delusion.  You don't

4  recognize it.  You don't see it, but the experts do."  And it's

5  inextricable to sit here and try to disentangle beliefs in

6  people from Pleiades and the fact you're a walk-in from another

7  planet at the age of 5, from the idea that you -- you too were

8  fed these lies.

9       Mr. Shrout did not invent these theories that we're here

10  discussing today.  You know, they want to point him as some

11  sort of, I think, a leader, a guru.  He did not invent these

12  things.  He, too, later in life, read them, listened to them,

13  and was gullable enough and delusional enough to believe them

14  and spew them back out.

15       But we have to consider -- we're not looking at someone as

16  the government tries to portray, a monovalent, greedy terrible

17  person.  The evidence is very much to the contrary, Judge.

18       Like I say, I think we've all seen him.  I am sorry.  But

19  Mr. Shrout is not functioning mentally the same way that

20  Your Honor does, the same way that I do and that the prosecutor

21  does.  Those beliefs -- it's a little different; right?  The

22  jury found those beliefs -- they found him guilty, but

23  Mr. Shrout, because of that disorder, holds those beliefs.  But

24  it goes back to the issue that is critical here of intention

25  and purposefulness.

1           And, again, I think we can't dissect this stuff.  We can't

2     say, "Oh, look he got a BS in psychology in 1976, and back then

3     he had a high IQ, so, therefore, this was all purposeful.  It

4     was intentional."  No.  Things happen to people at different

5     points in their lives.

6                THE COURT:  His IQ is labeled at 136?

7                MR. INIGUEZ:  Back in the day.

8                THE COURT:  That was the Marine Corps level.  Do you

9     have anything more fresh?

10               MR. INIGUEZ:  No, I don't, Judge.  I'm sorry.

11          I do know the IQ you're preferring to, I think, was back

12    at 40, 45 years ago.

13               THE COURT:  Yeah.

14               MR. INIGUEZ:  Yeah.  Judge, his employment history as

15    well.  A very long career of hard work supporting that family.

16    He worked hard.  A journeyman carpenter for 20 years.  He

17    worked for the government with a clearance.  All these things

18    have to be considered.

19          Again, I can't stress it enough.

20               THE COURT:  Journeyman carpenter?

21               MR. INIGUEZ:  Yes.  That's right, Judge.

22               THE COURT:  Apparently.

23               MR. INIGUEZ:  Yeah, for 20 years.  And then he's been

24    retired.  And that, Judge, I think, again it coincides with the

25    end of his employment, retirement, the onset of this disorder,

1    and that's when these things start.

2         Again, not violent offenses.  Congress says, you know,

3    when you've got a violent offender, sentence of imprisonment

4    should be presumed.  But when you don't and it's a first-time

5    offender, the presumption is the other way.  There should not

6    be prison.

7         Again, no actual loss.  No intended loss.  The commission

8    of the offenses are inextricably intertwined with delusional

9    disorder.  I'm asking -- the government acts like it's no big

10   deal, but we have a felon -- convicted felon, who I believe --

11   I strongly believe supervision by this Court will go the same

12   way that supervision by the Court has for the last three years.

13   He will comply.  He will comply now more than ever because, as

14   you just heard, the day after the competency hearing, he shut

15   down the website.  We've discussed the fact of these conditions

16   that we agree with.  No further conduct, behavior -- it's not

17   really employment, but whatever we want to call it, regarding

18   seminars, books, DVDs, tax laws, anything, it's over with.

19   It's done.  He's complied with -- for three years.  He will

20   comply with five years, Judge.  This is not, I think --

21                 THE COURT:  How many books did he author?

22                 THE DEFENDANT:  Three.

23                 MR. INIGUEZ:  Three books, Your Honor.

24                 THE DEFENDANT:  One all on UFOs.

25                 MR. INIGUEZ:  One on UFOs.

1          THE COURT:  Thank you.

2          MR. INIGUEZ:  Judge, five years of supervision.  We

3   don't have this -- this idea of future harm, future crimes.  I

4   think we can tell from his past, before the onset of this

5   disorder, before these offenses for which he stands convicted,

6   no crimes.  None at all.  As a juvenile; as a young adult.  Now

7   that he's been made fully aware, regardless of his disordered

8   beliefs, he understands now fully this is over.  It's done.

