Ruben L. Iñiguez
Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204
(503) 326-2123 Telephone
(503) 326-5524 Facsimile
ruben_iniguez@fd.org
Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:15-cr-00438-JO-1 |
| Plaintiff, | |
| v. | MOTION TO CONTINUE RELEASE PENDING APPEAL |
| WINSTON SHROUT, | |
| Defendant. | |

The defendant, Winston Shrout, through counsel, Ruben L. Iñiguez, moves the Court to enter an Order granting his continued release pending the appeal of his conviction and sentence to the Ninth Circuit. The continuation of his release pending appeal is warranted because Mr. Shrout is not likely to flee or pose a danger to the safety of any other person or the community, the appeal is not for the purpose of delay, and the appeal raises several questions of law or fact that are "fairly debatable" and likely to result in reversal, an order for a new trial, or a reduced sentence. *United States v. Handy*, 761 F.2d 1279, 1281 (9th Cir. 1985); 18 U.S.C. § 3143(b).

**Page 1- MOTION TO CONTINUE RELEASE PENDING APPEAL**

## I.    INTRODUCTION

On October 22, 2018, the Court sentenced Mr. Shrout to 10 years' imprisonment following his convictions for willful failure to file tax returns and producing, presenting, and shipping fictitious financial instruments.  CR 161.  On October 26, Mr. Shrout timely filed a notice of appeal.  CR 163.  The Court ordered him to self-surrender on November 26 to the Federal Prison Camp at Sheridan, Oregon, to commence his sentence. CR 161.  It subsequently revised its Order and directed the U.S. Marshals Service to "alert the court and [Mr. Shrout] at the time the Bureau of Prisons designates an institution.  The court will assign [Mr. Shrout's] self-surrender date at that time." CR 178.  Mr. Shrout remains on release pending the BOP's completion of the designation process.

Mr. Shrout respectfully requests that the Court permit him to remain on his current conditions of release pending appeal, pursuant to the Bail Reform Act of 1984, because he satisfies the requirements of § 3143(b).  First, he is not likely to flee or pose a danger.  Second, his appeal is not for the purpose of delay.  Third, he presents several "substantial questions" for appeal, which the Ninth Circuit interprets to mean issues that are "fairly debatable" or "fairly doubtful." *Handy*, 761 F.2d at 1281.  Of course, this Court need not determine that its own rulings were incorrect in order to grant bail pending appeal.  Nor must it determine that Mr. Shrout "present[s] an appeal that will likely be successful; only a non-frivolous issue that, if decided in [his] favor, would likely result in reversal[.]" *United States v. Garcia*, 340 F.3d 2013, 1021 n.5 (9th Cir.

**Page 2- MOTION TO CONTINUE RELEASE PENDING APPEAL**

2003).[1]  Mr. Shrout presents several issues that are, at the very least, "fairly debatable."  The Court only need find that one issue meets the *Handy* standard in order to grant his Motion.

## II.    LEGAL STANDARD

18 U.S.C. § 3143(b) governs release pending appeal.  It states that release is appropriate where the Court finds: (1) "that the person is not likely to flee or pose a danger to the safety of any other person or the community if released," (2) "that the appeal is not for the purpose of delay," and (3) that the appeal "raises a substantial question of law or fact likely to result in – (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process."

The burden is on the defendant to demonstrate his eligibility for bail pending appeal. *Handy*, 761 F.2d at 1283.  He must show the first *Handy* factor—flight or danger—"by clear and convincing evidence."  18 U.S.C. § 3143(b)(1)(A).  He must show the remaining factors by a preponderance of the evidence.  *United States v. Heine*, 2018 WL 3745813, at *2 (D. Or. Aug. 7, 2018) (because statute only requires clear and convincing evidence for first factor, defendant must show remaining *Handy* factors "only by a preponderance of the evidence"), *reversing order denying bail, United States v. Heine*, No. 18-3083, Docket No. 14 (9th Cir. Sept. 28, 2018) (distinguishing clear and convincing standard for first factor from showing required for other factors).

---

[1] Unlike Mr. Shrout, the defendants in *Garcia* were required to show an additional factor for bail – "exceptional reasons" – because they had been convicted of a violent offense.  340 F.3d at 1014. Mr. Shrout's convictions were for non-violent offenses that triggered no adverse presumptions regarding flight and danger.

**Page 3- MOTION TO CONTINUE RELEASE PENDING APPEAL**

*Handy* is the foundational Ninth Circuit case analyzing this standard. 761 F. 2d at 1279. There, the Ninth Circuit interpreted the phrase "substantial question," as it is used in § 3143(b), to mean an issue that is "fairly debatable" or "fairly doubtful"—that is, "of more substance than would be necessary to a finding that it was not frivolous." *Handy*, 761 F.2d at 1283 (internal quotation marks and citations omitted). The Ninth Circuit rejected the government's contention that this standard limits bail pending appeal to defendants who can demonstrate that they will *probably* prevail on appeal:

> [W]e reject the government's proposed construction of the statute. Like the Third and Eleventh Circuits, we find that the word "substantial" defines the level of merit required in the question raised on appeal, while the phrase "likely to result in reversal" defines the type of question that must be presented.

*Id.* at 1281. Additionally, "[t]he question may be 'substantial' even though the judge or justice hearing the application for bail would affirm the merits of the appeal." *Id.* (quoting *D'Aquino v. United States*, 180 F.2d 271, 272 (11th Cir. 1950)).

The Ninth Circuit subsequently discussed *Handy* in *Garcia*, 340 F.3d at 1013. "The second part of the requirement – that the question be likely to result in reversal, a new trial, a non-prison sentence, or a sentence reduced to less than the time that would be served by the end of the appeal process – concerns only the *type of question* that meets the requirement; it does not involve assessing the likelihood that a reversal will occur in the particular case." *Id.* (emphasis in original). The court in *Garcia* emphasized that a defendant "need not, under *Handy*, present an appeal that will likely be successful, *only a non-frivolous issue* that, *if decided in the defendant's favor*, would likely result in reversal or could satisfy one of the other conditions." *Id.* (emphasis added). "Because under § 3143(b)(1)(B) a defendant need not show a likelihood of success on

appeal, a defendant who does show such likelihood goes well beyond the threshold requirement."
*Id*.

