**Ruben L. Iñiguez**
**Assistant Federal Public Defender**
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204
Tel: (503) 326-2123
Fax: (503) 326-5524
Email: Ruben_Iniguez@fd.org

**Attorney for Defendant**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 3:15-cr-00438-JO |
| Plaintiff, | **MOTION TO REDUCE SENTENCE UNDER THE FIRST STEP ACT** |
| v. | **(COMPASSIONATE RELEASE)** |
| **WINSTON SHROUT,** | |
| Defendant. | |

## Introduction

The defendant, Winston Shrout, through counsel, respectfully moves this Court to reduce his sentence to time served and to order his immediate release to serve an extended period of home confinement pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). His motion is based on the First Step Act (FSA). Pub. L. No. 115-391, 132 Stat. 5194 (2018). The FSA allows prisoners to petition courts for sentence modification, after exhausting administrative procedures, based on extraordinary and compelling reasons—a process also known as compassionate release. Mr. Shrout's reason for filing his petition is his medical condition in the face of the novel coronavirus pandemic. For the reasons that follow, this Court should grant his motion and order his immediate release to serve an extended period of home confinement as a special condition of his supervised release.

Mr. Shrout is a 72-year-old father, grandfather, husband, and military veteran. His cardiologist, Dr. Vincent Reyes, and the Portland VA Medical Center have diagnosed him with hypertension and two cardiovascular diseases—hypertrophic cardiomyopathy and atherosclerotic peripheral vascular disease—serious medical conditions that put his life at grave risk should he contract COVID-19. *See* Exhibit A (Medical Record), filed under seal. Mr. Shrout faces an extraordinarily high likelihood of contracting COVID-19 each day that he remains incarcerated in FCI Terminal Island, a federal prison where nearly 70% of the inmate population, a full 695 men, have been infected with the deadly virus. BOP, COVID-19 Cases, https://www.bop.gov/coronavirus/ (last visited May 22, 2020 at 1:20 p.m.); *see also* Rep. Ted Lieu and Rep. Nanette Barragan, *Reps Lieu And Barragan Urge Release, Home Confinement of Federal Prisoners In COVID-19-Struck San Pedro Facility*, Press Release, April 30, 2020, available at https://lieu.house.gov/media-center/press-releases/reps-lieu-and-barragan-urge-release-home-confinement-federal-prisoners (requesting that BOP "immediately take steps to place all inmates at FCI Terminal Island into home confinement or exercise compassionate release.").

Mr. Shrout has approximately 95 months left to serve on his sentence. His advanced age, weight, and serious medical conditions, combined with the substantial risk that he will contract COVID-19 if he remains incarcerated at FCI Terminal Island, constitute an extraordinary and compelling reason to reduce his sentence and to order his immediate release to serve an extended period of home confinement as a special condition of supervised release in lieu of further incarceration.

## Statutory Framework for Sentence Reduction Authority under the FSA

Under the FSA, a court may reduce a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction; ... and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission...." 18 U.S.C. § 3582(c)(1)(A)(i).

The pertinent policy statement by the Sentencing Commission for sentence reductions related to medical ailments was last amended before the FSA passed and is found in Application Note 1 to U.S. Sentencing Guidelines (U.S.S.G.) § 1B1.13. The Application Note identifies extraordinary and compelling reasons in four categories: (1) the medical condition of the defendant; (2) the age of the defendant; (3) family circumstances; and (4) other reasons in a defendant's case, as determined by the director of the Bureau of Prisons (BOP), amounting to an extraordinary and compelling reason, other than, or in combination with, the reasons described in subdivisions (1) through (3).[1] The "catch-all provision" in subdivision (4) provides courts

---

[1] The portion of the FSA relevant to Mr. Shrout's petition defines "extraordinary and compelling reasons" as:

1. **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:

   (A) **Medical Condition of the Defendant**.—

   * * *

   (ii) The defendant is—

   (I)   suffering from a serious physical or medical condition,

   (II)  suffering from a serious functional or cognitive impairment, or

authority to define other bases for a sentence reduction. *See United States v. Joling,* No. 6:11-CR-60131-AA, 2020 WL 1903280, at *3 (D. Or. Apr. 17, 2020) (citing U.S.S.G. § 1B1.13, comment. (n.1(D))); *see also United States v. Rodriguez*, No. 2:03-cr-00271-AB, 2020 WL 1627331, at *7 (E.D. Penn. Apr. 1, 2020) ("[A] majority of district courts have concluded that the 'old policy statement provides helpful guidance, [but] ... does not constrain [a court's] independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3852(c)(1)(A)." (citation omitted)).

