**BILLY J. WILLIAMS**, OSB #901366
United States Attorney
District of Oregon
**STUART A. WEXLER**
Trial Attorney, Tax Division
Stuart.A.Wexler@usdoj.gov
**LEE F. LANGSTON**
Trial Attorney, Tax Division
Lee.F.Langston@usdoj.gov
1000 SW Third Avenue, Suite 600
Portland, OR 97204-2902
Telephone: (503) 727-1000
Attorneys for United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 3:15-cr-00438-JO |
| v. | **GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO REDUCE SENTENCE [ECF 198]** |
| **WINSTON SHROUT,** | |
| **Defendant.** | |

The United States of America, by and through Billy J. Williams, United States Attorney for the District of Oregon, and Stuart A. Wexler and Lee F. Langston, Trial Attorneys, Tax Division, hereby submit this Opposition to Defendant's Motion to Reduce Sentence (Doc. 198). In the more than three years after defendant was convicted at trial, he has served just six months of a 120 month sentence, broken his word to the Court to self-surrender, fled the state as a fugitive until apprehended by the US Marshals, and now stands before the Court requesting that

his sentence be reduced from ten years to six months or, in the alternative, that the Court recommend that he be sentenced to home confinement. Because defendant has not met his burden of showing the "extraordinary and compelling reasons" to justify relief, his motion should be denied.

## FACTUAL BACKGROUND

Defendant was convicted on April 21, 2017, of all nineteen counts charged in the superseding indictment. Following conviction, this Court permitted defendant to remain at liberty until sentencing. Defendant filed three motions requesting continuances and then filed a motion arguing that defendant was not competent to proceed to sentencing. Following the denial of that motion, defendant was sentenced on October 22, 2018. At sentencing, defendant argued that he be sentenced to probation. Then, as now, defendant contended that his age, veteran status, medical conditions, and large family meant he should receive a more lenient sentence. He also argued – as he does here and contrary to the jury's factual findings – that there was no chance anyone would honor the thousands of fictitious financial instruments the defendant sent to community banks and the US treasury and that there was essentially no loss. The Court, after considering these factors, declined to give defendant a probationary sentence and instead sentenced him to 120 months imprisonment. Doc. 160.

Following the pronouncement of sentence, the Court expressed concern about releasing defendant because the Court was concerned he would not voluntarily report to prison. *Sentencing Tr.* 10/22/18, p. 59. The defendant promised the Court that he would self-report. *Id.* Defendant filed four motions to delay his self-surrender date (Doc. 165, 176, 179, and 182) and requested bail pending appeal from the Ninth Circuit. His bail motion was denied by the Ninth Circuit on March 1, 2019. Defendant was ordered to report to FCI Sheridan on March 4, 2019.

Defendant called Christina Song, U.S. Pretrial Services Officer, on March 1, 2019, and left a voice message promising to report as ordered. Despite his promise to the Court and the U.S. Pretrial Services Officer, defendant failed to report and a warrant was issued on March 5, 2019.

Defendant was apprehended on November 1, 2019, by US Marshals in Payson, Arizona. Defendant was returned to custody by federal agents and began serving his sentence at FCI Terminal Island. His current release date is May 7, 2028. On April 1, 2020, defendant submitted a request to the Bureau of Prisons for a "reduction in sentence due to the dangers of the coronavirus." The defendant submitted a second request on May 22, 2020. Defendant's request was denied by the warden at FCI Terminal Island on June 5, 2020.[1]

Defendant tested positive for COVID-19 on April 29, 2020, and was admitted to the inpatient unit at the Health Services Center at Terminal Island.[2] *See* Exhibit A, pp. 13, 19. He received two x-rays and reported no symptoms consistent with COVID-19, although the chest x-rays showed a case of pneumonia which BOP concluded was likely a symptom of COVID-19. Additionally, he did not have a fever and denied any shortness of breath or chest pains. *Id.* at 8. Defendant asked to be returned to the general population on May 2, 2020. *Id.* He was discharged from the health unit on May 2, 2020, and isolated within his housing unit until May 10, 2020.[3] After discharge, he continued to be treated on an outpatient basis. He received chest x-rays on May 5, 2020, May 11, 2020, and May 20, 2020. *Id.* at 1-3. Those x-rays showed that his pneumonia was improving. *Id.*