9          So when I look at -- here is one of the things I look at:

10  When we have a case where there's tax loss -- as I say, that's

11  the only loss; right?  This idea that we should be sentencing

12  this gentleman for hundreds of trillions of dollars, as I point

13  out in my brief, that's outrage.  Everybody knew it was

14  outrageous.  No one acted on it because it's so, I'm sorry,

15  crazy.

16         Only three of these documents for which he was convicted

17  were worth less than the gross domestic product of the world's

18  leading economy -- the United States.  That's insane; right?

19  If I were to get a piece of paper by anybody that said it was

20  worth trillions of dollars, I would have to laugh.  I'm not

21  going to believe that.  No one is going to believe that.  This

22  was not only impossible or not likely to occur, it would never

23  have occurred.  And, in fact, it did never occur.

24         THE COURT:  Well, he also wanted to have all those

25  trillions of dollars to bail out the people who suffered

1    foreclosure from the fall of 2008.  That was his goal.

2           MR. INIGUEZ:  Isn't that, Your Honor, on its face,

3    when I hear that, although, I think, well, that's well-meaning,

4    but that's incredible.  The fact that anybody would believe

5    that they single-handedly had the power to write up a document,

6    put a number on it, and solve the world's problems -- it sure

7    would be nice if that's how things worked.  But I think, again,

8    Judge, I think we all know from our own personal experience,

9    that is a strong indicator of just how disordered this

10   particular mind is.

11       I wish I could solve the world's hunger crisis by writing

12   a check, but I can't.  No one can.  Most of us know that.

13   This, I think, Judge -- to sentence this man to prison, my

14   humble opinion, would be a travesty.

15       I know the government wants to, for lack of a better word,

16   scare, threaten, impress upon at least, the Court that, "Oh, my

17   God, if you were to send him home and supervise him and

18   give him -- let him have the medical treatment and mental

19   health treatment that he needs, all these people out there in

20   the world are going to be emboldened.  They're all watching,

21   Judge.  Hours from now everybody is going to see what you did,

22   and, wow, you should be really harsh, not consider the

23   individual circumstances.  Look at all these people and what

24   happened in their cases that we don't have any information for

25   you about, other than our claim that they're somehow related

here, and treat him the same way.  Forget about who he is as an
individual.  Forget about everything we know about him.  Don't
do the just and reasonable and fair thing, but be vindicative
and be harsh, as we would like you to do."

I know this Court has the perspective to put this case in
perspective with other cases.

Judge, you know, I'm not going to -- I'll deal with the
issue of restitution just briefly for this purpose.  Again,
we're between -- we're less than 250,000, but between 157 and
191.  I think we can decide that issue with finality in due
course.

Supervision.  Five years will allow the repayment of
restitution.  If, in fact, what the government is after is not
an eye for an eye but recompense --

THE COURT:  How is he going to pay any restitution if
he's got multiple disks, still is disabled, has no other
source -- he can't return to carpentry.  How in the world is he
going to pay anything, realistically?  Certainly not selling
books.

MR. INIGUEZ:  Not at all.

THE COURT:  Or conducting seminars.

MR. INIGUEZ:  That is for sure.

THE COURT:  That may be a moot issue.

MR. INIGUEZ:  Actually, Judge, you know, when we keep
talking about here the loss, the actual tax loss was the amount

1   of taxes due.  Not all of his income is from this scheme.

2       His income -- he had a considerable amount of income from

3   a pension because of that 20 years as a carpenter, a journeyman

4   carpenter.  So I would respectfully submit that that is where

5   that money can come from, as -- in addition to family members

6   and friends that want to help him.

7       But I think he can do that.  In prison, he can't.

8             THE COURT:  You have 90 days to resolve that issue.

9             MR. INIGUEZ:  Yes.

10            THE COURT:  After I sentence.

11            MR. INIGUEZ:  Thank you, Judge.

12            THE COURT:  I would like to hear from the government.

13            MR. INIGUEZ:  Judge, if I might just make one other

14  point, since we're talking about, it seems like, money, I just

15  wanted to note one thing I find rather remarkable.  That's the

16  cost of imprisonment for 20 years versus supervision.