Following this relatively low standard, courts in this District and throughout the Ninth Circuit regularly grant bail pending appeal in similar circumstances. For example, in *United States v. Pollock*, 2016 WL 8730144 (D. Or. 2016), Judge Brown granted the defendant's motion for release pending appeal after he entered a guilty plea to making a false statement to a bank. After finding the defendant was not likely to flee, Judge Brown identified sentencing issues concerning loss as likely to require resentencing:

> The Court finds Defendant has raised substantial questions on appeal because this Court's rulings on the amount of loss are "fairly debatable." For example, Defendant challenges the Court's rulings that the amount of actual loss could not be reliably calculated and that Defendant intended to cause a loss to the victim. If the Ninth Circuit agrees with Defendant on one or both of these issues, Defendant's sentence would likely be reversed and the case remanded to this Court for resentencing.

*Id*. at *2.

Similarly, in *United States v. Winsor*, 890 F. Supp. 2d 1257 (D. Or. 2012), Judge King granted the defendant's motion for bail pending appeal after his guilty plea to possession of child pornography resulted in a sentence of 60 months.[2]  Judge King noted that, "[t]he court need not find that its [prior] ruling was wrong, just that it is fairly debatable. A question not yet decided by controlling precedent can present a substantial question."  *Id*. at 1259 ("While I am confident in my decision, it is possible the Ninth Circuit may disagree and I find his appeal raises a substantial question of law or fact.").  The substantial questions Judge King noted were his findings of good

---

[2] Because the offense in *Winsor* was not consider non-violent, Judge King was required to find additional "exceptional reasons," a factor not applicable here.  890 F.Supp.2d at 1258.

**Page 5- MOTION TO CONTINUE RELEASE PENDING APPEAL**

faith in upholding a search warrant of the defendant's residence and his denial of a motion to suppress a confession. Judge King also noted that the defendant was 66 years old, the offense had "occurred over seven years ago," and in the meantime, the defendant had "been using his time wisely." *Id*. at 1260.

In *United States v. Ogle*, 779 F. Supp. 141 (D. Or. 1991), Judge Frye granted the defendant's motion for release pending appeal following his conviction by a jury for the crimes of tax evasion. Judge Frye agreed there was "a fairly debatable question as to whether the jurors [had unanimously agreed upon the facts which constituted an affirmative act of evasion]," agreed the issue was likely to result in a reversal or an order for a new trial, and granted the defendant's motion. *Id*. at 144.[3]

---

[3] S*ee also United States v. Bernot*, 2015 U.S. Dist. LEXIS 66782, at *4 (E.D. Cal. May 20, 2015) (granting bail pending appeal where defendant raised question of applicability of vulnerable victim enhancement); *United States v. Memmott*, 2015 U.S. Dist. LEXIS 17032, at *2 (E.D. Cal. Feb. 11, 2015) (granting bail pending appeal in tax evasion case because of difficulty of loss calculation); *United States v. McKany*, 2014 U.S. Dist. LEXIS 159, at *5 (S.D. Cal. Nov. 12, 2014) (granting bail pending appeal where defendant raised question as to his motion to suppress statements); *United States v. Abad*, 2014 U.S. Dist. LEXIS 198311, *3 (N.D. Cal. Aug. 6, 2014) (granting bail pending appeal; though defendant raised the same issues he raised in connection with his motions for judgment of acquittal and new trial, and the court had considered and rejected those, "the Court is not required to certify that it believes its rulings to be erroneous" to grant motion); *United States v. Martin*, 2014 WL 2155187, at *2 (D. Idaho May 22, 2014) (defendant raised 12 issues; while most did not present a substantial question, "one or two do, and that is all Swigert needs to be eligible for release pending appeal"); *United States v. Dilworth*, 1998 U.S. Dist. LEXIS 328, at *3 (D. Or. Jan. 9, 1998) (Frye, J.) (granting bail pending appeal after trial conviction; sufficiency of evidence at trial presented substantial question); *United States v. Bascue*, 1995 WL 617480 (D. Or. Oct. 18, 1995) (Frye, J.) (granting bail pending appeal after trial conviction; substantial question whether statute was constitutionally applied to defendants); *Unite States v. MacDonald*, 1994 U.S. Dist. LEXIS 9138 (D. Or. June 29, 1994); *see also United States v. Aceves*, 2018 U.S. App. LEXIS 5097, at *1 (9th Cir. Feb. 27, 2018) (reversing district court's denial of bail pending appeal in white collar case); *United States v. Wetselaar*, 2017 U.S. App. LEXIS 26958, at *2 (9th Cir. Nov. 7, 2017) (same).

### III.    ARGUMENT

The circumstances of this case easily satisfy the *Handy* factors: Mr. Shrout is neither a flight risk nor a danger, the appeal is not for the purpose of delay, there are several fairly debatable questions for appeal, and appellate resolution of the questions is likely to result in reversal, an order for a new trial, or a reduced sentence.

### A.    The First *Handy* Factor: No Risk Of Flight Or Danger.

The evidence clearly and convincingly establishes that Mr. Shrout is not likely to flee or pose a danger to the safety of any other person or the community if he is continued on release. He has significant family and community ties to Oregon. He has been on pretrial supervision for the past three years. He first appeared via summons on January 7, 2016. Presentence Investigation Report ("PSR") at ¶ 6. "At this time the Court ordered his release." *Id*. He was again "ordered released to U.S. Pretrial Services on March 31, 2016, subsequent to his arraignment on a Superseding Indictment." *Id*. He presently remains on release.

With the Court's permission, Mr. Shrout has traveled several times not only outside the United States for medical treatment, but also outside the state of Oregon to visit family in Nevada and Utah. He has always returned, as promised. He has appeared, as directed, not only for all hearings, but also for trial. He has committed no new law violations while on release. His compliance with pretrial supervision is hardly surprising given the complete absence of any prior criminal history, juvenile or adult, during the past 70 years. He is a military veteran, having served honorably as a Sergeant in the U.S. Marine Corps. PSR at ¶ 66. Throughout the three-year period of release, he has not posed a danger to anyone.

At the conclusion of the sentencing hearing, the Court renewed its determination that Mr. Shrout was not a flight risk or a danger. Rather than order his immediate detention, he was

**Page 7- MOTION TO CONTINUE RELEASE PENDING APPEAL**

permitted to self-surrender voluntarily. CR 175 at 81. The Court's ruling was consistent with the recommendation of the Probation Office, which found that he has been "compliant with the conditions of pretrial release and viewed as suitable for voluntary surrender." PSR at Sentencing Recommendation (Voluntary Surrender). In short, the evidence clearly and convincingly shows Mr. Shrout is neither a flight risk nor a danger.