The policy statement also requires a finding that the defendant is not a danger to the safety of any other person or to the community. U.S.S.G. § 1B1.13(2). Finally, the policy statement notes that "[t]he court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction)." U.S.S.G. § 1B1.13 n.4.

---

    (III)    experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) **Age of the defendant**.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

* * *

(D) **Other Reasons**.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

A defendant seeking a reduction in his term of imprisonment bears the burden to establish both that he satisfied the procedural prerequisites for judicial review and that compelling and extraordinary reasons exist to justify compassionate release. 18 U.S.C. § 3582(c)(1)(A).

## Material Facts and Procedural History

Mr. Shrout is a military veteran from Winchester, Kentucky. PSR at ¶¶ 52, 61, 64, 66. He is serving a 120-month sentence that was imposed after a trial in which he was found guilty of multiple counts of making, presenting, and shipping fictitious obligations under 18 U.S.C. § 514(a), as well as willfully failing to file tax returns under 26 U.S.C. § 7203. There was no realistic chance anyone would honor the fictitious instruments claimed to be worth billions of dollars and, in fact, no one did. Other than the amount of unpaid tax owed to the U.S. Treasury Department, there was no actual loss. The Court permitted Mr. Shrout to surrender voluntarily to begin serving his sentence. ECF 161, 178. He failed to surrender and on November 1, 2019, he was taken into custody to begin serving his sentence. *See United States v. Shrout*, No. 2:19-mj-08467-JZB, ECF 1 (D. Ariz. Nov. 1, 2019). Based on a projected release date of May 7, 2028, a balance of approximately 95 months remains on his sentence.

Prior to his convictions, Mr. Shrout had never been convicted of a single crime. *See* PSR at ¶¶ 45-50. He had led a law-abiding and productive life for more than 70 years. As a younger man, he served honorably in the United States Marine Corps. PSR at ¶ 66. He obtained the rank of Sergeant and was decorated with a service medal and marksmanship ribbon. *Id*. Later, as a journeyman carpenter, he obtained certification to perform welding to nuclear power plant specifications. PSR at ¶ 65. With his rare skillset, Mr. Shrout fulfilled government prime contracts, and possessed a high level (Q) security clearance. *Id.* He is the father of 18 successful

children, all of whom he helped to raise. PSR at ¶¶55-57. He continues to maintain strong relationships with each of his 14 living children. *Id*.

Mr. Shrout is now 72 years old. He is 6'1" tall and weighs approximately 195 pounds. PSR at ¶ 60. His family medical history includes Lupus. His body mass index—25.7—indicates he is overweight. He also suffers from primary hypertension and two cardiovascular diseases: hypertrophic cardiomyopathy and atherosclerotic peripheral vascular disease. Exhibit A. Some of the ways these illnesses manifest is with pitting edema (swelling), decreased temperature, discoloration, and pain bilaterally to his lower extremities. As a result, his mobility is also severely impaired. He now requires the assistance of a walker.

For the past three years, Mr. Shrout also has been afflicted by a chronic lung infection. These medical conditions place him at high risk for serious complications should he contract COVID-19. *See* Ernesto L Schiffrin et al., *Hypertension and COVID-19*, American Journal of Hypertension, April 6, 2020, *available at* https://academic.oup.com/ajh/article/33/5/373/5816609 (recognizing that hypertension is the most common underlying condition associated with deaths from COVID-19); Manish Bansal, *Cardiovascular Disease and COVID-19*, United States National Library of Medicine, Mar. 25, 2020, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7102662/ (noting that patients with pre-existing cardiovascular disease "appear to have heightened vulnerability to develop COVID-19 and tend to have more severe disease with worse clinical outcomes").

Mr. Shrout is incarcerated at FCI Terminal Island in San Pedro, California. More than half the inmate population, 695 inmates (as well as 16 staff), has been infected with COVID-19. BOP, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last visited May 22, 2020 at 1:29 p.m.). On April 1, 2020, Mr. Shrout submitted a request for compassionate release to Warden Ponce. The

next day, two of his daughters and one son-in-law forwarded correspondence to the BOP in support of his request for compassionate release. *See* Exhibit B (Letters from Elisa Shrout, Hettie Turner, and Ernie Jessop). Their pleas have gone unanswered.