---

[1] BOP has not yet acted on defendant's request to transfer to home confinement. It is the government's understanding that defendant's request is still under consideration.
[2] BOP records indicate that this positive test result was from a swab administered on April 23. Therefore, it is likely defendant was positive as early as April 23.
[3] Defendant was in isolation from April 25 until May 10 in keeping with BOP policy of requiring prisoners to be in isolation until symptom free for 15 days.

**United States' Opposition to Defendant's Motion for Release**            **Page 3**

On May 22, 2020, defendant filed the instant motion pursuant to Section 3582(c)(1)(A)(i) seeking a reduction of his sentence to time-served and a period of home confinement. Defendant argued that his underlying health conditions "put his life at grave risk should he contract COVID-19" and that remaining at FCI Terminal Island gave defendant "an extraordinarily high likelihood of contracting COVID-19."

**ARGUMENT**

Defendant's motion should be denied because (1) defendant has failed to meet his burden of demonstrating compelling reasons sufficient to justify releasing him 6 months into a 120 month sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) demonstrate that defendant should continue to serve his sentence; and (3) defendant's release would create a substantial danger to the community.

I. <u>Defendant has not demonstrated extraordinary and compelling reasons warranting release</u>.

The Court should deny the defendant's motion for compassionate release on the merits. The Court may grant the defendant's motion for reduction of sentence only "if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Further, the proposed sentencing reduction must be consistent with "the factors set forth in section 3553(a)." *Id.* As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014). As the terminology in the statute makes clear, compassionate release is "rare" and "extraordinary." *United States v. Willis*, 2019 WL 2403192, at *3 (D.N.M. June 7, 2019) (unpublished) (citations omitted).

The defendant's ability to bring a motion for release under Section 3582 was created by the First Step Act's amendments. The statute previously allowed such a motion only by the Bureau of Prisons. Aside from allowing prisoners to bring motions directly, however, the First Step Act did not change the substantive requirements for compassionate release. As was the case before the First Step Act, the rules for allowing release appear in the Sentencing Commission's policy statements, as directed by Congress in 28 U.S.C. § 994(t). Thus, the Application Notes to U.S.S.G. § 1B1.13, "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) (Policy Statement)," define "extraordinary and compelling reasons."

There are four categories of circumstances that can be deemed extraordinary and compelling: (1) terminal or serious medical conditions that "substantially diminish" a defendant's ability to provide self-care and from which the defendant is not expected to recover; (2) serious physical and mental deterioration suffered by defendants who are sixty-five or older and who have served at least 10 years or 75% of their sentence; (3) the death or incapacitation of a caregiver for minor children of a spouse in circumstances where the defendant is the only available caregiver, and (4) "other reasons" determined by the Director of Prisons, which are set forth in Program Statement 5050.50, available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf (last accessed June 4, 2020). U.S.S.G. § 1B1.13 Application Notes 1(A) – (D).

Program Statement 5050.50 contains standards that are both more extensive than and slightly different from those stated in the Section 1B1.13 policy statement. For instance, the program statement defines a "debilitated medical condition" as one where the inmate is "[c]ompletely disabled, meaning the inmate cannot carry on any self-care and is totally confined

to a bed or chair; or [c]apable of only limited self-care and is confined to a bed or chair more than 50% of waking hours." *Program Statement 5050.50 at 5*.

The Sentencing Commission recognizes two circumstances related to the medical condition of the defendant that may warrant a reduction in a defendant's term of imprisonment. First, the Commission describes an inmate "suffering from a terminal illness (*i.e*., a serious or advanced illness with an end of life trajectory)." The Sentencing Commission noted that "[e]xamples include metastatic solid—tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." Second, the Commission identifies a circumstance in which "[t]he defendant (I) suffering from a serious physical or medical condition, (II) suffering from a serious functional or cognitive impairment, or (III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *Program Statement 5050.50*. The common denominator is "a serious physical or medical condition" that "substantially diminishes the ability of the defendant to provide self-care within a correctional facility."