17            THE COURT:  $36,000 a year.

18            MR. INIGUEZ:  Or $726,000 total versus $21,000.

19  That's three percent of the cost of prison by putting him on

20  supervision.  If we're really at the government -- if the

21  government is really concerned about money, it does not make

22  sense.

23       Thank you, Judge.

24            THE COURT:  All right.  We'll take a recess so you

25  can regroup here, and we'll pick up in ten minutes.

1          MR. WEXLER:  If you want, Your Honor, I'm ready to

2     go.

3          THE COURT:  Well, we have a court reporter.

4          MR. WEXLER:  Thank you, Your Honor.

5          THE COURT:  Thank you.  We'll take ten minutes.

6                    (Recess taken.)

7          THE COURT:  Counsel.

8          MR. WEXLER:  Thank you, Your Honor.

9          Your Honor, Mr. Iniguez's comments earlier are --

10    essentially amount to a second try at closing argument.  All of

11    the arguments regarding the defendant's conduct were made

12    during trial, and the jury found none of those arguments

13    compelling and convicted the defendant for all of the conduct

14    that Mr. Iniguez now says nobody could possibly believe.

15         The jury believed him, and they convicted the defendant.

16    The verdict -- the defense is asking for the judge to impose

17    your judgment in lieu of the jury's verdict.

18         He's saying that the seminars that he conducted had no

19    impact at all; that people, for some reason, attended them for

20    no reason; that they paid hundreds of dollars to attend them

21    for no reason; that they asked him for private coaching for no

22    reason; and that his -- the fact that his stepdaughter went to

23    jail is mere coincidence.

24         MR. INIGUEZ:  Your Honor, I object.  It's repeated

25    reference despite your admonition to the stepdaughter and her

1   conviction, Your Honor.

2          MR. WEXLER:  Your Honor --

3          THE COURT:  Let's leave the stepdaughter out of it,

4   period.  You don't need it.  You have plenty other to talk

5   about.

6          MR. WEXLER:  Very well, Your Honor.

7          THE COURT:  I don't know how you -- you want to get

8   into a subject that is -- is not helpful to the Court.  I've

9   made that clear to you.

10      Now, I want is help from you as to what the guidelines

11  should be and what the -- your -- your rebuttal is to what

12  counsel has to say.

13         MR. WEXLER:  Yes, Your Honor.

14         THE COURT:  He didn't say anything about the

15  stepdaughter, did he?

16         MR. WEXLER:  There is a reason for that, Your Honor,

17  but I'll move on.

18         THE COURT:  Please do.

19         MR. WEXLER:  Thank you.  Your Honor, regarding

20  restitution, there's no need for a 90-day extension for

21  resolving restitution.  The government provided a number.

22         THE COURT:  I would like to get right to the essence

23  of the case.

24         MR. WEXLER:  Very well, Your Honor.

25         THE COURT:  The restitution is a minor, minor matter.

1   Let's just talk about what rebuttal you have to his argument.

2           MR. WEXLER:  Yes, Your Honor.

3       Mr. Iniguez talked about the defendant's unordered mind

4   and that he read all of his stuff and his delusions caused him

5   to believe it.  The government put on video evidence at trial

6   where the defendant stated that he was making up these

7   documents, that he was changing the documents to make them more

8   successful, to have a better chance of working.

9       In fact, he said, "We added this stub so that it would

10  look more official."  That's evidence of an ordered mind.

11  That's evidence of someone who's making stuff up of their own,

12  and that's why people paid the defendant to come to his

13  seminars.

14      If he was just repeating what everybody else is repeating,

15  why did they come to him?  They came to him because he had new

16  stuff.  He was working hard on creating all of these new

17  documents, and that's why they paid him.  And they used it to

18  their detriment, and they're in jail, and they're paying

19  restitution.

20      Mr. Iniguez talks about $36,000 a year.  All the

21  defendants that used the defendant's scheme and are now in

22  jail, the government is paying for them to be in jail.  Why

23  would they -- the government have to pay for them to be in jail

24  but not the defendant who taught them the scheme?