### B. The Second *Handy* Factor: Not For The Purpose Of Delay.

The purpose of Mr. Shrout's appeal to the Ninth Circuit is to present for review several preserved issues relative to his conviction and sentence. The purpose of the appeal is not to delay. There is no evidence of any purpose for the appeal other than his desire to assert his right to contest the legality of his conviction and sentence.[4]

### C. The Third *Handy* Factor: Substantial Questions Of Law Or Fact.

There are several "fairly debatable" or "non-frivolous" questions for appeal that are of the type that, if the Ninth Circuit rules in Mr. Shrout's favor, would result in reversal or resentencing. The Court need only determine that one of the issues meets the *Handy* standard.[5]

#### 1. Denial of Motion to Dismiss Indictment for Vindictive Prosecution Without Discovery or an Evidentiary Hearing.

Before trial, Mr. Shrout moved to dismiss the 13 fictitious financial instrument counts alleged in the Superseding Indictment for vindictive prosecution. CR 73. He submitted three

---

[4] The fact that almost three years elapsed between the filing of the initial Indictment and sentencing has no bearing on the issue of whether *the appeal* is for the purpose of delay. Even so, it was the legitimate, complicated, and interrelated issues regarding competency, self-representation, and the role of standby counsel, as well as the admittedly "voluminous" nature of the discovery involved (CR 16 at 24), that resulted in the Court's decision to "declare this as a complex case" and prevented a speedier conclusion. CR 68 at 10.

[5] Mr. Shrout does not set forth in this Motion every argument he intends to raise on direct appeal. He expressly reserves the right to present additional arguments to the Ninth Circuit.

exhibits— an email from the prosecutor and two hearing transcripts—as evidence in support of his motion. *Id*. at 73-1 to 73-3. He expressly requested an evidentiary hearing. *Id*.

The government opposed the motion. CR 74. But it submitted no evidence—documentary or testimonial—to support its opposition. *Comstock v. Humphries*, 786 F.3d 701, 709 (9th Cir. 2015) ("arguments in briefs are not evidence").[6] Notably, the government admitted it had been "investigating [Mr. Shrout] for potential violations of 18 U.S.C. § 514 *since at least June 2012*." CR 74 at 7 (emphasis added). The government also admitted it already had "establishe[d] probable cause that [Mr. Shrout] acted in violation of … § 514" at that time, namely, at least 3½ years before it filed the initial Indictment. *Id*. In other words, the government conceded that, despite having investigated Mr. Shout for approximately 80 months, and despite having established probable cause for the fictitious instrument violations at least 42 months earlier, it did not pursue a single § 514 charge when it first presented its case to the grand jury for Indictment in December 2015.

Without providing any evidence to support its claim, the government in its opposition memo claimed it was the "discovery of an important piece of evidence at around the time of the initial indictment [that] prompted [it] to revisit" its charging decision and file the Superseding Indictment charging Mr. Shrout with 13 felony counts less than 100 days after it filed the initial misdemeanor Indictment. CR 74 at 7. The obvious flaw in its unsupported assertion was its admission that Mr. Shrout "mailed the document well in advance of the initial indictment" (*i.e.*,

_____

[6] Without directly addressing vindictive prosecution, the government referenced an Affidavit in Support of Application for Search Warrant that IRS Special Agent Hill submitted almost five years earlier, on June 21, 2012. This did not constitute evidence as the government only offered to "provide[] [a copy] to the Court for review … upon request." CR 74 at 7 n. 2. The Court did not request a copy. The Affidavit supports retaliation because it confirms that the government's "investigation [of Mr. Shrout] began on or about April 21, 2009," that is, more than 6½ years before it filed the initial indictment. Affidavit at ¶ 9.

**Page 9- MOTION TO CONTINUE RELEASE PENDING APPEAL**

six months earlier) and, more importantly, its concession that the document formed the basis for *only two of the 13 counts*. *Id*. In other words, the supposedly "new" document, referenced only in argument in a brief, was wholly unrelated to the 11 remaining § 514 counts that the prosecutor suddenly saw fit to charge. The prosecutor offered no justification for his decision to charge Mr. Shrout with those 11 counts, despite his own admission that sufficient evidence to bring those particular charges had existed for years before the initial Indictment was filed.

But that is not all. Confronted with documentary evidence indicating that the prosecutor's charging decision was vindictive, the government feigned ignorance. It claimed the prosecutor "does not specifically recall what subpoenas [he] was referring to in [his] conversation and subsequent email with [standby] counsel." CR 74 at 8.[7] At the same time, the government represented that "records indicate two subpoenas were issued by the Grand Jury in this matter in late-February/early March, *2015*." *Id*. (emphasis added). The government further represented that "[b]oth of the subpoenas … proved unresponsive: neither party possessed any material relevant to the investigation." *Id*.

Mr. Shrout then filed a reply memorandum. CR 76. He noted that the government had produced no evidence and, therefore, had failed to sustain its burden to show intervening circumstances to dispel the appearance of vindictiveness. *Id*. at 11-13. He specifically requested both discovery and an evidentiary hearing. *Id*. at 14.

The next day, the government filed a motion to correct a critical misrepresentation it had made to the Court. CR 77. It admitted its representation that it possessed "records" showing the

---

[7] In his email to standby counsel on February 3, 2016, the prosecutor, Stuart A. Wexler, asserted that "[t]he timing of the superseding indictment is uncertain, as *the government is waiting on the return of subpoenas*." CR 73 at Exhibit C (emphasis added).

**Page 10- MOTION TO CONTINUE RELEASE PENDING APPEAL**

grand jury had issued two subpoenas in "late-February/early-March, 2015" was "factually incorrect." *Id*. at 1-2 (citing CR 74 at 8). Instead, the government now claimed the subpoenas were issued one year later—in *2016*. *Id*. at 2. The difference, of course, is crucial. When the prosecutor claimed in early February 2016 that he was "waiting on the return of subpoenas" before deciding whether to file the superseding charges, no subpoenas were outstanding or awaiting return because no subpoenas had been issued yet. Accordingly, the "correction" not only cast serious doubt on the veracity of the prosecutor's written representation, but it also added considerable strength to the appearance of vindictiveness.