On April 30, medical personnel at FCI Terminal Island performed a chest x-ray after Mr. Shrout began to experience difficulty breathing. When the results revealed his lungs were "cloudy," he was transferred to the medical facility for two days, from April 30 to May 2. Upon discharge, his doctors prescribed two oral antibiotics: Azithromycin (500 mg) and Cephalexin (500 mg), presumably to treat an upper respiratory infection.[2]

More recently, on May 16, attorneys from the American Civil Liberties Union filed a class action lawsuit asserting that conditions at FCI Terminal Island during the national coronavirus emergency violate the Eight Amendment's protections against cruel and unusual punishment. *See Wilson v. Ponce*, No. 2:20-cv-04451, ECF 1 (C.D. Cal. May 16, 2020); Long Beach Post News, *After string of COVID-19 deaths, ACLU sues over conditions at Terminal Island prison*, May 16, 2020, available at https://lbpost.com/news/terminal-island-lawsuit-aclu-prisonsue.

---

[2] Prison medical personnel have not provided Mr. Shrout any specific reason for their prescription of the antibiotics. Although they also administered a test to determine whether he has been exposed to, and infected by, the novel coronavirus, they still have not disclosed those test results either. On May 14, the National Institute of Allergy and Infectious Diseases announced a clinical trial to evaluate whether azithromycin, one of the antibiotics prescribed to Mr. Shrout, can prevent hospitalization and death from COVID-19 when taken together with the antimalarial drug hydroxychloroquine. *See* https://www.nih.gov/news-events/news-releases/nih-begins-clinical-trial-hydroxychloroquine-azithromycin-treat-covid-19. Other recent research involving U.S. veterans has shown that "[t]he combination of hydroxychloroquine and azithromycin … led to an increase in mortality." https://www.cardiovascularbusiness.com/topics/electrophysiology-arrhythmia/covid-19-hydroxychloroquine-azithromycin-deaths-coronavirus.

Mr. Shrout has a wealth of family and community support that will assist him in reintegrating into society. *See* Exhibits B and C. If released, he intends to live in a small trailer he owns in Hurricane, Utah. His common-law wife and children have prepared this safe location for him to quarantine. He will have cell phone service there.

**Argument**

**A.      Mr. Shrout's Motion for Compassionate Release is Ripe for Adjudication.**

Although the compassionate release statute previously permitted sentence reductions only upon motion of the director of the BOP, Congress expanded the statute in the FSA. As amended, Section 3582(c)(1)(A)(i), now permits courts to consider a defendant's motion so long as he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"

The reason for the congressional expansion to include defense motions was the "documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants." *United States v. Redd*, No. 1:97-CR-00006-AJT, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020). Accordingly, "while the First Step Act did preserve the BOP's role relative to a sentence reduction in certain limited respects, it eliminated the BOP Director's role as the *exclusive* channel through which a sentence reduction could be considered by courts." *Id.* (emphasis in original).

Mr. Shrout submitted his written request for compassionate release to the warden at FCI Terminal Island on April 1, 2020. He has waited almost 50 days without any response. Accordingly, he has "fully exhausted all administrative rights" in light of "the lapse of 30 days from the receipt" of his request. 18 U.S.C. § 3582(c)(1)(A)(i). *See United States v. Resnick*, No.

14 CR 810 (CM), -- F.Supp.3d --, 2020 WL 1651508, *6 (S.D. N.Y. 2020) (applying prisoner mailbox rule to compassionate release statute).

B. **Mr. Shrout's Age, Fragile Health, and Vulnerability to COVID-19 in the BOP's Most Infected Prison Establish Extraordinary and Compelling Reasons for an Immediate Sentence Reduction to Time Served.**

The compassionate release statute does not expressly define or limit what constitutes an "extraordinary and compelling" reason for a sentence reduction. Black's Law Dictionary defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common," BLACK'S LAW DICTIONARY (11th ed. 2019). Its definition of "compelling need" is one "so great that irreparable harm or injustice would result if [the relief] is not [granted]." *Id.*

The ongoing global pandemic is a quintessential extraordinary and compelling circumstance. It is far beyond what most Americans have experienced in their lifetimes. Given Mr. Shrout's unique vulnerability to the disease and his incarceration in the federal prison with the highest rate of outbreak, infections, and fatalities, the grave risk to him from continued incarceration provides a compelling reason for his immediate release.