Defendant's sole argument for compelling circumstances is the risk that he might contract COVID-19 while incarcerated and suffer serious or potentially serious complications. Defendant's contention is unsupported by the record of care he has already received while incarcerated at his current facility.

Defendant was administered a COVID-19 test on April 23, 2020, and the results were confirmed as positive for COVID-19 on April 29. Following confirmation of the results, defendant was admitted to an inpatient facility, his condition and symptoms were monitored, and he was isolated from other prisoners. He received five chest x-rays to monitor his pneumonia.

He reported no shortness of breath, chest pains, or fevers. Following his release from the medical center, doctors working for the Bureau of Prisons continued to monitor him on an outpatient basis and examined him each week, including a chest x-ray to evaluate his health. Despite defendant's x-ray results, defendant denied any other symptoms.

Defendant's motion argues that his underlying medical conditions and age make him particularly vulnerable to complications from COVID-19. Doc. 198, p. 10. The government agrees that the defendant is in the group of the population identified by the CDC as high-risk. In the four weeks following his positive diagnosis, however, defendant's condition was stable and improving. Indeed, defendant himself requested that he be released from the medical facility back to the general population. *See* Exhibit A, p. 7. Accordingly, while defendant might be in a high-risk group *ex ante*, it does not appear his age and underlying medical conditions have prevented the Bureau of Prisons from effectively managing his case of COVID-19 in his current facility.

The only factor defendant identifies as an extraordinary and compelling circumstance is the possibility that his health conditions could exacerbate a potential COVID case and the existence of the pandemic within FCI Terminal Island more generally. It is clear, however, that his underlying health conditions have not actually made his positive COVID diagnosis unmanageable. Bureau of Prisons has continued to have the resources necessary to diagnose, treat, and monitor defendant's condition. While defendant did have pneumonia at the time of his positive test result, his prognosis has been consistently improving despite any underlying health conditions. As a result, defendant has failed to show the extraordinary and compelling reasons necessary to justify releasing him 95 months early. *See United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of

contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme.")

II. <u>Defendant should not be released based on an analysis of the § 3553(a) factors</u>.

Even were this Court to find that defendant had met the burden of demonstrating extraordinary and compelling reasons for release, this Court must consider the factors set forth in 18 U.S.C. § 3553(a) as part of its analysis. *See* § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020). Here, the § 3553(a) factors strongly disfavor a sentence reduction. Those factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment;
>     (B) the need to afford adequate deterrence to criminal conduct;
>     (C) to protect the public from further crimes of the defendant; and
>     (D) to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C. § 3553(a).

**A. Nature and Circumstances of the Offense and History of the Defendant**

Defendant's motion tries to portray defendant's offense as a non-violent offense that caused essentially "no actual loss." (Doc. 198, p. 5). But as the Court noted at sentencing, defendant was "a non-productive person" who "advocated hundreds, if not thousands, of people through the years that they need not pay their taxes and support our government . . . The fact of the matter is that other people have followed [his] instruction and tutelage and have violated the law." *Sentencing Tr.* 10/22/18, p. 56-57.

**United States' Opposition to Defendant's Motion for Release**                **Page 8**

Although defendant accurately states that this is defendant's first conviction, the record makes it clear that it is not his first offense. Rather, as defendant admitted at trial, he has run his seminars advocating lawbreaking for decades. Defendant's sole method of support for years was running seminars where he tried to induce people to commit crimes. In addition to the loss in taxes to the government, defendant's own followers suffered as their credit was ruined, they lost their homes and businesses, and – like the defendant's own stepdaughter – they were arrested and convicted of crimes. *See* Doc. 155, p. 19. The Southern Poverty Law Center and the Anti-Defamation League identified the defendant as a leading sovereign citizen. *Id.* Further, defendant arguably committed a crime *after* his conviction and sentencing by willfully failing to report to prison after promising to do so.