25      And regarding the connection between those cases,

1   Your Honor, as the government has stated in its brief,

2   Agent Hill is here and available to testify.  If the Court

3   wants to hear as to how each of those cases are connected to

4   the defendant --

5            THE COURT:  I do not.

6            MR. WEXLER:  Very well.

7       Your Honor, I sort of glanced over this, but now I see

8   that perhaps I shouldn't have given it short shrift in my own

9   argument, but the tax system is one of voluntary compliance,

10  and Mr. Iniguez says the Court shouldn't be considering

11  punishment here.  But punishment -- the fact of the matter is

12  punishment is an essential deterrence.  People will look at

13  Mr. Shrout, who didn't -- by his own admission, didn't file or

14  pay taxes for 20 years.  And if he walks out of this courtroom

15  today and just has to spend some time in his house -- which, by

16  the way, is where he broadcasts his YouTube podcasts from

17  anyway -- that in no way is going to encourage somebody to

18  comply with a voluntary compliance system.  Instead, it's going

19  to embolden them to not comply.  Punishment is an essential

20  aspect of the sentencing regime.  To completely ignore it, I

21  think would be improper for this Court.

22       Another example of the Court's order -- the defendant's

23  order of mind, Your Honor, is the government put on evidence

24  from an undercover agent Mark Morini at trial.  And Mr. Morini

25  testified to how he went through an extended back and forth by

email with the defendant about producing a fictitious financial instrument.

The defendant said, "Do this." Agent Morini tried it and sent it back. Defendant said, "No, no, no. You have to change this, change this, change this, and do that."

That's not delusional. That's focused and -- a focused fraud that the defendant is well aware of. There's nothing in the defendant's mental history -- in fact, Mr. Iniguez stood up at the *Faretta* hearing so many months ago, years ago, and told this Court, "The defendant is competent. The defendant is competent to represent himself at trial."

The judge asked, "Mr. Iniguez, do you know of any reason why I should not find this defendant competent?"

Mr. Iniguez, "No, Your Honor. I spent a lot of time with him. He's perfectly competent."

That's what Mr. Iniguez said, and now Mr. Iniguez is coming back saying, "He was crazy the whole time. He couldn't possibly have known what he was doing."

You can't have it both ways, and he's not crazy. I mean, there's no evidence of that.

THE COURT: Well, that's correct. The psychiatrist -- psychotherapist, at least as far as I'm concerned, found that he does not suffer from a specific psychosis, delusional disorder, but is grandiose.

I think that was the fair conclusion that he was

1  competent, and that's why we're having this hearing today,

2  because I have found him competent.

3          MR. WEXLER:  Yes, Your Honor.

4      And Mr. Iniguez continues -- Mr. Iniguez brought attention

5  to this -- what he thinks will be the effect of the Court

6  sentencing the defendant here today to just one day in prison

7  by referring to the fact that the defendant took down his

8  seminar advertisement two weeks ago.

9      And the Court should really take note that part of the

10  defendant's release conditions was to not have that seminar.

11  So just by advertising it, he was in violation of his release

12  conditions.  He advertised it years after he was indicted in

13  this case, and then -- and he was going to have it the weekend

14  before -- this past weekend.  His sentencing is today.  The

15  seminar was scheduled for this past weekend.  The only reason

16  the defendant took down the seminar application and took down

17  his website is because the Court told him specifically, at the

18  competency hearing, "If you don't do this, I am going to

19  sentence you more harshly."  That's the motivation.  He knew

20  that the gambit was up.  All his delays had been expended.

21  Sentencing was facing him, and the Court told him, "Hey, if you

22  don't do this, you'll face a harsher penalty."  So it came

23  down.

24      The day after the competency hearing, he went on YouTube

25  and said, "It's all coming back up.  Just wait for the change

1    in government."  Who knows what that means?  But it's clear

2    that the defendant took it down for the sole reason of getting

3    favor with the Court today and out of no intention to comply

4    with taking it down forever.

5         And with -- I'll -- I'll pass on that last thing I was

6    going to mention.

7              THE COURT:  That's okay.  When I wave you off of a

8    couple of issues, I'm trying to give you the direction that I

9    really need.  There's no criticism to you.  You've been

10   doing -- as all counsel, you've been doing an exceptionally

11   professional job.  Thank you.

12             MR. WEXLER:  Thank you, Your Honor.

13        And throughout this process, the defendant has shown no

14   remorse.  After he was convicted, he's been on YouTube.  It's a

15   weekly podcast, as the government put in it's sentencing brief.