Three days later, the Court issued an Order denying the motion to dismiss for vindictive prosecution. CR 78. It denied the motion without addressing Mr. Shrout's request for discovery or conducting an evidentiary hearing. *Id*. Despite the fact that the government had presented no evidence, the Court found it "unlikely the prosecutor would have a punitive animus toward [Mr. Shrout] for exercising the rights he asserted." *Id*. at 3. The Court also found "the timing of the superseding indictment suggests that a presumption of vindictiveness is not warranted." *Id*. (citations omitted).

On appeal, Mr. Shrout will argue that the Court erred in denying his motion to dismiss without affording him discovery or conducting an evidentiary hearing. A hearing is required when "a material issue of fact [is] raised 'which if resolved in accordance with [the defendant's] contentions would entitle him to relief.'" *United States v. Irwin*, 612 F.2d 1182, 1187 (9th Cir. 1980) (quoting *Wright v. Dickson*, 336 F.32d 878, 888 (9th Cir. 1964)); *see also United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000) (evidentiary hearing required "when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude

**Page 11- MOTION TO CONTINUE RELEASE PENDING APPEAL**

that contested issues of fact exist"); *United States v. Packwood*, 848 F.2d 1009, 1010 (9th Cir. 1988) (same); *United States v. Carrion*, 463 F.2d 704, 706 (9th Cir. 1972) (same).

In *Irwin*, both the defendant and the government introduced affidavits in connection with a motion to dismiss the indictment for prosecutorial misconduct. In deciding whether to conduct an evidentiary hearing, the district court considered not only the affidavits, but also "the tape [recording of several] telephone conversations, legal memorandum and oral argument." *Irwin*, 612 F.2d at 1184. While it ultimately denied the motion without an evidentiary hearing, the court did so "[o]n the basis of [the evidence]." *Id.; see also* 612 F.2d at 1189 ("the court referred specifically to the affidavits" in finding no evidentiary hearing was required).

On appeal, the Ninth Circuit first held it "must assume that the factual allegations in [Irwin's] affidavits are true" in determining whether they "show as a matter of law that [he] was or was not entitled to relief." *Irwin*, 612 F.2d at 1187. The court then "examine[d] in some detail the affidavits … to determine whether they raised factual issues requiring a hearing." *Id.* at 1190. Only because "[t]he moving papers failed to allege facts sufficient to enable the trial court to conclude that relief must be granted if the facts alleged were proved" did the Ninth Circuit conclude that "the trial court did not err in denying the motion to dismiss without an evidentiary hearing." *Id.* at 1191 (citing *Carrion*, 463 F.2d at 706); *see also United States v. Mazzarella*, 784 F.3d 532, 537-541 (9th Cir. 2015) (trial court abused its discretion by not allowing discovery or holding an evidentiary hearing to resolve disputed issues of fact relative to *Brady* claim).

It is well established that "[v]indictive prosecution violates due process." *Rushdan v. Schriro*, No. CV 05–114–TUC–FRZ (JM), 2010 WL 7508269, at *8 (D. Ariz. 2010) (citing *Moran v. Burbine*, 475 U.S. 412, 466 (1986)). "[T]he mere filing of an indictment can support a charge of vindictive prosecution." *United States v. Hooton*, 662 F.2d 628, 634 (9th Cir. 1981). In most

cases, a "claim of vindictive prosecution usually arises when the government increases the severity of alleged charges—for example, by re-indicting a defendant—in response to the exercise of constitutional or statutory rights." *Id*. at 633; *see also United States v. Montoya*, 45 F.3d 1286, 1299 (9th Cir. 1995) ("most vindictive prosecution cases involve re-indictment of a defendant.").

"To establish a prima facie case of vindictive prosecution, [a defendant] 'must show either direct evidence of actual vindictiveness or facts that warrant an appearance of such.'" *United States v. Edmonds*, 103 F.3d 822, 826 (9th Cir. 1996) (quoting *Montoya*, 45 F.3d at 1299). "Evidence indicating a realistic or reasonable likelihood of vindictiveness may give rise to a presumption of vindictiveness on the government's part." *United States v. Garza-Juarez*, 992 F.2d 896, 906 (9th Cir. 1993); *see also Hooton*, 662 F.2d at 633 ("the mere appearance of vindictiveness gives rise to a presumption of vindictive motive"). "Upon such a showing, the prosecution has the burden of proving that 'independent reasons or intervening circumstances dispel the appearance of vindictiveness and justify its [prosecutorial] decisions.'" *Edmonds*, 103 F.3d at 826 (quoting *Montoya*, 45 F.3d at 1299); *accord Hooton*, 662 F.2d at 633. "Thus, whether the facts give rise to the appearance of vindictiveness is dependent upon the totality of the circumstances surrounding the prosecutorial decision at issue." *United States v. Griffin*, 617 F.2d 1342, 1347 (9th Cir. 1980).

Although "it is not dispositive of the inquiry," the Ninth Circuit has long held that "[t]he chronology of events is, of course, entitled to *great weight*." *Griffin*, 617 F.2d at 1347 (emphasis added); *see also United States v. Spiesz*, 689 F.2d 1326, 1328 (9th Cir. 1982) (evidentiary hearing held where prosecutor filed superseding indictments seven weeks after initial indictment and, therefore, appearance of vindictiveness arose from "the sequence of events").

Here, Mr. Shrout relied on much more than "the timing of the superseding indictment" to support his contention of a realistic or reasonable likelihood of vindictiveness. CR 78 at 3. He not

only observed that the prosecutor filed the Superseding Indictment less than 100 days after the initial Indictment, but he also submitted uncontested evidence that was strongly suggestive of animus on the part of the prosecutor.

Mr. Shrout provided evidentiary support of an appearance of vindictiveness by exposing the faulty premise for the prosecutor's initial claim that his decision whether to pursue § 514 charges depended on the return of subpoenas that were still outstanding.  As the government itself later acknowledged, the prosecutor's claim that he was "waiting on the return of subpoenas" issued one year earlier was not correct.  Mr. Shrout provided further evidence of vindictiveness when he similarly undermined the prosecutor's claim that his decision to file the 13 fictitious instrument charges resulted from the belated receipt of a single document.  Again, by its own admission, the government agreed that the solitary document received six months before the prosecutor filed the Indictment only related to *two* fictitious instrument charges.  The obvious implication of that admission is that as early as 2012, the government's multi-year investigation already had produced sufficient evidence to charge Mr. Shrout with the 11 other § 514 charges.  Indeed, as early as June 2012, the case agent affirmed exactly that.  *See* Affidavit at ¶ 5 ("there is probable cause that evidence of … Fictitious Obligations in violation of 18 U.S.C. § 514 … will be found.").  And yet the prosecutor chose not to file a single § 514 charge when he filed the Indictment in December 2015—quite reasonably since the documents, at the very least, do not fit within the core of the statute.[8]  As Mr. Shrout demonstrated, it was only *after* he had exercised his constitutional and

---

[8] The § 514 charges depended on the dubious premise that documents purportedly worth $1 trillion dollar had a real effect (*i.e.*, that anyone would take them at face value).