The coronavirus has spread like wildfire in the past few months. It already has infected more than 5,169,907 people worldwide, and has caused more than 335,993 deaths. *Coronavirus COVID-19 Global Cases*, CENTER FOR SYSTEMS SCIENCE AND ENGINEERING (CSSE) AT JOHNS HOPKINS UNIVERSITY, https://coronavirus.jhu.edu/map.html (last visited May 22, 2020, at 1:24 p.m.). COVID-19 has made terrifying inroads into the BOP, despite the agency's best efforts to prevent an outbreak. *See* https://www.forbes.com/sites/walterpavlo/2020/04/15/federal-bureau-of-prisons-institutions-not-showing-any-signs-of-flattening-curve/#67533f8c54dd (discussing the fact that BOP has not been able to "flatten the curve" within federal prisons). As of May 22, 2020, there were 1,594 federal inmates and 194 staff who had confirmed positive test results for COVID-

19. BOP, *Open COVID-19 Tested Positive Cases*, www.bop.gov/coronavirus/ (providing daily tallies of confirmed infections) (last visited May 22, 2020 at 1:26 p.m.). An additional 3,047 inmates and 394 staff have recovered from the virus. *Id.* Fifty-nine federal inmates have died. *Id.*

FCI Terminal Island, where Mr. Shrout is detained, is one of the prisons hardest hit by COVID-19 within the federal prison system. *See* Richard Winton, *Terminal Island Prison Inmates Have Worst Coronavirus Outbreak In Federal System*, Los Angeles Times, April 29, 2020, *available at* https://www.latimes.com/california/story/2020-04-29/coronavirus-terminal-island-prison-inmates-outbreak. With 695 inmates already infected with COVID-19 out of a total population of 1,042 inmates, prisoners who have yet to contract the deadly virus are in the minority. BOP, *Open COVID-19 Tested Positive Cases*, www.bop.gov/coronavirus/ (last visited May 22, 2020 at 1:29 p.m.). Eight inmates housed in Terminal Island FCI already have died from COVID-19. *Id.* In response to the dire circumstances for prisoners in Terminal Island FCI, Representatives Ted Lieu and Nanette Barragan sent a letter to BOP Director Michael Carvajal requesting he "immediately take steps to place all inmates at FCI Terminal Island into home confinement or exercise compassionate release." Press Release, April 30, 2020, available at https://lieu.house.gov/media-center/press-releases/reps-lieu-and-barragan-urge-release-home-confinement-federal-prisoners.

In addition to being housed at one of the top COVID-19 hotspots in the federal prison system, Mr. Shrout is among the most vulnerable of the prison population based on his age, weight, and combined health conditions. *See* Exibit A. Each of his medical conditions—hypertension, excessive weight, hypertrophic cardiomyopathy, and atherosclerotic peripheral vascular disease—has been identified as creating an increased risk of severe illness, if not death, from COVID-19. CDC, *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-

ncov/need-extra-precautions/people-at-higher-risk.html; *see also* Schiffrin, *Hypertension and COVID-19*, *available at* https://academic.oup.com/ajh/article/33/5/373/5816609 (recognizing that hypertension is the leading underlying condition associated with deaths from COVID-19); Bansal, *Cardiovascular Disease and COVID-19*, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7102662/ (noting that patients with pre-existing cardiovascular disease "appear to have heightened vulnerability to develop COVID-19 and tend to have more severe disease with worse clinical outcomes"). Yet, as a BOP inmate, it is impossible for Mr. Shrout to follow the CDC's recommendations to protect himself from exposure to this highly communicable disease. *See United States v. Gross*, No. 15-CR-769 (AJN), 2020 WL 1673244, at *1 (S.D.N.Y. Apr. 6, 2020) (recognizing that "not only is [the defendant] at a higher risk of serious illness if he contracts COVID-19 due to his underlying health conditions, but he is also at a higher risk of contracting COVID-19 due to his incarceration"). The rate of infections at FCI Terminal Island and other federal prisons demonstrates clearly that BOP cannot control the spread of COVID-19 in its facilities.

There is well-established precedent in favor of compassionate release eligibility based on the combination of Mr. Shrout's heart concerns and the fact that he is incarcerated in a COVID-19-infected BOP facility. *See United States v. Ardila*, No. 3:03-cr-00264-SRU-1, 2020 WL 2097736 (D. Conn. May 1, 2020) (granting compassionate release where defendant was 71 years old with diagnoses for hypertension and cardiovascular disease); *United States v. Kriglstein*, No. 1:16-cr-00663-JCH-1, Dkt. No. 55 (D. N.M. Apr. 23, 2020) (53-year-old defendant with heart disease showed exceptional circumstances warranting compassionate release); *United States v. Sawicz*, No. 1:08-cr-00287-ARR-1, 2020 WL 1815851, at *2 (E.D. N.Y. Apr. 10, 2020) ("the COVID-19 pandemic, combined with [the defendant's] particular vulnerability to complications