Defendant has expressed no remorse either at trial, sentencing, or in the eighteen months since he was sentenced. Indeed, as discussed further below, defendant advertised a scheduled "seminar" for the weekend before sentencing until ordered to stop by the Court. *Competency Hearing Tr.* 9/27/18, p. 81.

> **B. The Need for the Sentence to Promote Respect for the Law and to Provide Just Punishment for the Offense**

As further evidence of his lack of remorse, defendant broke his promise to the Court and failed to report for his sentence. Despite the Court extending defendant the courtesy to remain at liberty for the three years after he was convicted of multiple felonies, defendant failed to report to prison even after telling Probation that he was aware of the reporting date. Defendant has expressed no remorse for the eight months he remained a fugitive and indeed does not address it in his motion. Releasing defendant now would significantly reward him for becoming a fugitive. In fact, it would result in defendant serving less time in prison than he was a fugitive.

In October of 2018, this Court sentenced defendant to a 120 month sentence that the Court acknowledged "may well be a life sentence." *Sentencing Tr.* 10/22/18, p. 58. Defendant became a fugitive and has now served just six months or approximately five percent of his sentence. It would be grossly unfair for the defendant to serve significantly less time than those who followed his teachings. *See United States v. Anton Paul Drago*, 2:13-cr-00334-JCM-CWH, Doc. 1 at Count Eight, Doc. 177 (D. NV 2016) (25 years); *United States v. Morris, et al*, 1:10-cr-00317-REB, Docs. 140, 588, 623 (D. CO 2012) (10 years); *United States v. Paul Ben Zaccardi*, 2:13-cr-00463-TC, Doc. 35 at Counts Seven-Nine, Doc. 110 (D. UT 2015) (4 years).

### C. Deterrence

The Sentencing Guidelines explicitly recognize the importance of deterrence in criminal tax cases. *See* U.S.S.G. ch 2, pt. T, introductory cmt. ("Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these Guidelines."). As noted above, defendant, through his seminars as well as his online writing and video appearances, is a particularly visible member of the sovereign citizen movement.

Throughout the pendency of this case and even after conviction, defendant maintained that the prosecution was illegal and that he would be vindicated. The day after his competency hearing, more than 18 months after his conviction, defendant appeared on a program called The GoldFish Report. Defendant told the public that his website and seminars "ha[ve] been suspended under threat by agents of the present government" but that once "this new government comes into effect . . . it will come back up as Solutions in Commerce." *See* https://youtu.be/vRJpvWlvbIg?t=1h6m39s.

As discussed in the Government's sentencing memorandum, defendant has been on notice that his teachings were criminal since at least 2012. Doc. 155, p. 26. Nevertheless, he did not stop advertising his seminars until so ordered by the Court in September 2018. Releasing the defendant after serving just six months of his sentence will send a dangerous message that defendant's crimes were not serious or that he has in some way been vindicated by the Court. It runs the very real risk that more people will be seduced by the defendant's teachings and end up committing further crimes.

**D. Defendant's Proposed Release Plan is Inappropriate**

Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). Here, defendant's positive COVID diagnosis poses a danger to the safety of the community and his proposed release plan fails to adequately address either the community or the defendant's own medical needs.

Defendant's motion indicates that the extent of his release plan is living in a trailer in Hurricane, Utah. The motion further states that defendant's "common-law wife and children have prepared this safe location for him to quarantine." Doc. 198, p. 8. Notably, the motion and its accompanying exhibits are silent on who exactly would be caring for defendant, the location of the trailer, or what steps would be taken to ensure the safety of defendant and the surrounding community.

The U.S. Probation Office conducted a site visit of a trailer identified by counsel on June 3, 2020.[4] The trailer currently has no running water or gas, and the ground can be seen through

---

4 Probation has informed the government that they were unaware of defendant's positive COVID test and did not take that into consideration in evaluating the appropriateness of the location or their ability to supervise defendant.