16   It's called the GoldFish Report.  He appears weekly on that

17   report.  And ever since he was convicted, ever since he was

18   indicted, he's never shown one ounce of remorse.  He's never

19   apologized to anybody who ended up in prison.  He never did

20   anything to even -- he admitted he did the conduct on the

21   stand.  He admits that he does this all -- on all of his

22   videos.  But he's never apologized, never shown an ounce of

23   remorse for any of this conduct.

24        And, I mean, to use a metaphor, he's not just trying to

25   rob a bank.  He's actively and consistently advocating for

others to rob the bank and telling them there's no -- there's

no problem; there's no penalty.  He's telling them that this is

legitimate; this is what you should do.

And now he says that the Court should ignore all of that

and simply focus on his charged conduct and focus not on the

fictitious instruments, but just focus on that he didn't pay

taxes.

I mean, as -- as I said, Your Honor, 514 is a serious

crime.  And, yet, the Court should not just simply ignore all

of that conduct because there happens to be an ascertainable

loss associated with his failure to pay taxes.  The guidelines

provide and Ninth Circuit case law provide a framework for the

court to use in these types of situations, and that's using

intended loss.

And I -- Your Honor, it just -- it would be -- I'll

rephrase that, Your Honor.

THE COURT:  Careful.

MR. WEXLER:  Yes, Your Honor.  I guess one last thing

I want to -- I just want to point this out.  I believe I

pointed it out in my brief as well.  But when the defendant met

with Dr. Millkey, Dr. Millkey asked him if he understood "Why

are you meeting with me?"  And the defendant said -- and this

is from Dr. Millkey's report -- "the public defender has a

conscience and thinks I was railroaded.  He's trying to

backtrack without getting an appeal.  The shortcut is getting

1    me declared weird."

2         That's what this is all about.  That's what their entire

3    argument is all about.  It's about undoing the jury's verdict,

4    trying to avoid an appeal, and just having the Court look at

5    the defendant, who looks elderly, looks frail, walks with a

6    cane, all -- and the government doesn't -- you know, he -- he

7    is the age that he is.  He has the ailments that he has.  But,

8    I mean, to use a cliche, don't judge a book by its cover,

9    Your Honor.  You are what your record says you are.

10        And the defendant, for at least 20 years, is a tax cheat

11   and an individual who has convinced others to scheme against

12   the government and perform their own frauds on top of his, and

13   he's responsible for significant harm to the United States, and

14   he should be sentenced accordingly.

15        Thank you, Your Honor.

16             THE COURT:  Thank you, sir.

17             MR. INIGUEZ:  Judge, may I just respond very briefly

18   to a few points?

19             THE COURT:  No.

20             MR. INIGUEZ:  No?  Just --

21             THE COURT:  We have the opening argument, your

22   closing argument, and the rebuttal.

23        If you're bursting with some -- one sentence.

24             MR. INIGUEZ:  Just four points, Judge, in terms of --

25             THE COURT:  All right.

1          MR. INIGUEZ:  -- what he read about Dr. Millkey, he's

2     right.  I have a conscience.  I thought from the beginning of

3     this case, had I been counsel I would have raised this issue at

4     the beginning of the case.  That's why I told Mr. Shrout, "It's

5     too late to," as he says, "undo the convictions."  But we have

6     to raise this issue because I have an ethical obligation.

7     That's the one point.

8          The issue of no remorse.  You also heard -- it's

9     antithetical.  You just heard him admit.  And this is what

10    happened at trial.  Mr. Shrout admitted he didn't pay taxes.

11    He admitted the six counts of the taxes.  And he admitted that

12    he produced and shipped these instruments.  He made those

13    his --

14          THE COURT:  Okay.  That's enough.

15          MR. INIGUEZ:  Okay.  So he has shown remorse, Judge.

16          THE COURT:  Thank you.

17     You can make a statement if you choose to do so.

18          THE DEFENDANT:  Is it on?

19          MR. INIGUEZ:  Yes.  You press it.  There you go.

20          THE DEFENDANT:  Just a few short comments.  I'm

21    really sorry about all of this trouble we had to go through to,

22    you know, get to the point we're at today.

23          THE COURT:  You're not under any time constraint.

24    The other issue was procedural.  You have all the time you

25    want.