**Page 14- MOTION TO CONTINUE RELEASE PENDING APPEAL**

procedural rights (*i.e.*, to represent himself, plead guilty to the initial misdemeanor charges, and file *pro se* pleadings) that the prosecutor filed the § 514 charges.

On appeal, Mr. Shrout will argue that his moving papers and evidence established facts with sufficient definiteness, clarity, and specificity to enable the Court to conclude that there were contested issues of fact.  He demonstrated a reasonable likelihood that the prosecutor changed his decision not to pursue the § 514 charges *after* Mr. Shrout exercised his constitutional right to waive counsel and defend himself, twice attempted to plead guilty to the initial misdemeanor Indictment, and exercised his procedural right to file *pro se* pleadings.  He satisfied his burden of making an initial showing of an appearance of vindictiveness and, therefore, the burden shifted to the government to prove that the increase in the severity of the charges did not result from any vindictive motive.

The Court erred by not placing the burden of overcoming the presumption of vindictiveness on the government, affording discovery to Mr. Shrout, holding an evidentiary hearing, or otherwise requiring the prosecutor to introduce objective evidence justifying his decision to file the fictitious instrument charges.  *See United States v. Jenkins*, 504 F.3d 694, 700 (9th Cir. 2007) (prosecutor testified at hearing on motion to dismiss); *United States v. Spiesz*, 689 F.2d 1326, 1328 (9th Cir. 1982) (evidentiary hearing where prosecutor testified).  As in *Jenkins*, the prosecutor here "had more than enough evidence to proceed with the [§ 514] charges prior to [Mr. Shrout's] decision to [represent himself, plead guilty, and file pleadings]."  *Id*.  Unlike *Jenkins*, however, the Court did not "place the burden on the government to justify its course of conduct."  *Id*.  And, unlike *Jenkins*, the prosecutor who filed the § 514 charges was not required to testify at a hearing or introduce objective evidence justifying his decision to increase the severity of the charges.  *Id*. at 698; *see also Spiesz*, 689 F.2d at 1326.

**Page 15- MOTION TO CONTINUE RELEASE PENDING APPEAL**

Mr. Shrout recognizes that the Court ruled against him and denied his motion to dismiss for vindictive prosecution—without granting his request for discovery or an evidentiary hearing. *See* CR 78 (Order).  But, as noted above, the Court need not determine that its ruling was incorrect in order to grant his motion.  *Handy*, 761 F.2d at 1281.  Instead, it need only find that the question is "fairly debatable" to continue his release pending appeal.

## 2.    Sixth Amendment Violation

In *Faretta v. California*, 422 U.S. 806 (1975), the Supreme Court recognized a defendant's right to waive his Sixth Amendment right to counsel and conduct his own defense.  "A defendant's decision to forgo counsel and instead to defend himself—known as a 'Faretta waiver'—is valid if the request is timely, not for the purpose of delay, unequivocal, and knowing and intelligent." *United States v. Erskine*, 355 F.3d 1161, 1167 (9th Cir. 2004).  "In order to deem a defendant's *Faretta* waiver knowing and intelligent, the district court must insure that he understands 1) the nature of the charges against him, 2) the possible penalties, and 3) the 'dangers and disadvantages of self-representation.'"  *Id.* (citation omitted).

The courts "have consistently emphasized the primacy of the district court's role in protecting a defendant's twin Fifth and Sixth Amendment rights by insuring that a *Faretta* waiver is knowing and intelligent."  *Erskine*, 355 F.3d at 1167; s*ee United States v. Hernandez*, 203 F.3d 614, 625 n. 16 (9th Cir. 2000) (discussing this "fundamental obligation").  "[W]e cannot overstate the importance of the court's responsibility in this respect."  *Erskine*, 355 F.3d at 1167.  Failure to meet the requirements for a valid *Faretta* waiver constitutes *per se* prejudicial error.  *United States v. Arlt*, 41 F.3d 516, 524 (9th Cir.1994).  The determination that a *Faretta* error occurred requires reversal of the conviction.  *Erskine*, 355 F.3d at 1167.

**Page 16- MOTION TO CONTINUE RELEASE PENDING APPEAL**

The government carries the burden of establishing the legality of a *Faretta* waiver on appeal. *United States v. Mohawk*, 20 F.3d 1480, 1484 (9th Cir. 1994). The Ninth Circuit "evaluates this question with great care, indulging 'every reasonable presumption against waiver.'" *Arlt*, 41 F.3d at 520 (quoting *Brewer v. Williams*, 430 US. 387, 404 (1977)).

When Mr. Shrout appeared for arraignment on the initial Indictment, he admitted he was "kind of confused by the nature of this situation." CR 16 at 6. Later, when the Court asked whether he understood the charges, he unequivocally stated: "No, sir." *Id.* at 9. He subsequently reiterated that he did not "understand them." *Id.* Similarly, when the Court asked whether he understood the potential penalties, Mr. Shrout stated: "no, I do not understand them." *Id.* at 10. The prosecutor subsequently acknowledged that "the government has some concern as *that does not qualify as a knowing and intelligent response* to those two questions." CR 16 at 21 (emphasis added). Despite his concern, the prosecutor did not ask the Court to confirm Mr. Shrout's understanding of the nature of the charges and potential penalties.

Approximately two months later, Mr. Shrout appeared before the Court for arraignment on the Superseding Indictment. CR 68. As the Court advised him of the new felony charges and related penalties, it suddenly stopped and stated: "Let's put it bluntly. *You're not competent to represent yourself*, but you have a right to do that." *Id.* at 6 (emphasis added). The Court nonetheless accepted Mr. Shrout's choice "to be my own attorney without representation from [the Public Defender], but as standby counsel." *Id.* at 8. The Court told him: "That's your choice. I'll accept that as a full and knowing decision, complying with the *Faretta* decision." *Id.* at 8-9. Despite its contradictory pronouncement one minute earlier, the Court concluded: "I find, without doubt, he's totally competent, and if he chooses to represent himself after advisement, that's his legal right." *Id.* at 9.