from COVID-19 because of his hypertension, constitutes an "extraordinary and compelling reason" warranting release); *United States v. Miller*, No. 2:16-cr-20222-AJT-RSW-1, 2020 WL 1814084, at *3-4 (E.D. Mich. Apr. 8, 2020) (finding extraordinary and compelling reasons for release where defendant suffered from hypertension, cardiovascular disease, and other diagnoses); *United States v. Hansen*, No. 07-CR-00520-KAM, 2020 WL 1703672 (E.D. N.Y. Apr. 8, 2020) (granting compassionate release to defendant with hypertension and cardiovascular disease, among other medical conditions); *United States v. Muniz*, No. 4:09-CR-0199-1, 2020 WL 1540325 (S.D. Tex. Mar. 30, 2020) (granting compassionate release in part because some of defendant's medical conditions, including hypertension, were identified by the CDC as medical conditions that may put a person at higher risk for severe consequences of COVID-19).

The catastrophic circumstances surrounding the COVID-19 outbreak at FCI Terminal Island, combined with Mr. Shrout's particular vulnerability, provide extraordinary and compelling circumstances to grant a sentence reduction.

C.  **With Full Consideration of the § 3553(a) Factors, the Court Should Order Mr. Shrout Released to Home Confinement for an Extended Period.**

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i). Here, the COVID-19 pandemic and the serious health risk it presents to Mr. Shrout constitute overriding factors under § 3553(a) that were neither present nor foreseen when he was sentenced. At the time of sentencing, the Court could not have anticipated that Mr. Shrout's sentence would be exposed to a virus that, in light of his underlying health conditions, could seriously threaten his life. As the court in *United States v. Zukerman* framed it, the sentence was not intended to "'include incurring a great and unforeseen risk of severe illness or death' brought on by a global pandemic." No. 1:16-cr-00194-AT-1, 2020 WL 1659880, at *6.

Based on these new circumstances, permitting Mr. Shrout to return to the small trailer home he owns near his family, and requiring him to serve an extended period of home confinement rather than remaining at FCI Terminal Island, satisfies the purposes of punishment under § 3553(a). With an extended term of home confinement as a condition of his supervised release, Mr. Shrout's liberty will remain restricted, but he will be better able to protect himself from exposure to COVID-19.[3]

Mr. Shrout's release will not present any risk to the safety of the community. His crimes were non-violent, and he is now designated to a minimum-security facility, the least restrictive type of institution reserved for the most trustworthy inmates. In addition, he has a solid release plan to live near his family in the small trailer home he owns. Given the extreme risk of exposure to the deadly virus in custody, Mr. Shrout will have the trailer home to himself. Once there, he can isolate himself from his family members and others for a sufficient period to ensure he has not already been infected.

Mr. Shrout's family justifiably fears for his safety if he remains in custody. His daughter expresses that her "family is worried" that Mr. Shrout may have contracted COVID-19 while housed in a dormitory with 75 other men. Exhibit B at 1. His son-in-law similarly writes: "my children are afraid their grandfather will die before they see him again because of this outbreak." Exhibit B at 3. If Mr. Shrout is released from prison, they will help ensure his safe transition to the community. The Shrout family stands prepared to provide any necessary assistance for his

---

[3] In addition to § 3553(a), the Eighth Amendment plays a role because of its prohibition against cruel and unusual punishment, including unreasonable exposure to dangerous conditions in custody. *See Helling v. McKinney*, 509 U.S. 25, 28 (1993); *see also Wallis v. Baldwin*, 70 F.3d 1074 (9th Cir. 1995) (applying *Helling* to exposure to asbestos); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 650 (E.D. Va. July 28, 2004) (applying *Helling* to "contagious diseases caused by overcrowding conditions").

transportation from California to Utah.  Once there, they can provide him with all he needs: a home to self-isolate, food, medication, and other essentials.  *See* Exhibit B at 1-3.  Mr. Shrout's robust community will support him in managing his chronic medical conditions throughout his period of home confinement.  Exhibit B at 1.

## Conclusion

The extraordinarily high likelihood that Mr. Shrout will contract COVID-19 only continues to increase each day that he remains incarcerated at FCI Terminal Island.  His advanced age, weight, hypertension, and serious cardiovascular diseases—hypertrophic cardiomyopathy and atherosclerotic peripheral vascular disease—make him particularly vulnerable to the fatal disease.  For each of these reasons, Mr. Shrout respectfully requests that the Court grant his motion for compassionate release, reduce his sentence to time served, and modify the special conditions of his supervised release to require an extended period of home confinement.

Respectfully submitted this 22nd day of May 2020.

                                                */s/ Ruben L. Iñiguez*
                                                Ruben L. Iñiguez
                                                Attorney for Defendant