**United States' Opposition to Defendant's Motion for Release**            **Page 11**

holes in the floor.  *See* Exhibit B, p. 1.  Probation concluded these issues make the trailer currently uninhabitable.  *Id.* at 2.[5]  Defendant has provided no timeline nor plan on when or how the trailer would be repaired enough to be inhabitable.  Further, and contrary to defendant's assertion that he will self-isolate in the trailer, Probation learned that he is planning to share the trailer with two individuals, including a minor.  *Id.*  The trailer has no address and, although Charlotte Killips indicated that the neighbor whose address was provided was a good friend, the neighbor claimed not to know Ms. Killips or defendant and made a veiled threat about the number of guns he owned.  *Id.* at 1.

The motion is also silent on how defendant plans on travelling from FCI Terminal Island to Utah other than that his family "stands prepared to provide any necessary assistance for his transportation."  Doc. 198, pp. 14-15.  It does not address how defendant and any escort will travel the 429 miles through three states from FCI Terminal Island to Hurricane, Utah.  The proposed release plan does not address the mode of transportation, identify who will accompany defendant, or identify what steps will be taken to keep defendant or his escorts from spreading or being exposed to COVID-19 along the way.  If defendant elects to drive, anyone that accompanies the defendant will be exposed to many hours of close confinement with the COVID-19-positive defendant, putting their health at risk.  If defendant attempts to fly, he will encounter exponentially more people and could infect them at the airport or in the plane.

Presently, defendant is in a facility where the Bureau of Prisons is aware of his diagnosis, actively monitoring his medical condition, and providing the appropriate treatment.  Defendant

---

5 Supervisory U.S. Probation Officer Frank Davis, who conducted the site inspection, informed the government on June 4 that the trailer is not currently fit for human residence and that defendant should not be allowed to release to the location until repairs are verified.  Officer Davis also stated that he did not inspect the trailer for electricity or air conditioning, both of which he felt were essential because the daily temperature in Hurricane, Utah, can hit 110 in the summer.  Officer Davis indicated he would attempt to ascertain whether the trailer had electricity, but did not provide an update prior to the submission of this pleading.

**United States' Opposition to Defendant's Motion for Release** **Page 12**

instead proposes a release plan that potentially exposes people in three states to a positive COVID-19 case, where defendant will live in a small, currently uninhabitable trailer with no running water or heat with two other individuals. This Court recently denied a motion for compassionate release, in part, for similar inadequacies. *United States v. Houghton*, 3:14-cr-00312, Doc. 43 at 5 (June 4, 2020).6 Defendant's proposal puts the onus on U.S. Probation to monitor defendant while avoiding infection themselves and provides no assurances defendant will not become a fugitive again, potentially spreading COVID-19 to wherever he chooses to hide. It is also silent on how defendant will support himself or what medical care will be available.

Finally, defendant's risk of flight poses specific risks to the U.S. Probation Office that must supervise him, and the law enforcement officers who would be called upon to arrest him if he were to try and flee again. Far from reducing risk, defendant's proposed release plan creates more of a danger to the community, to those responsible to monitor him, and to defendant himself.

Given defendant's crimes, prior fugitive status, lengthy remaining sentence, history of adequate medical care at FCI Terminal Island, and lack of a release plan, compassionate release is not warranted in this case.

/ / /

/ / /

---

6 Additionally, while defendant Shrout does not have the criminal history of defendant Houghton, they do both share a long history of non-compliance with the law. *Houghton* at 5-6.

**United States' Opposition to Defendant's Motion for Release**            **Page 13**

## CONCLUSION

For the foregoing reasons, the Court should deny defendant's motion for early release.

Dated: June 5, 2020.

                                                Respectfully submitted,

                                                BILLY J. WILLIAMS
                                                United States Attorney

                                                */s/ Lee Langston*
                                                LEE F. LANGSTON
                                                STUART A. WEXLER
                                                Trial Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that on June 5, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorney of record for the defendant.

    _s/Lee F. Langston_
LEE F. LANGSTON
STUART A. WEXLER
Trial Attorneys, Tax Division
202-353-0036