1          THE DEFENDANT:  Well, like I say, I'm not here to

2    retry the case or anything like that.  You know, I've been

3    studying the law, if you will, for, gosh, I don't know, well

4    over 20 years.  Some of it seems to be pretty simple and some

5    of it seems to be pretty confusing, so -- but I have made an

6    attempt, you know, in my life to understand these things, and I

7    have drawn conclusions I have about things from things I've

8    studied.

9          So, anyway, in regards to this whole matter about remorse,

10   yeah, I'm very sorry just this whole thing happened.  It's --

11   it's been very confusing for me to understand how it happened

12   and why and so forth.  But as mentioned, at the time of trial I

13   took full responsibility for exactly what I have done.  That's

14   the way I was trained.  That's the way I was taught as a child.

15   You know, you take responsibility for what it is you do right

16   or wrong.

17         Any regards to this -- this business with the psychiatrist

18   and so forth, let me just say some of the comments I made to

19   them would be considered tongue-in-cheek.  My mother was a

20   psychiatric nurse for all -- basically all her career and --

21             THE COURT:  Your father was a prison guard?

22             THE DEFENDANT:  Yeah, uh-huh.

23         Anyway, my mother had a certain disdain for psychiatrists,

24   because she didn't believe they were helping the patients, and

25   so she passed it on to me.  So sometimes when I get in the

1    presence of those type of professionals, I think some of my

2    mother rubs off on me, you know, when I make comments to them.

3         In regards to -- you know, certainly I have no intention

4    of continuing on in these matters that seem objectionable, you

5    know, to the Court and to the government and so forth.  I had

6    not -- when I started out, I had no belief that they would be

7    objectionable.  But apparently it turned out that they are.

8    And so if I have offended in any manner, then I ask your

9    forgiveness.  I mean, I was taught to do that a long time ago.

10         And in regards to -- to some of the subjects, he talks

11    about these podcasts and things I do.  You know, that's true.

12    But the subject matter that we go over in those has to do with

13    the teachings in the Kings James Version of the Holy Bible.  If

14    you go and listen to them, we try to -- or I try to relate our

15    present world to the circumstances and bring it forward from

16    2,000 years ago to see how that applies in our modern society,

17    hopefully, so other people will have a better life.

18         So, again, you know, when we start to talk about

19    intention, I have never had any intention to harm anyone or

20    anything.  And if -- if I have offended or harmed someone, then

21    I'm truly sorry, and I would simply ask your forgiveness.

22         And also to the matter in regards to all the things that

23    have gone on, I freely forgive others as well.

24         So that's basically all I have to say, Your Honor.

25    Thanks.

1              THE COURT:  Very well.

2         In respect to this matter, if you would please stand.

3    Well, you can sit down.  You can just sit down if it's more

4    comfortable.

5              MR. INIGUEZ:  Thank you, Judge.

6              THE COURT:  As defense counsel pointed out, I perhaps

7    never or seldom have seen a case of what -- such a range in

8    requested sentences from 20 years to essentially no sentence at

9    all.  The case has been complex, to say the least.  The

10   representation has been remarkable.  I could not have asked for

11   a more helpful professional presentation from the government or

12   from the defense.  They have been very honorable and

13   straightforward.

14        The defense has had to work with the handicap of being an

15   advisor, as opposed to regular counsel, and has done an

16   outstanding job in that limited capacity.

17        As far as the defendant is concerned, he is also a very

18   remarkable person.  70 years.  He came from a stable family; a

19   religious family.  He did his service to his country honorably.

20   He has never had a criminal issue.  He has not had any

21   substance abuse.  He had a brother who was a terrible alcoholic

22   and died of it, but other -- he stayed away from that.  He has

23   never abused alcohol or drugs in his life.  He has enormous

24   support from all the people that know him.  They besieged the

25   Court, to which I welcome, with kind comments about his

1  generosity and helpfulness to other people.

2      But, as they say, the other side of the story is he has

3  grandiose ideas as to who he is and what he can do.  He is not

4  psychotic, as the psychiatrist said, but he believes he is a

5  descendant of Christ and Mary, that he comes from a different

6  planet, that he is a nonresident alien, that he was put in a

7  form as a human at age 5.  These things he believes to this

8  day.