**Page 17- MOTION TO CONTINUE RELEASE PENDING APPEAL**

On appeal, Mr. Shrout will argue that the government cannot sustain its burden of establishing the validity of the purported *Faretta* waiver given (1) the unequivocal statements that he did "not understand" the nature of the charges or potential penalties, and (2) the Court's determination that he was "not competent" to represent himself. Because this mixed question of law and fact is "fairly debatable," the motion to continue release pending appeal should be granted.

### 3.    Sentencing Errors

Before sentencing, Mr. Shrout formally objected to the offense level computations set forth in the PSR. *See* PSR at ¶¶ 33-43. He objected to the application of U.S.S.G. § 2B1.1 because the only actual loss resulted from his failure to file income tax returns. Because no loss—actual or intended—resulted from his production, presentation, or shipping of the fictitious financial instruments, he argued that the Court was required to use the tax guideline—U.S.S.G. § 2T1.1— to calculate the guidelines range. The Court did not address his objection at sentencing. CR 175.[9] The evidence at trial established that the total amount of tax loss for the six years that Mr. Shrout failed to file tax returns was $157,895. *See* PSR at ¶ 89 and Sentencing Recommendation (Justification) ("the actual losses resulting from all of the conduct charged in the Superseding Indictment is limited to less than $160,000 in unpaid taxes."). Accordingly, he argued that a base offense level of 16 applied under § 2T1.1(a)(1) and § 2T4.1(F) (Tax Table) (tax loss more than $100,000, but less than $250,000).

---

[9] Mr. Shrout's general objection to the proposed application of § 2B1.1 encompassed his specific objection to both the application of a 30-level increase under § 2B1.1(b)(1)(P) because the amount of "intended loss" was more than $550,000,000, PSR at ¶ 34, and the application of a 2-level increase under § 2B1.1(b)(10) because the offense involved "sophisticated means." PSR at ¶ 36.

### a.    Erroneous standard of proof

The Court not only applied the wrong guideline—§ 2B1.1—but it also applied a 30-level increase under § 2B1.1(b)(1)(P).  Its application of the enhancement was apparently based on a finding that the amount of "intended loss" was more than $550,000,000.  *See* PSR at ¶ 34.[10]  While the Court seems to have implicitly overruled Mr. Shrout's objections, it made no finding on the issue of the standard of proof that applied.  *See* CR 175.

Before sentencing, Mr. Shrout argued that the government was required to prove the amount of loss by clear and convincing evidence.  He observed that the base offense level would increase from 7 (for losses of $6,500 or less) to 37 (for losses of more than $550,000,000) under U.S.S.G. § 2B1.1(b)(1)(A) & (P).  Because the higher base offense level increased the resulting guideline range from 0-6 months to 210-262 months, he argued that the circumstances required the government to prove the loss amount by clear and convincing evidence.  He cited both *United States v. Treadwell*, 593 F.3d 990 (9th Cir. 2010), and *United States v. Pollock*, 3:14–cr–00186–BR, 2016 WL 1718192 (D. Or. Apr. 29, 2016), as support for his position that the "extremely

---

[10] Mr. Shrout objected to the use of the purported "face value" of the fictitious financial instruments as the measure for intended loss given the fact that no less than eight of the 10 instruments were purportedly worth more than $550,000,000 each—the minimal amount necessary to apply a 30-level increase under the Guidelines.  Two fictitious instruments (counts 8 and 9) had purported face values of $1 trillion dollars each; one instrument (count 5) had a purported face value of $500 billion dollars; and six instruments (counts 1, 2, 3, 4, 6, and 10) had purported face values of $1 billion, $1.9 billion, $10 billion, and $25 billion dollars.  PSR at ¶¶ 20-21.  Those figures were so outrageous, there was no real possibility that any person or entity would accept the "Monopoly money."  In fact, the purported face value of only three of the 10 instruments (counts 2, 3, and 7) was less than $5,102,981 million: the gross domestic product (GDP) of the world's leading economy—the United States—in the second quarter of 2018.  It was hardly surprising that no instrument was in fact negotiated by anyone.

**Page 19- MOTION TO CONTINUE RELEASE PENDING APPEAL**

disproportionate effect" of the factor on his sentence required its proof by clear and convincing evidence.

The application of an incorrect standard of proof to enhancements with disproportionate impact constitutes plain error. *United States v. Jordan*, 256 F.3d 922, 930 (9th Cir. 2001). Indeed, as the Ninth Circuit has observed, "the application of the correct burden of proof at a criminal sentencing hearing is critically important." *Id*. (citing *Rose v. Clark*, 478 U.S. 570, 580-82 (1986)); *see also Fox v. Vice*, 563 U.S. 826, 839 (2011) ("A trial court has wide discretion when, but only when, it calls the game by the right rules."). Whether the district court applied the correct burden of proof is reviewed *de novo. United States v. Kilby*, 443 F.3d 1135, 1140 (9th Cir. 2006); *United States v. Banuelos*, 322 F.3d 700, 704 (9th Cir. 2003).

The Court at sentencing did not address the issue of the appropriate standard of proof. CR 175. It is not possible to discern, therefore, whether it correctly applied the clear-and-convincing standard or the less demanding preponderance-of-the-evidence standard. On appeal, Mr. Shrout will argue that his sentence must be vacated and his case remanded for resentencing so that the Court may determine in the first instance whether the evidence is clear and convincing that the amount of intended loss exceeded $550 million. *See United States v. Hymas*, 780 F.3d 1285, 1293 (9th Cir. 2015); *Jordan*, 256 F.3d at 933.[11] Because this question is "fairly debatable," the motion to continue release pending appeal should be granted.

---

[11] It may not be necessary for the Ninth Circuit to reach the issue of the correct standard of proof for determining intended loss if it agrees with Mr. Shrout's related argument that the Court should have applied the tax guideline—U.S.S.G. § 2T1.1—to calculate the guidelines range.

**Page 20- MOTION TO CONTINUE RELEASE PENDING APPEAL**

      **b.**      **Erroneous finding that the purported face value of the fictitious financial instruments qualified as "intended loss."**

Mr. Shrout objected in writing to the calculation of his sentencing range based on the amount of "intended loss" under § 2B1.1(b)(1)(P) (more than $550,000,000).  He argued that the definition of "intended loss" did not apply because he had not intended or "purposely sought to inflict" the claimed pecuniary harm.  U.S.S.G. § 2B1.1, comment. (n.3(A)(ii)).  Citing evidence that he suffers from a mental disease or defect (*i.e.*, delusional disorder), and that the defect contributed substantially to his commission of the offenses, he argued that the purported face value of the fictitious instruments did not qualify as "intended loss," as that term is specifically defined by the Guidelines, because the disease prevented him from purposely or intentionally seeking to inflict pecuniary harm.