9      He says that the federal government is not -- doesn't have

10  control over him, that the federal government need not be

11  obeyed, that the -- he has some -- the usual sovereign nation

12  lack of mentality of thinking the Uniform Commercial Code

13  controls our government and all their other totally

14  unacceptable beliefs.  The -- you are not being sentenced

15  because of your bizarre beliefs.  You are being sentenced

16  because of your conduct.  You definitely feel that you are

17  smarter than most everybody you encounter.  You have become

18  their teacher.  You want to be called the head of your

19  organization.  You want to be recognized as a highly -- high

20  intellectual with a vast knowledge of the law.  Unfortunately,

21  that isn't the case.

22      You have been a nonproductive person.  You have advocated

23  hundreds, if not thousands, of people through the years that

24  they need not pay their taxes and support our government.  That

25  is not acceptable.

1       When you tell people that they should violate the law --

2   the tax laws, you are advocating other people to violate the

3   law.  The fact of the matter is other people have followed your

4   instruction and tutelage and have violated the law.

5       There is almost no way to track the amounts of money that

6   were actually not reported by your many, quote, students, end

7   quote.  But there's no question, in the Court's mind, that you

8   intended -- your intention was to sign these documents and

9   have them be effective for trillions of dollars.  And your

10  motive was to rescue the people that were besieged with

11  foreclosures under the 2008 crash.  This is what you believe

12  and what you did.

13      When you add up the -- your -- this was your intention.

14  Whether anybody was a damfool to follow them is another matter,

15  but the -- the guidelines call for relevant conduct from

16  262 months to 327 months.  That's the calculation, and it's

17  based upon what you intended for people to act.  Whether they

18  would be, as you used the phrase, crazy enough to act on these

19  concepts, that's up -- that's irrespective -- that's

20  irrelevant.  It's what you intended to do, and that is no

21  question that you intended to do that.

22      But then the guidelines are discretionary.  We have

23  a guidelines -- I hesitated to mention this, but

24  Judge James Burns and myself were strong advocates of the

25  guidelines.  We taught sentencing guidelines to -- nationally,

1    to 120 judges at a time, and we give them a set of facts,

2    including a homicide that happened in a barroom.  And the

3    disparity that we received ran from probation to death in the

4    judges that were there.  So we felt very compelled to support

5    the sentencing guidelines.

6        Judge Burns was a member of the Sentencing Commission.  I

7    fought for the same thing on the state level with Judge Beatty.

8    But they are still advisory.  You just cannot put into

9    individuals a set of numbers.  But we start out with the

10   guidelines, but they are advisory only.  And, thank heavens, in

11   this case, they are not mandatory.

12       The recommendation of the government is for 20 years.  The

13   recommendation for -- from the presentence writer is for

14   15 years.  My sentence -- and you will be going to prison -- is

15   for 10 years.  Because you're 70 years old, you not only have

16   your eye problem and your hernia problem, you -- and your disk

17   problems, you also have other problems of your general health,

18   that this may well be a life sentence.  I'm well aware of that.

19   But you will -- I'll be recommending the facility that the

20   government -- Bureau of Prisons best recommends for a person of

21   your age and your disability.

22       I think that you can be accommodated right here at

23   Sheridan where you will be near your beloved lady who's here

24   today.  And your family -- a lot of them are Utah, where you

25   went -- graduated from college.  But the final call will be

1   Bureau of Prisons.  Unless I hear otherwise, I'll recommend
2   Sheridan facility.

3       There will be no fine.  The fee assessment for all
4   accounts totals $1,450.  I can set the restitution at
5   $191,226.10 at this time, but if you wish to be heard and
6   challenge that, that can be done after he starts -- after the
7   Bureau of Prisons makes their selection as to when and where he
8   should report.

9       I am concerned about releasing you to clear up your
10  matters because of your activity and being able to travel
11  internationally and into Canada willy-nilly.

12      I just know that you have been very faithful in reporting
13  to the Court as directed and that I will need your personal
14  problem from -- promise from you to me that you will appear as
15  directed by the marshal to the institution if I allow you to
16  self-report.

17              THE DEFENDANT:  Yes.

18              THE COURT:  You make that promise?

19              THE DEFENDANT:  Yes.

20              THE COURT:  And you know that if I -- you don't and
21  you are ever caught and if I'm still around, I'll give you the
22  maximum.  You understand that?