The Ninth Circuit reviews *de novo* a district court's interpretation of the sentencing guidelines. *United States v. Dixon*, 201 F.3d 1223, 1233, (9th Cir.2000).  It reviews for clear error the factual findings underlying the sentencing decision.  *United States v. Barnes*, 125 F.3d 1287, 1290 (9th Cir.1997).

The Court did not address Mr. Shrout's objection at sentencing.  CR 175.  On appeal, Mr. Shrout will argue that his sentence must be vacated and his case remanded for resentencing because the evidence offered to support the 30-level enhancement was factually and legally inadequate to qualify as "intended loss" and, therefore, the Court erred in its calculation of the sentencing range. This question is "fairly debatable" and, therefore, the motion to continue release pending appeal should be granted.

### c.    Erroneous application of "sophisticated means" enhancement

Mr. Shrout formally objected to the application of a two-level increase under U.S.S.G. § 2B1.1(b)(10)(C).  The Court did not address the objection.  CR 175.

The Guidelines commentary provides a specific and narrow definition of the term "sophisticated means."  U.S.S.G. §2B1.1, comment. (n.9(B)).  The term means "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  *Id*.  Two examples are provided.  First, "in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means."  *Id*.  Second, "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."  *Id*.

There was no evidence that Mr. Shrout located offices in multiple jurisdictions in an effort to avoid detection; hid assets or transactions; or used fictitious entities, corporate shells, or offshore financial accounts.  To the contrary, the fictitious instruments listed both his name and an account number "which matched [his] Social Security number."  PSR at ¶ 36.  The instruments also contained his fingerprint and signature.  PSR at ¶ 21.  He shipped the instruments via the U.S. Postal Service and Federal Express.  Related invoices bore not only his name and signature, but also his address and phone number.  These undisputed facts demonstrate that he made no effort to conceal the offenses.  Nor was the "offense conduct pertaining to the execution" of the offenses "especially complex or especially intricate."  To the contrary, it is difficult to conceive of a less complex or intricate scheme than this.

Most of the facts that the government cited as support for its argument that the "sophisticated means" enhancement applied did not pertain to "the execution or concealment of

[the] offense," as the Commentary expressly requires.  For example, while it is true that Mr. Shrout "operated a business" under his true and correct name (*i.e.*, Winston Shrout Solutions in Commerce) and "received payments for services as a presenter at seminars," those business activities did not pertain to "the execution or concealment" of the offense.  The execution of the offenses bore no direct relationship to his operation of the business.  His conduct pertaining to the execution of the offenses simply involved the production, presentation, and shipping of the instruments.  Nor was there evidence of any effort to conceal the offenses.  The fact that Mr. Shrout used his true name, signature, fingerprint, Social Security number, and mailing address to execute the offenses demonstrates that he made no attempt to conceal his conduct.  Accordingly, the enhancement did not apply.

On appeal, Mr. Shrout will argue that his sentence must be vacated and his case remanded for resentencing for at least three alternative reasons.  First, so that this Court may determine whether the evidence is clear and convincing that "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."  U.S.S.G. § 2B1.1(b)(10)(B); *see Jordan*, 256 F.3d at 922.  Second, because the evidence the government offered to support the enhancement was inadequate to qualify for the enhancement and, therefore, the Court miscalculated the sentencing range.  *Id.* at 926.  Third, because the Court provided insufficient reasoning to allow for meaningful appellate review. *See Gall v. United States*, 552 U.S. 38, 50 (2007); *United States v. Carty*, 520 F.3d 984, 992 (9th Cir. 2008).  Because each question is "fairly debatable," the motion to continue release pending appeal should be granted.

**Page 23- MOTION TO CONTINUE RELEASE PENDING APPEAL**

### 4.    Competency Errors

#### a.    Failure to hold a competency hearing before trial

There is an independent obligation upon the defense, the prosecution, and the Court to inquire into a defendant's mental competence if a good faith basis to question competency arises during the criminal proceedings.  *See* 18 U.S.C. § 4241(a) (obligation to raise issue "if there is reasonable cause to believe" that the defendant might not be competent); *see also Pate v. Robinson*, 383 U.S. 375, 385 (1966) ("Where the evidence raises a 'bona fide doubt' as to a defendant's competence to stand trial, the judge on his own motion" must hold a competency hearing).  If a bona fide doubt regarding a defendant's mental competence is raised, the district court must hold a competency hearing, which begins with an evaluation of the defendant's mental competence performed by a court-appointed mental health professional.  *Pate*, 383 U.S. at 385.  If a reasonable judge would have a "genuine doubt" about the defendant's competency to stand trial, failure to hold a competency hearing is plain error.  *United States v. Dreyer*, 705 F.3d 951, 961 (9th Cir. 2013) (citing *Chavez v. United States*, 656 F.2d 512, 516 (9th Cir. 1981)).

When Mr. Shrout appeared for arraignment on the initial Indictment, he admitted he was "kind of confused by the nature of this situation."  CR 67 at 6.  He noted that "what's confusing to me is that obviously this is not a tort case."  *Id*. at 7.  He asked whether "[t]here has to be a commercial crime?"  *Id*.  He then asked what the proceeding was "based upon" and whether the "procedures of statutes of the United States" applied "to citizens or what?"  *Id*.  Later, when the Court inquired whether he understood the charges, Mr. Shrout stated: "No, sir."  *Id*. at 9.  He subsequently repeated that he did not "understand them."  *Id*.  And when the Court asked whether he understood the potential penalties, he again stated: "no, I do not understand them."  *Id*. at 10.

The Court subsequently commented on the *pro se* pleadings that Mr. Shrout filed before the hearing. It told him:

> Based on the documents you have submitted so far in this case, it is clear you do not know how to present a viable defense to the charges against you. The documents you have submitted purporting to be a lien and invoice and liquidation are null and void. They have no legal consequence at all. If these documents are intended to be the basis of your defense, you're going to lose this case.