23              THE DEFENDANT:  Yes.

24              THE COURT:  All right.  You do have a right to
25  appeal.  Counsel can raise the issues that he wishes to raise.

1  At that time, I accept the presentence report as written with

2  the conditions of supervised release, except that you do not

3  need conditions about alcohol or substance abuse.

4      Are there any objections to the other criteria?

5          MR. INIGUEZ:  Your Honor, I would only maintain the

6  objections that I made in writing with respect to the

7  presentence report's guideline calculations.

8          THE COURT:  Yes.  I'm talking about conditions of

9  supervised release.

10         MR. INIGUEZ:  Right.  No objections to those,

11 Your Honor.  Just the two points you raised that might warrant

12 some discussion.  First, if you would see fit to recommend the

13 federal prison camp at Sheridan, I think that would be

14 appropriate, given his age.

15         THE COURT:  That's where we put the bankers and the

16 lawyers and the like.

17         MR. INIGUEZ:  Thank you, Judge.

18     And with respect to restitution -- well, restitution, I

19 guess, ties in with the self-surrender issue.  If we can set --

20 the restitution hearing, we have up to 90 days -- that would be

21 my calculation -- is the very beginning of January.  I think I

22 have January 9th.  If we can set it a couple of days earlier,

23 it may be that the parties can try to resolve that issue.  If

24 so, we'll inform the Court that the hearing is not necessary.

25 But if we can set the hearing for January 7th, and I would ask

1  the Court to set a self-surrender date two weeks after that

2  hearing date for Mr. Shrout.

3         THE COURT:  I don't know what you're talking about.

4  What that adds up to be -- normally, we have 30 days.  No.

5  Becky how long do we have?

6         DEPUTY COURTROOM CLERK:  Usually they turn themselves

7  in within 30 days.

8         THE COURT:  He'll be directed to follow the

9  availability at the Sheridan facility, if that's where the

10 person is going to be designated within 30 days.

11     As far as restitution, I want you to clear that up

12 within 30 days.

13         MR. INIGUEZ:  Okay.  So we'll -- so we'll --

14         THE COURT:  Get it all behind us.

15         MR. INIGUEZ:  30 days for both surrender and --

16         THE COURT:  And restitution.

17         MR. INIGUEZ:  And restitution.

18         THE COURT:  Final restitution.  I expect you to

19 resolve that.

20         MR. INIGUEZ:  Very good.

21         THE COURT:  The amount of restitution, I often waive

22 interest, if that's any help.

23         MR. INIGUEZ:  That is one of the issues, Your Honor.

24 That's one of the issues.

25         THE COURT:  He's going to have a tough time paying

1    the 151,000.

2              MR. INIGUEZ:  Judge, just for the issue of the

3    self-surrender, I do have his passport, and I'm prepared to

4    give this to Pretrial Services.  You have his word and he'll be

5    appearing in 30 days.

6              THE COURT:  Yes?

7              THE PROBATION OFFICER:  Your Honor, we just ask for

8    clarification that Counts 1 through 13 he's sentenced to 120

9    months and then Counts 14 to 19 for the statutory maximum of

10    12 months, all to run concurrent to each other, with five years

11    supervised release.

12              THE COURT:  And supervised release, yes.

13              THE PROBATION OFFICER:  Thank you.

14              THE COURT:  Any further questions from the

15    government?

16              MR. WEXLER:  No, Your Honor.

17              THE COURT:  Anything further for the defense?

18              MR. INIGUEZ:  Not at this time, Your Honor.  Thank

19    you.

20              THE COURT:  Thank you.  Court is in recess.

21                        (Hearing concluded.)

22

23

24

25

1                    C E R T I F I C A T E

2

3            United States of America v. Winston Shrout

4                      3:15-CR-00438-JO

5                         SENTENCING

6                      October 22, 2018

7

8            I certify, by signing below, that the foregoing is a

9    true and correct transcript of the record, taken by

10   stenographic means, of the proceedings in the above-entitled

11   cause.  A transcript without an original signature, conformed

12   signature, or digitally signed signature is not certified.

13

14   /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
     _____
15
     Official Court Reporter      Signature Date: 10/29/18
16   Oregon CSR No. 98-0346        CSR Expiration Date:  9/30/20

17

18

19

20

21

22

23

24

25