CR 16 at 11. Later, when Mr. Shrout informed the Court that he was "confused about the terms being used here" (*i.e.*, assistance of counsel, standby counsel, and advisory counsel), the Court stated:

> Here's what I mean: You've got some theories … about admiralty courts and all that stuff. It's hogwash. It doesn't exist in the law, but you have a right to make a record of it, as I've done for other tax protestors. A lawyer can't assert that right for you. They just can't do that. They can't present to the Court spurious matters. You can if that's your choice. But at the same time … you can go ahead and assert your positions, even though I feel that they are without merit, but you have a right to put them on the record.

*Id*. at 13. Still confused, Mr. Shrout then said, "One more question: On the – at this advisory position, would an attorney be able to sign my name or any other documents that would pertain to me?" *Id*. at 14. He acknowledged he was having trouble "trying to understand what the advisory counsel would be." *Id*. In the end, he posed the issue to the Court in a different fashion, asking "could he [standby counsel] create a liability in me?" *Id*. It was only after the Court agreed that Mr. Shrout would "sign all the documents" that he stated: "Okay. Would that – with that being the case, then I agree to the terms of the…." *Id*. Later, after Mr. Shrout had pleaded guilty, the Court noted its own confusion over the situation: "Well, in respect to this matter, he's pleading guilty to the facts and if – do you have any basis of – I've – I still am confused as to what you want because you could go to trial before a judge or a jury." *Id*. at 19.

Approximately two months later, Mr. Shrout appeared before the Court for arraignment on the Superseding Indictment.  CR 68.  As the Court advised him of the charges and related penalties, it stopped and stated: "Let's put it bluntly.  You're *not competent* to represent yourself, but you have a right to do that."  *Id.* at 6 (emphasis added).  The Court also stated: "You don't have the competency to know the first thing about cross-examining a witness, but…." *Id.* at 7.  Finally, the Court noted: "I've said this before to people like you.  You're well meaning.  You -- *you are bizarre*, however…." *Id.* (emphasis added).

Despite its observations and statements to the contrary, the Court ultimately accepted Mr. Shrout's choice "to be my own attorney without representation from [the public defender], but as standby counsel."  CR 68 at 8.  The Court told him: "That's your choice.  I'll accept that as a full and knowing decision, complying with the *Faretta* decision."  *Id*. at 8-9.  The Court concluded: "I find, without doubt, he's totally competent, and if he chooses to represent himself after advisement, that's his legal right." *Id*. at 9.

This case presented unique, complex, and overlapping issues involving the right to self-representation under *Faretta*, the role of standby counsel under *McKaskle v. Wiggins*, 465 U.S. 168 (1984), and client autonomy under *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018).  Here, Mr. Shrout's conduct both in and out of the courtroom created a genuine doubt as to his competency to stand trial.  Secondarily, the doubt also related to whether *Faretta* required the Court to decide whether mental illness impacted the exercise of that right.  *Indiana v. Edwards*, 554 U.S. 164 (2008).  But the Court failed to order a competency hearing *sua sponte*.

On appeal, Mr. Shrout will argue that because the evidence of incompetence was such that a reasonable judge would be expected to experience a genuine doubt respecting his competence, the failure to order a competency hearing *sua sponte* is plain error.  The fact that two mental health

experts later found that he suffered from a mental disease or defect (*i.e.*, delusional disorder) supports his argument.  Because this question is "fairly debatable," the motion to continue release pending appeal should be granted.

### b.    Erroneous competency finding before sentencing

Mr. Shrout was convicted after trial of all 19 counts set forth in the Superseding Indictment. CR 110.  A few days later, he changed his mind and asked the Court to appoint counsel to represent him in all subsequent proceedings.  The Court granted his request and appointed counsel.  CR 112.

Defense counsel subsequently filed a motion for a hearing to determine mental competency.  CR 129.  Counsel submitted a psychological evaluation by a local mental health expert, Dr. Martin, in support of the motion.  She found that Mr. Shrout was not malingering, did suffer from a mental disease or defect, namely, delusional disorder, and he was not competent to proceed to sentencing.  Based on that report, the Court granted the motion for a competency hearing and ordered a further evaluation by another expert, Dr. Lopez.  CR 141 and 173.

Dr. Lopez submitted her report to the Court before the hearing.  She opined that Mr. Shrout was not malingering, did not suffer from a mental disease or defect, and was competent.  The defense also submitted a report from a third expert, Dr. Millkey.  He too agreed that Mr. Shrout was not malingering.  He found that while Mr. Shrout did suffer from delusional disorder, he was competent to proceed.

The Court held a competency hearing.  CR 153 and 174.  Dr. Lopez and Dr. Millkey both testified.  *Id*.  Dr. Martin did not.  At the conclusion of the hearing, the Court succinctly ruled as follows:

> My ruling is clear that he is competent to proceed to sentencing.  He may have delusional beliefs.  He may not be medically diagnosed as such, but as far as I'm concerned, he is fully competent to address any matters pertaining to sentencing….

**Page 27- MOTION TO CONTINUE RELEASE PENDING APPEAL**

CR 174 at 81.

On appeal, Mr. Shrout will raise at least two related arguments with respect to the contested issue of his competency to proceed to sentencing. First, because the test of his competency is whether he has a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him, the record does not sufficiently support the Court's cursory finding of competency. *Dusky v. United States*, 362 U.S. 402 (1960). Second, the Court erred by finding him competent because "a preponderance of the evidence [established that Mr. Shrout was] presently suffering from a mental disease or defect rendering him mentally incompetent." 18 U.S.C. § 4241(d); *see United States v. Benson*, No. 12-CR-00480-YGR-1, 2015 WL 1064738, at *5 (N.D. Cal. Mar. 11, 2015) ("In federal court, the government, not the defendant, bears the burden.").

D.    **The Fourth *Handy* Factor: Effect on Conviction or Sentence**

As demonstrated, there are several "fairly debatable" questions for the appellate court, some of them novel, that, if any one of them is resolved in Mr. Shrout's favor, will result in at least resentencing, if not reversal. Accordingly, he respectfully asks the Court to grant his request to remain on release pending appeal, pursuant to 18 U.S.C. § 3143(b).

**IV.    CONCLUSION**

For each of the foregoing reasons, Mr. Shrout respectfully requests that the Court grant his motion and enter an Order permitting him to continue on his current conditions of release while pending appeal.

RESPECTFULLY submitted this 10th day of December, 2018.

*/s/ Ruben L. Iñiguez*
Ruben L. Iñiguez
Assistant Federal Public Defender
